**DOW CHEMICAL COMPANY AND SUBSIDIARIES, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 00–10331–BC.

United States District Court, E.D. Michigan, Northern Division.

March 31, 2003.

Valorie J. Gilfeather, Midland, MI, Richard C. Stark, John B. Magee, Nelson McKee, Washington, DC, for plaintiff.

Dennis M. Donohue, Joseph A. Sergi, Alex E. Sadler, Washington, DC, James A. Brunson, Bay City, MI, Nicole M. Bielawski, Maggie O'Shaughnessy, Washington, DC, for defendant.

## OPINION

LAWSON, District Judge.

Dow Chemical Company and its subsidiaries (Dow) have filed a complaint in this Court against the United States claiming that they are entitled to refunds for taxes paid for calendar/fiscal years 1989, 1990, and 1991, totaling $22,209,570, plus interest. The center of the dispute is the disallowance of deductions which Dow claimed for payment of interest on loans that were used to pay premiums on broad-based, corporate owned life insurance (COLI) policies purchased by Dow, and for administrative expenses associated with the purchase and maintenance of those insurance policies. In a very real sense, then, this case involves both death and taxes.

Dow purchased COLI policies on the lives of 4,051 of its upper management employees from Great West Life Assurance Company in 1988. In 1991, Dow purchased a group COLI policy on the lives of 17,061 employees from Metropolitan Life Insurance Company (MetLife). The premiums on these policies were financed by means of an elaborate plan to borrow from the insurer to pay premiums in the first three and eighth years of the policies. The loans were secured by the cash value of the policies. Premiums in years four through seven were paid by means of partial withdrawals of the accumulated cash value of the policies. The policy acquisition plan thus drastically minimized the initial cash outlay for premium payments.

The United States claims that because the payment of the premiums and the loans and withdrawals occurred simultaneously on the first day of each policy anniversary, and were accomplished virtually or literally simultaneously by means of netting transactions, the transactions never actually occurred and constitute factual shams. The United States also asserts that the COLI plans had no practical economic purpose apart from generating the tax deductions for the interest payments and therefore are shams in substance. The government also contends that the Great West COLI plan does not constitute "life insurance" under Michigan law because Dow did not have an insurable interest in all of the 4,051 employees insured under that plan. Consequently, the argument goes, the plan fails to comport with Internal Revenue Code § 7702(a) and therefore Dow is not entitled to any of the tax advantages afforded life insurance, particularly the deferral of tax on the "inside build-up," and the interest paid on policy loans is not deductible under Internal Revenue Code § 161. Further, the government argues that the use of simultaneous netting transactions to finance the premiums by means of policy loans and withdrawals, which it believes are factual

shams, causes the plan to fail the "four-of-seven" test set forth in Internal Revenue Code § 264(c)(1), and therefore, for that additional reason, interest deductions should be disallowed.

Many of these issues were thoroughly litigated in three prior cases, *American Electric Power, Inc. v. United States,* 136 F.Supp.2d 762 (S.D.Ohio 2001), *In re CM Holdings, Inc.,* 254 B.R. 578 (D.Del.2000), *aff'd* 301 F.3d 96 (3d Cir.2002), and *Winn–Dixie Stores, Inc. v. Commissioner of Internal Revenue,* 113 T.C. 254, 1999 WL 907566 (1999), in which the courts have found that the broad-based COLI plans constituted shams in substance. The constellation of these cases has formed a lodestar which has guided and shaped the parties' presentation of evidence; the plaintiff has endeavored to demonstrate through testimony and exhibits that its COLI plans are substantially different from the plans condemned in the prior cases, while the defendant has attempted to show that the Great West and MetLife COLI plans are virtually identical, with nearly all of the offending features of the other plans in common.

Trial began on January 8, 2002, and the proofs concluded on March 12, 2002. The Court heard the testimony of 26 witnesses and received 1,526 exhibits. The parties filed a stipulation of facts consisting of 137 separate paragraphs. Initial and amended proposed findings of fact were filed, along with post-trial briefs. The parties then presented their final arguments in open court on May 28, 2002. The following constitutes the Court's findings of fact under Federal Rule of Civil Procedure 52, followed by its application of the governing law.

## I. Background and Facts of the Case

### A. Life Insurance General Terms and Features

In its most basic form, a life insurance contract consists of an agreement by an insurance company to pay a sum of money, known as a death benefit, to the beneficiary named on the insurance policy upon the death of the insured life. In consideration of the payment of a premium, the insurance company assumes the risk that the insured will die during a fixed period of time, usually one year. The premium charged for that year is calculated based upon data which includes the age of the insured, life expectancies of individuals of that same age, the likelihood that individuals of that age will die during that year, and the amount of the death benefit. If there are no other features to the insurance contract, this kind of insurance coverage is known as term insurance or "pure insurance," and the charge associated with assuming the risk of premature death of the insured during that period is called the cost of insurance (COI). Because the likelihood of death increases as age advances, the COI for renewable term insurance becomes increasingly expensive as an insured grows older.

The insurance industry over the years has developed products that ameliorate the high cost of term insurance in the later years. "Whole life insurance" is a form of cash value insurance that is designed to provide coverage over the course of one's entire life, which is typically calculated at 95 years. A level, annual premium in excess of the cost of insurance is charged. The excess premium is invested by the insurance company so that the insurance policy accumulates "cash value," which consists of the accumulation of the excess premiums and earnings. The earnings are referred to as "inside build-up." If the insured dies, the cash value is paid out as part of the death benefit. As the insured advances in age, the cash value becomes an increasingly larger component of the total death benefit, and the pure insurance

element correspondingly decreases, thereby moderating the COI.

In a typical whole life insurance policy, the annual premium is comprised of the COI, an excess amount which is invested for the purpose of accumulating cash value, charges for expenses such as policy administration and commissions, and a profit for the insurance company. The COI element of the premium is based in part on calculations using complex actuarial formulae which endeavor to quantify the risk of mortality of an insured in relation to a given population. Information concerning rates of death generally comes from statistical studies and compilations by actuaries who assess the mortality experience of a given population. The results are assembled in mortality tables. In some circumstances, the actual mortality experience of an insurance company, that is, the frequency of the incidence of death among actual policy holders compared to the expected mortality of the comparator population, can determine the profitability of an insurance company. Another component of profitability comes from the performance of the insurance company's investment of excess premium. However, an insurance company may choose to share favorable mortality, expense, and investment experience with its policy holders by paying dividends when this experience outperforms expectations. Insurance policies which have this feature are known as participating (par) policies. Those without this feature are known as non-participating (non-par) contracts. Generally, in whole life policies the expense and pricing components of the premiums and, in par policies, dividends formulae, are not revealed to the policy holder.

In some cash value insurance policies, the policy holder has a contractual right to access the cash value. This may occur in the form of loans from the insurance company which are secured by the cash value of the policy. The insurance company charges interest, usually at a rate in excess of the rate of return paid on the investment principal of the contract. The rate of return on the investment portion of the insurance premium is known as the "credited rate." The amount of interest charged on the policy loan is known as the "loan rate." The difference between the loan rate and the credited rate is called the "spread," which can be established or adjusted to serve a variety of payment and financing goals. If an insured dies, a portion of the death benefit is used to pay off the loan and outstanding interest charges.

The policy holder may also access the cash value of the policy in certain insurance contracts by partial withdrawals, or "partial surrender," of the policy. Partial withdrawals need not be repaid, but there is a corresponding reduction in the death benefit of the policy.

When the cash value of the policy reaches a point where the return on investment covers the COI required to satisfy the death benefit along with the accumulated cash value and the expense of administration, the policy is considered "paid up" and no further premiums are due. Some policies are designed to require premium payments throughout the insured's "whole life," while others, such as the policies in this case, may compress the payments by requiring a larger premium for a lesser number of years for the same death benefit. Some par policies include a feature that dividends declared are used to purchase "paid-up additions" which increase the amount of the death benefit.

In the late 1970s, the insurance industry developed a "universal life" policy, which is a cash value policy in which all of the economic components are "unbundled," or revealed, to the policy holder. The development of universal life policies

and the unbundling of economic components stimulated the development of different life insurance products that could address varying investment goals and returns for individual policy holders. For example, a younger individual who wants to purchase a maximum death benefit for a finite period of years may elect to purchase term insurance. Someone who wants a very low premium but permanent protection may elect to purchase a whole life insurance policy with limited borrowing features. A person who intends to use an insurance policy as a savings vehicle may elect to purchase a universal life policy which includes a partial withdrawal feature. An individual who wants to use his insurance policy as a source of funds may look for an insurance contract which permits borrowing and partial withdrawals. The insurance industry has developed products over the years to accommodate all of these goals.

Insurance contracts are highly regulated at the state level, and the standard policies, or "forms," themselves are submitted to state regulators for approval. Policy forms may be approved as individual policies—i.e., contracts which insure a single life—or as group policies. Under a group policy form, a single policy can provide insurance on the lives of several individuals. Insurance provided to several employees as a benefit of employment frequently takes the form of a group contract, with the corporation owning the policy and the employees designating their respective beneficiaries. Some states, including Michigan, as will be explained later, limit the range of group insurance contracts in which corporations may be named as beneficiaries.

### B. Tax Treatment of Life Insurance and Changes in Tax Law

It has been a long-standing feature of Congressional tax policy that the death benefit of insurance policies is not subject to income tax. *See* IRC § 72, 101(a). In addition, the inside build-up is tax deferred, and if paid out as a death benefit it is non-taxable. *See id.* Policy withdrawals are treated as coming first from basis and then from earnings, so withdrawals up to basis are likewise not taxable. *See id.*

The proceeds from loans secured by the cash value of insurance are, of course, not taxable since they do not constitute "income." *See* Internal Revenue Code (IRC) § 61 (not listing loan proceeds as gross income); *United States v. Ivey,* 414 F.2d 199, 202–03 (5th Cir.1969). Furthermore, interest paid on these loans in the past has been tax deductible, although Congress has curtailed and ultimately eliminated the interest deduction. In 1964, Congress amended IRC § 264 to limit interest deductions on loans used "to purchase or carry a life insurance ... contract ... pursuant to a plan of purchase which contemplates the systematic direct or indirect borrowing of part or all of the increases in the cash value of such contract." Pub.L. 88–272 (1964); IRC § 264(a)(3). Deductions were still allowed where "no part of 4 of the annual premiums due during the 7–year period (beginning with the date the first premium on the contract to which such plan relates was paid) is paid under such plan by means of indebtedness." IRC § 264(c)(1). In 1986, Congress once again amended section 264 to allow interest deductions only on the first $50,000 borrowed and secured by the cash value of a policy. *See* Pub.L. 99–514, § 1003, 100 Stat.2085 (1986). Congress eventually eliminated the interest deduction altogether when it enacted the Health Insurance Portability and Accountability Act of 1996 (HIPA), Public Law No. 104–191, 110 Stat. 1936 (1996).

### C. COLI in General

Traditionally, individuals purchased policies insuring their own lives naming other

persons or entities as the beneficiaries designated to receive the death benefit upon the death of the insured policyholder. In earlier times, it was not uncommon for strangers to purchase insurance on the lives of prominent people, in effect wagering on the likelihood of their premature death. *See Crossman v. Amer. Ins. Co. of Newark, N.J.*, 198 Mich. 304, 308, 164 N.W. 428, 429 (1917). The concept of "insurable interest" arose to curb this disturbing trend. Generally speaking, an "insurable interest" is "a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit or advantage from the continuance of the life of the assured." *Warnock v. Davis*, 104 U.S. 775, 778–79, 26 L.Ed. 924 (1881) An individual is presumed to have an insurable interest in his or her own life. 3 *Couch on Insurance*, § 41.19 (1995). Likewise, it has long been recognized that corporations have an insurable interest in their important employees, supporting the development of so-called "key person" insurance in which a corporation purchases insurance on its employees' lives naming the corporation as the beneficiary. 3 *Couch on Insurance*, § 43.13. The death benefit provides economic protection against the untimely death of employees important to the success of the business. In these plans, the insured neither names the beneficiary nor owns the policy. Rather, it is "corporate owned."

Because of the favorable tax treatment of death benefits and inside build-up, corporate-owned life insurance on the lives of key employees was marketed and sold as an investment vehicle. Proceeds were commonly used to fund deferred compensation and other employee benefit plans. In addition, the industry developed plans to leverage the purchase of such insurance by borrowing from the insurance company, using the cash value of the policy as collateral, and using the loan proceeds to pay the annual premiums. Large cash value policies were marketed on the tax arbitrage opportunity based on the deductibility of policy loan interest. When Congress limited the interest deduction to policy loans of $50,000 or less, insurance entrepreneurs marketed COLI policies which insured a broader employee base, taking advantage of a national trend recognizing an employer's insurable interest in lower-level employees. Contributing to the desirability of these plans was the concept of "aggregate funding," i.e., using the cash generated by the policy or group of policies to fund entire programs, rather than simply tying the policy's death benefit to the benefit costs of a specific insured individual. In many circumstances, the financial success of these broad-based COLI plans relied on the favorable tax treatment of cash value life insurance—that is, tax-exempt death benefits, tax deferral of inside build-up, and the deductibility of policy loan interest—rather than the economic gain solely from premature mortality of the insured employees.

In prior challenges to broad-based, highly leveraged COLI plans, the United States has not assailed the taxpayers' reliance on and utilization of tax benefits afforded by the treatment of death benefits and inside build-up. The broad-based COLI plans that have been under attack are those in which the government has argued that the taxpayer will derive no economic benefit from the plan absent the tax deductions on policy loan interest. In fact, it is the absence of the likelihood of profit from mortality and the stripping of cash value which has made those plans suspect and susceptible to the economic sham argument, as is described in the *AEP, CM*, and *Winn–Dixie* cases. The government claims that Dow's two COLI plans suffered the same infirmities.

758

### D. The COLI Plans in AEP, CM Holdings and Winn–Dixie

The insurance policies involved in *Winn–Dixie, CM Holdings, and AEP,* were all characterized as highly leveraged, broad-based COLI plans, which combined large, front-loaded premiums and liberal access to quickly accumulating policy cash value. The cash from the policies accessed by a combination of loans and other distributions (partial withdrawals and dividends) was used to pay premiums and loan interest charges. The respective corporations owned the policies and were named as beneficiaries for the death benefits.

#### 1. Winn–Dixie Stores, Inc., v. Commissioner of Internal Revenue

In *Winn–Dixie,* the taxpayer purchased insurance on the lives of nearly all of its 36,000 full-time employees. Annual premiums were charged in the amount of $3,000 per insured payable in years one through fifteen, with the amount of death benefit varying depending on the age of the insured. For the first three years, approximately 93% of the premium was paid by means of loans secured by policy cash value. Winn–Dixie elected an option in which interest was charged at a variable rate equal to Moody's high-risk bond average (Moody's BAA) instead of a lower fixed-term rate that was offered, and the borrowed cash value was credited with earnings at 40 basis points below the loan interest rate. This amounted to a 10.66% return on borrowed funds in the first year, yet the crediting rate on unborrowed funds was 4%. Based on pre-purchase 60–year projections, the Court found that Winn–Dixie would pay premiums and loan interest primarily through partial withdrawals of cash value in years four through seven, and then continue borrowing to pay loan interest throughout the remaining policy years. In the first four years, the amount of the premium actually paid in cash roughly approximated the insurance company's COI plus expense charges. The same projections demonstrated that the net pre-tax cash flow generated by the plan was a negative $682 million; however, when accounting for policy loan interest deductions and assuming a 38% tax bracket, Winn–Dixie would realize over $2 billion in positive cash flow over the life of the plan. The policies issued by AIG Life Insurance Company also contained a provision establishing a "claims stabilization reserve" which effectively limited the ability to profit from mortality charges. The policies allowed for partial withdrawals and borrowing up to net cash value, with the death benefit applied first to retire any outstanding policy loans. After the passage of HIPA which eliminated tax deductions for COLI interest payments, Winn–Dixie cancelled its policies with AIG.

The Tax Court found that the loan and other premium-financing transactions "actually occurred," and therefore confined its analysis to whether the plan constituted a sham in substance. 113 T.C. at 278, 1999 WL 907566. In examining the overall transaction, the Court concluded that since there was no reasonable basis for Winn–Dixie to expect to profit from death benefits due to the ameliorating effect of the claim stabilization reserve, and policy cash value was relatively small throughout the projected life of the plan, the deduction of policy loan interest payments was "clearly the dominant element" of the plan. *Id.* at 281, 1999 WL 907566. Without the benefit of interest deductions, the plan yielded substantial negative cash flow in each of the sixty years. The plan was economically viable only as long as Winn–Dixie's "appetite for interest deductions remains large," and tax considerations "permeated" the pre-purchase analyses. *Id.* at 288,

1999 WL 907566. Finding that consistent pre-tax negative cash flow "precludes any economic value, economic significance, economic substance, or commercial substance other than the tax benefit," the Court concluded that the plan was a sham in substance. *Id.* at 290, 1999 WL 907566.

### 2. *In re CM Holdings, Inc.*

In *CM Holdings*, the COLI policies were "designed to be owned on a broad base of employees, to be financed through a highly leveraged transaction, and had to provide the policyholder with a positive cash flow in every year of the policy." *CM Holdings*, 254 B.R. at 582–82. The COLI policies, known as the "COLI VIII Plan," were issued by Mutual Benefit Life Insurance Company (MBL) to Camelot Music, Inc., a wholly owned subsidiary of CM Holdings, and carried a fixed annual premium of $10,000 payable in years one through nine for each of the policies purchased on 1,431 employees (one policy was later rescinded). The death benefits increased over time, varied based on the issue age of the policies on each individual insured, and the policies had several cash-access and transparency features of universal life policies. Camelot paid $1 million of the $14 million in cash for the first-year premium. The balance of the premium, or approximately 93%, was paid by policy loans. Camelot financed the second and third year premiums and accumulated loan interest charges in the same fashion.

Camelot continued to take policy loans in the second and third years to pay approximately 90% of the annual premiums. *Id.* at 593. The other 10% of the annual premiums was paid in cash. *Id.* at 593. The policy loan interest in these years was paid by taking additional policy loans. *Id.* at 607. The premium payment and loans occurred in simultaneous netting transactions in which the amount of the policy loan was deducted from the gross

premium, the payment of which was the basis for the cash value which secured the loan. The amount of the premium which Camelot elected was designed to create first-day, first-year cash value that earned interest at the crediting rate, which Camelot elected to be indexed to Moody's BAA enhanced rate. This election in turn determined the policy loan interest rate, because Camelot chose a variable rate calculated at 100 basis points above the crediting rate for borrowed funds.

Customarily in cash value policies, the annual premium less an expense charge and the COI is added to the policy's cash value. The expense charge is a percentage of the premium set aside to cover commissions and other administrative costs, and may include a "margin" which is intended as a hedge against higher than anticipated costs. The expense charge is typically between 5% and 8% of the annual premium, including the margin which is intended to reasonably relate to the risk that higher than anticipated charges will materialize. In *CM Holdings*, the annual premiums and loan interest payments in years four through seven were financed by cash, partial withdrawals, and a device called a "loading dividend." *Id.* at 593. By design, 95% of the gross premium was taken as an expense charge, known as the "loading charge." *Id.* at 593. In actuality, the expenses were between 5% and 8% of the gross premium. *Id.* at 593. The difference between the "loading charge" and MBL's actual expense charges generated excess funds in the policies which resulted in the payment of a "loading dividend," which amounted to about 92% to 95% of the loading charge. *Id.* at 594. In simultaneous netting transactions, the loading dividend was used to pay the premium. *Id.* at 593. A partial withdrawal was taken in an amount equal to about 99% of the policy loan interest payment and used to

make that payment. *Id.* at 593. The Camelot COLI VIII policies did not limit the amount of policy value that could be taken as a partial withdrawal. *Id.* at 594. Camelot paid the balance of premiums (about 5%) and loan interest payment (about 1%) in cash. *Id.* at 593.

Although Camelot originally planned to take policy loans in years eight and nine, those loans were never taken. *Id.* at 592 n. 16. During the first eight years, $31.3 million in policy loan interest accrued. *Id.* at 607. Camelot paid $12 million, or about 40% of the policy loan interest, in cash. *Id.* at 607.

Cash value was stripped from the Camelot COLI VIII policies by means of a highly efficient computer program designed to achieve zero net equity on the last day of each policy year, *id.* at 595, such that the net equity of the policies "would not exceed one penny." *Id.* at 631. Moreover, the Camelot COLI VIII plans were designed to be "mortality neutral." This meant that the

> cumulative COI charge paid by Camelot was anticipated to equal the cumulative death benefit that would be distributed to Camelot, with the exception of a profit margin to the insurance company of 20% of the COI charge in the first plan year, 10% in the second plan year, and 2% thereafter.

*Id.* at 632–33 (footnote omitted). Although so designed, the Camelot COLI VIII plan did not operate in a mortality neutral way. *Id.* at 633. Over the first seven years, Camelot received death benefits and mortality dividends $1.3 million higher than its COI. *Id.* at 633–34. This was the result of pooled dividends in the first three policy years and a combination of pooled and experience-rated dividends in the fifth policy year; the experience-rated dividend was totaled only $293, all received in the fifth policy year. *Id.* at 634–35. In that

fifth policy year, the Camelot COLI VIII plan moved to an experience-rated approach. MBL explained that

> [t]he new mortality mechanism will result in a much closer match between the expected cash flow from projected death benefits and claims that are actually paid. This will minimize any volatility or variation in the cash flows and corporate earnings which are expected in each year of the plan.

*Id.* at 635.

With the passage of HIPA in 1996, Camelot stopped paying premiums and allowed the policies to function as paid-up policies for a reduced amount of death benefit coverage. *Id.* at 641. This resulted in a $30 million reduction in death benefits causing a $30 million partial withdrawal which forced all of Camelot's taxable policy gain out of the policies. *Id.* at 641.

Albeit cleverly designed, the COLI VIII plan ran afoul of the governing case law concerning so-called "shams in fact" and "shams in substance," according to the district court. *Id.* at 598. Although the policy loans used in the first three years and the interest accrued on them were found to possess factual substance, the loading dividends used in years four through seven of COLI VIII did not fare so well. In order to calculate the dividend amounts, the policies charged administrative fees considerably out of proportion to the actual costs incurred. Furthermore, instead of distributing the dividend from accumulated surplus, the policies "sourced" their dividends from excessive loading charges which were instantaneously offset against payment of the premium. The lack of any contributions to the dividends from investment yields was also suspicious. The district court was also troubled by the payment of the dividends at the beginning of the policy year, rather than the industry-standard practice of paying at the end of

the year. The legitimacy of the dividends was further compromised by the fact that they were guaranteed, not contingent. Topping it off, the designers of the COLI plan did not treat the dividends as a liability on its balance sheets. The combination of all these factors provided "overwhelming evidence" to the district court that the loading dividends were factual shams. *Id.* at 617–20.[1]

The district court further concluded that the COLI plan, as a whole, was a sham in substance that lacked any rational economic purpose other than the creation of tax savings through interest-payment deductions. The court's determination centered on two factors: "the objective economic substance of the transactions and the subjective business motivation behind them." *Id.* at 621 (citation and internal quotation marks omitted). From the objective standpoint, all of the pre-purchase illustrations projected Camelot's cash flows to be negative absent the interest deductions in all years of the plan and in the aggregate. In addition, projections considered by the court, when discounted to present value, made it clear that the plans generated negative cash flow absent the interest deductions and positive cash flow only when those deductions were considered. This conclusion was bolstered by the economic neutrality of the plans, which were designed to preclude any cash build-up in the policies. Rather, any value received was immediately stripped from the policies in the form of loans or dividends. Similarly, the policies' focus on "mortality neutrality"

meant that there was no risk involved for either party with respect to the disbursement of death benefits, unlike traditional insurance contracts. *Id.* at 637.

Camelot's subjective intent in adopting the COLI plan did not salvage the transactions. Although the court saw no reason to discredit Camelot's explanation that it purchased the COLI policies to offset the cost of medical benefits, that alone was not sufficient to confer economic substance on what was otherwise an "economically empty transaction." *Id.* at 638. Camelot's position was also undermined by evidence indicating that the interest deductions played a crucial role in convincing Camelot to purchase the policies, and by management's awareness prior to purchase that the policies could not be profitable on a pre-tax basis. *Id.* at 639–41.

The district court further concluded that Camelot could not save the deductions taken in years one through three via the four-of-seven safe harbor provided by I.R.C. § 264(c)(1), which permits deductions on policy loans taken from life insurance policies as long as "no part of 4 of the annual premiums due during the 7-year period (beginning with the date the first premium ... was paid) is paid under such plan by means of indebtedness." 26 U.S.C. § 264(c)(1). The court concluded without contest by the policyholder that the statute implied that the premiums paid must be level throughout the seven-year period. *Id.* at 645. Once the court deducted the portions of those premiums that were "paid" by loading dividends, the remaining

---

**1.** It is worth noting that the Third Circuit disagreed with this finding on appeal, although it did affirm the judgment on the basis that the policies were nevertheless shams in substance. *In re CM Holdings*, 301 F.3d 96 (3d Cir.2002). Although the nature of the loading dividends—made contrary to industry practice—provided evidence that the dividends were part of a larger *substantive* sham,

the Court concluded that the circular netting transactions culminating in loading dividends were no less real than the circular netting transactions culminating in policy loans that the district court approved. *Id.* at 108. Because in both cases the transactions "actually occurred," they could not be considered factual shams. *Id.* (citation omitted).

amounts actually paid were substantially lower that those paid in previous years with the aid of the policy loans (which were found not to be factual shams). The result was that the effective amount of the premiums paid was not truly level throughout the first seven years of the policy, and the taxpayer could not take advantage of the safe harbor of Section 264(a)(2), which otherwise precludes deductions for premium financing arising from a corporate life insurance plan "which contemplates the systematic direct or indirect borrowing of part or all of the increases in the cash value" of the policy. Having violated the implicit requirement that premiums remain level, the interest deductions taken for the first three years of the policies were also invalid. *Id.* at 646–47.

### 3. American Electric Power, Inc. v. United States

The COLI plan at issue in *AEP* was almost identical to the one considered in *CM Holdings. See AEP,* 136 F.Supp.2d at 768–69. In that case, the plaintiff, American Electric Power Company, purchased COLI policies on its employees' lives intending to offset the effect on its earnings reports of new accounting requirements for expensing post-retirement medical benefit obligations. Although the death benefit of each policy varied according to the age of the employee, the other terms were identical. *Id.* at 774. Each policy in the plan provided fixed, annual premiums of $16,667 that were designed to permit the accumulation of $50,000 in cash value within three years.

Over the first three years, AEP would pay approximately ninety percent of the premiums through policy loans "in simultaneous netting transactions in which the loans were offset against the premiums." *Id.* at 776. This structure allowed AEP to pay approximately $23.5 million in cash, including administration fees, for premi-

ums costing $330 million. That $23.5 million, in turn, would be offset by deductions for interest paid on the policy loans and the receipt of tax-free disbursements in the amount of $10.8 million. AEP thus ended up with $3.5 million of *positive* cash flow in the plan's first year, rising to $3.9 million in the second year, $10.5 million in the third year, and more than $35 million after eight years. *Id.*

After the third policy year, borrowings to pay premiums approached the $50,000 policy loan limit of I.R.C. § 264, so premium payments and accrued loan interest were paid using dividends and partial withdrawals in simultaneous netting transactions once per year. Ninety-five percent of each premium was considered an expense charge by the insurer, and the remainder was returned to AEP as a "loading dividend." *Id.* No premiums were due from that point forward, although the policy loans remained outstanding and generated more than $100 million of interest expense each year, offset by cash withdrawals which stripped excess cash from the policies, resulting in zero net equity. Through year 20, positive cash flows of $35 million to $39 million were projected, after the tax deductions were taken into account.

In addition, the court found that these policies were "mortality neutral," since there was no risk to either party that the amount of death benefit paid would vary from the COI. This was achieved by means of an annual dividend that would refund excess monies after any year that morality "prove[d] more favorable to the [insurance] company than expected." *AEP,* 136 F.Supp.2d at 777.

The net effect of these structures was to create a scheme in which policy payouts would exactly offset the premiums paid less a fixed profit for the insurer. The *AEP* Court agreed with the *CM Holdings*

Court that this design was problematic. First, although the Court agreed that the loading dividends in years four through seven could be workable, the mortality neutral design of the COLI scheme eliminated any "reasonable relationship to the insurance company's risk of incurring higher than expected expenses." *Id.* at 782. Second, the *AEP* court agreed with *CM Holdings* that the Code's "four-of-seven" rule required the premiums to be level in all events. Third, the AEP COLI plan as a whole was an economic sham because its neutrality on mortality and absence of excess cash in the policy gave it no "practicable economic effect other than the creation of income tax losses." *Id.* at 785 (quoting *Rose v. Comm'r*, 868 F.2d 851, 853 (6th Cir.1989)).

Finally, although the court determined that simultaneously borrowing against the policy and paying that year's premiums with those loan proceeds was not a factual sham, the first-year loans were suspiciously backdated in a manner inconsistent with industry practice. When AEP decided to participate in the Mutual Benefit Life Insurance (MBL) COLI VIII plan, it signed prepayment agreements on February 16, 1990 that allowed AEP to purchase COLI on its employees between that date and the date the policies were finally issued. The policies were issued on March 23, 1990, and MBL originally calculated March 23, 1990 as the inception date for the policies. Because using the March date cost it almost $2 million in deductions, AEP complained, and Integrated Administration Services (IAS), which was administering the program for MBL, responded by backdating the inception date to February 16, 1990, when the prepayment agreements were signed. The Court found this to create a sham in fact with respect to interest "accrued" between February 16 and March 23, 1990 because loans were never issued during the prepayment period, and

AEP paid no interest during that time. Furthermore, since the policies were considered to have been issued to a grantor's trust on March 21, 1990, the trust became liable for debt that predated its existence. *Id.* at 781–82. The court brushed off, with little explanation, AEP's contention that these sort of "bridge" agreements were common in the life insurance industry for applicants who wanted to be protected while the policy was being considered and processed:

> While there was evidence presented showing that it is common in the life insurance industry to issue a conditional receipt at the time of taking an application for life insurance and to provide death benefit coverage from the date of the receipt—after it has been determined that the insured meets the company's underwriting requirements— there was no evidence presented of a custom or practice to backdate policy loans in the manner in which it was done in the instant case. The court concludes that the manner in which IAS originally intended to calculate the first-year policy loan interest is more likely the industry norm for a transaction of this kind.

*Id.* at 782.

Thus, in these three cases, the courts generally determined that the COLI plans constituted economic shams, functioning only as interest-deduction engines that drove no legitimate financial vehicles. The courts pointed to artificially high loan interest rates which had no practical adverse effect on the borrower because the fixed spread correspondingly drove up the supercharged credited rate on borrowed funds; relatively small interest rates on unborrowed funds to discourage leaving cash in the policies; the elimination of mortality risk by means of fully retrospective, annual equalization of COI and death benefit payments; the use of unconven-

tional "loading dividends" as a means of paying premiums in four of the first seven years; an exquisitely efficient computer program which stripped virtually all equity from the policies year after year; and prepurchase illustrations which showed only negative cash flows without the tax deductions in each of the policy years through the duration of the programs. These courts concluded that there could be no profit on premature mortality because of the retrospective adjustment which eliminated mortality risk in advance, and no return on inside build-up because all the cash was stripped from the policies throughout the program.

As will be explained in greater detail below, the COLI plans purchased by Dow were similar, although not identical to, the COLI plans in the cases described above. They all involved cash value policies that compressed the premium payments into a relatively short period, they called for a highly-leveraged premium financing strategy that avoided policy loans in years four through seven, they all carefully monitored the relationship between COI and the actual death benefit payout, and they all were used to fund in the aggregate future corporate benefit obligations. There are critical differences in Dow's plans, however, which preclude finding that the plans are factual shams. The Court concludes that there was an economic benefit that potentially could be derived from the plans without relying solely on the tax deductions for policy loan interest. As will be explained, Dow articulated a legitimate purpose for embarking on the programs: providing a source of cash to cover unfunded future medical obligations for its retirees. Dow had turned to similar devices in the past, albeit on a much smaller scale, to cover contingent liabilities.

### E. Dow's 1983 and 1985 COLI Policies

In 1983, Dow purchased 89 COLI policies from Connecticut General Life Insur-ance Company (CIGNA). Stip., ¶ 28. Purchased on senior executive-level employees, including Dow's President, its Chief Executive Officer, its Executive Vice Presidents, and a number of Senior Directors, the policies, dated December 1983, were intended to provide a funding source for deferred compensation obligations Dow had to those employees. Stip., ¶ 28. These policies were purchased to protect Dow from financial damage in the event of loss of its key employees' unique knowledge and expertise and to offset unfunded liabilities that Dow had to the insured employees. Pierce, Tr. at 4276, 4328. The premiums and death benefit varied for each policy according to the salary level of the insured employee. Pierce, Tr. at 4278–80; Ex. D970. Dow paid the annual premiums for the first, fifth, sixth, and seventh policy years in cash; annual premiums for the second, third, and fourth policy years were paid using policy loans. Pierce, Tr. at 4281; Ex. D970. Neither first-day, first-year policy loans nor partial withdrawals were taken with these policies. Pierce, Tr. at 4281; Ex. D970. These policies were acquired and subsequently monitored by Dow's Human Resources department. Falla, Tr. (1/9 a.m.), at 32–33. In 1988, Clark/Bardes, Inc. (Clark/Bardes), a broker, took over administrative support for the CIGNA policies. Stip., ¶ 29.

In 1986, Dow purchased 52 COLI policies from Great West Life Assurance Company (Great–West). Stip., ¶ 30. These policies, dated November 10, 1985, were purchased on senior executive-level employees to offset Dow's unfunded deferred compensation liabilities to those employees. Stip., ¶ 30; Pierce, Tr. at 4334; White, Tr. (1/10 a.m.), at 12. These policies were individual, traditional, participating, whole-life, paid–up–at–age–95 base policies with an attached rider. Ex. P91.

Level annual premiums were payable at issue and continued until age 95. *Ibid.* Like the 1983 COLI program, the annual premiums and death benefit on the 1985 COLI policies varied according to the salary level of the insured employee. Pierce, Tr. at 4285–87; Ex. J1191. Dow paid the annual premiums for four out of the first seven policy years in cash; annual premiums for the other three policy years were paid using policy loans. Pierce, Tr. at 4281. Neither first-day, first-year policy loans nor partial withdrawals were taken with these policies. *Id.* at 4292. The purchase of these policies was again handled by Human Resources; however, Clark/ Bardes provided the administrative support for the management of the policies. Stip., ¶ 31.

Both the 1983 CIGNA and apparently the 1985 Great–West COLI policies provided for a variable loan interest rate based on Moody's Corporate Average. Ex. J11; Ex. P91. Moody's Corporate Average is a long-term index which approximates the rate of return earned on assets invested by insurance companies. By charging interest at the Moody's Corporate Average rate, an insurer avoids discrimination between its borrowing and non-borrowing policyholders and protects the insurance company from the risk of disintermediation, that is, the risk that a policyholder will borrow cash from the insurance policy at below market rates when returns on investments are considerably higher than the policy loan rate. Todd, Tr. at 636–37; Puglisi, Tr. at 5276–77, 5278; DesRochers, Tr. at 35970–98, 3599; Hoag, Tr. at 6205–06. Also, by using Moody's Corporate Average as a borrowing rate for policy loans, an insurance company decreases the sensitivity of the insurance company's financial statements to policyholder borrowing. Plotkin, Tr. at 4085–86; DesRochers, Tr. at 3598.

The cash flows generated by the 1983 and 1985 COLI programs were not segregated as specific pools of funds for the purpose of offsetting Dow's unfunded liabilities to the employees insured; rather, the cash flows generated were fungible and could have been used for any corporate purpose. Pierce, Tr. at 4328, 4334. Dow's interest deductions relating to the 1983 CIGNA and 1985 Great–West COLI policies were not challenged by the IRS. Pierce, Tr. at 4335.

### F. Dow's Purchase of the Great West COLI Policies

### 1. Dow's Business Purpose: Mounting Employee Retirement Medical Expenses

The 1983 and 1985 COLI programs were purchased to fund deferred compensation obligations. In 1982, Dow retained an outside consulting firm, Watson Wyatt Worldwide (Wyatt), to calculate the present value costs of its future liabilities for retiree benefits and the annual contribution required to fund those benefits. Ex. J7; J9; Falla, Tr. (1/8 a.m.) at 121. For each dollar Dow pays an average employee in salary, it pays that employee an additional 22 to 25 cents in benefits. Falla, Tr. (1/18 a.m.) at 115. The estimated present value of Dow's accrued post-retirement life and medical plan liabilities in 1983 was approximately $500 million. Ex. J9; Pierce, Tr. at 4336. The estimated liabilities rose to over $1 billion by 1987. Ex. J73. The increase was the result of the escalating cost of benefits and the significant increase in the utilization of medical, health, and life insurance benefits. Falla, Tr. (1/8 a.m.) at 117, 123; Lake, Tr. (1/10 p.m.) at 85. Dow executives worried that Dow might no longer be able to offer post-retirement benefits to its employees unless it found a way to fund these costs. White, Tr. (1/10 a.m.) at 65.

In 1983, Wyatt assigned Gary Lake as Dow's actuarial consultant. Lake, a member of the American Academy of Actuaries since 1977, started at Wyatt in 1973 and became its national resource on COLI-related matters, advising approximately fifty clients. As Dow's actuarial consultant, Lake assisted Dow in evaluating whether COLI was a viable means for funding the employee benefit obligations identified, educated Dow as to insurance products and risks inherent in COLI, and helped develop specifications to solicit and compare bidder's proposals. Lake, Tr. (1/10 p.m.) at 73-74, 78. Lake advised Dow on its purchase of all its COLI programs: the 1983 CIGNA and 1985 Great-West, as well as the two COLI programs in this case.

### 2. Changes in Accounting Requirements for Retiree Medical Expenses

Prior to 1989, Dow accounted for its retiree medical benefits on a pay-as-you-go basis. Falla, Tr. (1/8 a.m.) at 116-17; Brink, Tr. at 2398-99. In February 1989, the Financial Accounting Standards Board (FASB) issued Exposure Draft 105, Employer's Accounting for Post Retirement Benefits Other than Pensions. If implemented, this document would have required employers to accrue current liabilities for retiree medical and life insurance benefits on a current basis for the purpose of their financial statements. Stip., ¶ 32; Lake, Tr. (1/10 p.m.) at 81. Exposure Draft 105 would have required Dow to accrue $1.6 billion as the present value of its accrued retiree medical liabilities in 1989. Stip., ¶ 33. In December 1990, the FASB issued FASB Statement No. 106 (FAS 106), Employer's Accounting for Post-Retirement Benefits Other than Pensions. FAS 106 adopted the requirements of Exposure Draft 105, effective for fiscal years beginning after December 15, 1992.

Stip., ¶ 34. A 1991 calculation placed Dow's accrued retiree medical liabilities at $1.34 billion. Ex. J411.

Dow adopted FAS 106 effective January 1, 1992. Stip., ¶ 35. In making the transition to this accounting standard, Dow took an after-tax charge of $994 million against its 1992 income for unfunded retiree obligations with a net present value of $1.45 billion accrued to date. Ex. J641. The liability continued to grow. Ex. J722 ($1.54 billion in 1993); Ex. J774 ($1.62 billion on January 1, 1994).

### 3. Requests for Proposals (RFP)

Dow officials decided to explore COLI as a means of funding these liabilities and, as before, turned to Gary Lake for advice. The "kick-off" date for the exploratory project, as Lake referred to it, was April 1, 1987. Because the Human Resources Department acquired Dow's other COLI policies, Loren Pierce, Dow's Manager of Executive and International Benefits at the time, was approached by Clark/Bardes about a new version of corporate-owned life insurance on the market, known as "COLI III," to fund various employee benefit liabilities. Ex. J12; Ex. J14; Pierce, Tr. at 4303-04. In April 1987, Dow, assisted by Lake, initiated a review of COLI as a potential funding vehicle for Dow's post-retirement liabilities. Ex. J58; Lake, Tr. (1/14 a.m.) at 5.

On May 28, 1987, Pierce wrote a memo inviting various Dow employees to a presentation on COLI III, noting that "COLI III is a significantly different product than we have previously seen and is becoming more of an investment than benefit funding mechanism; thus we thought more financial people should hear about it." Ex. P5; Falla, Tr. (1/8 a.m.) at 137-40. The proposed transactions involved large and complex financial issues, but also addressed liabilities with which Human Resources was familiar. Nevertheless, be-

cause COLI was described as more of an investment than a benefit funding mechanism, Pierce contacted representatives from Dow's Treasury Department. Ex. P5; Falla, Tr. (1/8 a.m.) at 140; Pierce, Tr. at 4337–39.

That spring, Lake conducted a two-step evaluation of COLI for Dow. In step one, he evaluated Dow's accrued post-retirement benefit liabilities; in step two, he helped Dow evaluate COLI as a potential funding vehicle for the liabilities. Ex. J55; Ex. J60; Lake, Tr. (1/10 p.m.) at 92. Lake made a side-by-side comparison of the net present value of the benefit liabilities and the projected after-tax cash flows of a COLI program, even though this was not necessary because the benefit liabilities far exceeded the projected earnings. Lake, Tr. (1/10 p.m.) at 93; Lake, Tr. (1/14 a.m.) at 15–16.

Between June 12 and August 25, 1987, Dow employees heard three presentations on COLI III. The June 12, 1987 presentation by Clark/Bardes detailed the then-recent amendment to I.R.C. § 264 which limited interest deductions to $50,000 of policy loans per employee. Ex. J65. The participants at the meeting also discussed future tax law changes, likely insurance carriers for Dow to consider, and issues to consider in the decision-making process. Ex. J65.

On August 4, 1987, a representative for Management Compensation Group (MCG), a broker, gave a presentation regarding a COLI product offered by Mutual Benefit Life. Ex. J71. After this presentation, Dow representatives made two decisions:

1) Proceed with COLI for [approximately] 1200 employees in the MIP [Management Incentive Program]. This will likely be done through Clark Bardes with Conn. Mutual since forms that were signed by employees contemplate this.

2) The new COLI concept with MCG will be investigated for up to 4 or 5,000 additional employees strictly as an investment vehicle to take advantage of the tax arbitrage.

Ex. J71, at A011224; Stip., ¶ 69.

On August 25, 1987, representatives from Clark/Bardes made a presentation regarding a proposal for a Connecticut Mutual COLI plan covering approximately 1,200 Dow employees. The Connecticut Mutual COLI product would offer a guaranteed dividend formula, guaranteed mortality, and a 75–basis–point spread with the "[g]ain to Dow com[ing] from tax leverage." Ex. J75, Bates A011212; Burdett, Tr. at 1492–93. As noted above, the "spread" is the difference between the interest rate earned by Dow on the money in the policy (i.e., the credited rate) and the interest rate charged to Dow on loans taken (i.e., the loan rate).

The next day, the COLI Task Force was formed by Enrique Falla, Dow's Chief Financial Officer, and Jay Hornsby, head of Human Resources. Falla, Tr. (1/8 a.m.) at 142. The COLI Task Force was chaired by Glenn White, director of taxes and *ex-officio* member of the finance committee. *Id.* at 142–43. The other members were Anita Jenkins, an attorney who worked in the tax department on benefits issues; William Wales and Janet VanAlsten, attorneys assigned to work with the human resources department; Pierce; Bill Schmidt, assistant comptroller; and Howard Burdett, assistant treasurer. Stip., ¶ 70. Falla provided the Task Force members a "road map" of issues to be addressed before proceeding with a transaction, consisting of: (1) tax issues, including concerns with the then-current law and with prospective legislative changes to that law; (2) legal issues, including the question of insurable interest; and (3) fi-

nancial issues. Ex. J76; Ex. J77. The COLI Task Force issued a report on September 8, 1987. The report indicated that "[COLI] is a program that the corporation may find suitable for providing funding for employee benefit plans or perhaps for other general revenue purposes." Ex. J1218. According to Falla, the "general revenue purposes" language was used to give Dow a "little latitude in the event [it] want[s] to modify a program." Falla, Tr. (1/8 a.m.) at 157.

### a. Dow's pre-purchase analysis of tax issues

In examining the tax issues, the tax force recognized that there are three tax benefits generally available through the corporate use of leveraged cash value life insurance: (1) the tax-free build-up of the cash value; (2) the tax-free payout of death benefits; and (3) the deductibility of interest up to a $50,000 loan cap. The defendant's experts acknowledged that corporations like Dow should take full advantage of the tax laws to minimize their tax liability and maximize shareholder wealth. Puglisi, Tr. at 5311, 5312; Hoag, Tr. at 6409–10, 6411, 6414, 6356. Dow's Tax Department, with the assistance of Lake, researched and resolved several tax issues prior to Dow's purchases of its 1988 and 1991 COLI, including evaluating Dow's options for unwind scenarios if the tax law changed. White, Tr. (1/10 a.m.) at 13, 20–21; Jenkins, Tr. at 462021; J67. On August 10, 1987, Jenkins authored a memorandum to White identifying potential tax issues concerning COLI, including: (1) the qualification of the policy as real life insurance under Code Section 7702, and (2) the use of financing mechanisms to pay premiums in years four through seven as potentially violative of Section 264. Ex. J72 at H00229–H00231; Jenkins, Tr. at 4535–37. White followed up on Jenkins's memorandum with a memorandum to Enrique Falla on August 25, 1987. He identified for Falla the primary tax exposure risks of COLI as outlined in Jenkins's August 10 memorandum. White also noted that Dow should incorporate a suitable cancellation provision in the contract in case Congress enacted legislation curtailing the tax benefits of COLI. Ex. J76; White, Tr. (1/10 a.m.) at 1516.

On October 22, 1987, Jenkins again identified the Tax Department's concerns regarding the design of COLI policies, advising that if Dow were to proceed with the purchase of COLI, then several conditions had to be met, including: (1) satisfaction of Code Section 264 by avoiding characterization as a single premium policy and complying with the so-called "four-out-of-seven" safe harbor; and (2) satisfaction of the requirements of Code Section 7702, including qualification as insurance under state law. Ex. J124; Jenkins, Tr. 4531–35; White, Tr. (1/10 a.m.) at 31. Gary Lake likewise identified as risks (1) the use of partial withdrawals or loading dividends to finance premiums in years four through seven under Section 264; (2) the definition of life insurance under Section 7702; and (3) the risks of sham transaction characterizations resulting from aggressive policy features such as policy loan rates above Moody's Corporate Average and the use of arbitrary dividend payments to minimize cash flow. Ex. J60; Ex. J67 at A011245.

Ultimately, White, Lake, and the COLI Task Force were satisfied that they had resolved all of their issues favorably. White, Tr. (1/10 a.m.) at 70–71, 73–77. Dow planned to use partial withdrawals instead of loading dividends to pay premiums in years four through seven. Lake, Tr. (1/14 a.m.) at 20–21, 92–93. Dow representatives were never comfortable with the use of unconventional "loading dividends" for that purpose. With respect to Section 7702, Lake provided actuarial veri-

fication that the COLI programs Dow considered satisfied the alternative mathematical tests of that section. Lake, Tr. (1/14 a.m.) at 14. Dow decided that the Great–West policies were not subject to Section 7702A. DesRochers, Tr. at 3564–65. As for financing premiums with policy loans, Dow rejected the use of enhanced policy loan interest rates and instead selected Moody's Corporate Average as an appropriate policy loan interest rate. According to Lake, Dow's selection of Moody's Corporate Average reflected Dow's desire to be on the "conservative side" of the policy loan feature. Lake, Tr. (1/14 a.m.) at 19, 59–60; White, (1/10 a.m.) Tr. at 36–38. On mortality issues, Dow and Lake determined that a COLI product that trued up COI charges based on actual mortality at the end of each policy year (i.e., a product that was 100% experience-rated) would violate the requirement that an insurance policy transfer risk to the insurer. Lake, Tr. (1/14 a.m.) at 124, 135. Although Dow and Lake wanted to reflect Dow's favorable mortality experience in the mortality charges, Dow wanted to avoid a 100% experience-rated policy. Dow also was mindful of the shifting landscape in tax legislation impacting COLI; the Task Force considered the possibility of legislative action that would diminish various tax advantages of COLI, particularly the tax-free character of the inside build-up and the deductibility of policy loan interest. J77 at A011205; Falla, Tr. (1/8 a.m.) at 149. White, as tax director, monitored pending tax legislation through Dow's Washington office, as did Paul Brink, White's successor.

#### b. Dow's pre-purchase analysis of legal issues

Among the legal issues explored was whether Dow had an insurable interest in all of the proposed insured employees. Jenkins raised the issue of insurable interest in an August 10, 1987 memo to White, concluding that a "corporation has an insurable interest in the lives of its officers, directors or managers (key men); however, the mere existence of the relationship of employer and employee is not sufficient to give the employer an insurable interest in an employee." Ex. J72. On October 5, 1987, Kirkland & Ellis, an outside law firm, advised Dow that it could structure a COLI program "so that the policies issued will not be void as a matter of public policy due to a lack of insurable interest." To do so, Kirkland & Ellis recommended that Dow (1) require all insureds to consent to insurance coverage, and (2) purchase an aggregate amount of insurance that was proportionate to the perceived potential liabilities to employees under all benefit plans. Ex. J107; White, Tr. (1/10 a.m.) at 48. MetLife also brought the insurable interest issue to Dow's attention in its response to Dow's November 1987 RFP. There, MetLife attached a memo on insurable interest in large employee populations from Roy Albertalli, a member of MetLife's Law Department. Albertalli identified the same issues that had been raised in Jenkins's and Kirkland & Ellis's memoranda. Ex. J136 at A03870; Ex. J797; Lake, Tr. (1/14 a.m.) at 42; Ryan, Tr. at 1725:7–24.

Since the 1960s, Dow had used a "Hay Point" system to measure the importance of its employees to the corporation. The system evaluates and quantifies a job's content and value on three dimensions: know-how, problem-solving, and accountability. Falla, Tr. (1/8 p.m.) at 18; Pierce, Tr. at 4339–43. In December 1987, the COLI Task Force met and determined that the insured pool should be limited to approximately 4,000 employees at 238 Hay points and above, representing a compensation level of approximately $50,000 or more. Stip., ¶ 75. Promotion to a job assigned a Hay Point level of 238 required

a performance review by a Dow Job Evaluation Committee. Falla and White testified that Dow requires this thorough review because it has long recognized 238 Hay Points as the equivalent of a middle management position; at 238 Hay Points, Dow employees became eligible for certain executive benefits, including stock options and performance incentive awards that were not available to employees at lower Hay Point levels. Falla, Tr. (1/8 p.m.) at 18–21; Ex. J149; Ex. J107; Ex. J132; White, Tr. (1/10 a.m.) at 46–49, 50–51, 52.

The reduction in the number of proposed insureds from the 20,000 reflected in the November 1987 RFP to 4,000 resulted from Dow's research of Michigan insurable interest law and the advice that it had received from MetLife and Kirkland & Ellis. Ex. J107; Ryan, Tr. 1725–26. Falla and White explained that Dow selected 238 Hay Points as its cut-off for the eligible group of insureds because Dow considered these employees to be "key employees." Falla, Tr. (1/8 p.m.) at 18–19; Ex. J160; Ex. J179; White, Tr. (1/10 a.m.) at 51–52.

In 1987, the COLI Task Force received an opinion from Kirkland & Ellis that an issue may exist as to employee consent. Ex. J76; Ex. J107; White, Tr. (1/10 a.m.) at 48. As a result, in connection with the Great West COLI program, Dow asked each employee to sign a consent form that constituted an application for insurance and consented to Dow as owner and beneficiary under the policy. Dykhouse, Tr. at 2710–11; Ex. J253. Dow initially considered setting premiums at $16,667 per insured, but scaled back to $10,000 per insured because Dow had been advised by Kirkland & Ellis and MetLife that the most conservative route to follow with respect to insurable interest was to make sure the insurance was commensurate with benefit liabilities. Although Michigan law

did not require them to adopt that approach, Dow followed this advice. Lake, Tr. (1/14 a.m.) at 25–26; Ex. J107; Dykhouse, Tr. at 2726–27.

Based on the legal analyses of Jenkins, VanAlsten, Kirkland & Ellis, and Roy Albertalli, its decision to limit the insured population to its highly compensated middle and upper managers and professionals, requiring the consent of insured employees, and selecting a $10,000 annual premium, Dow believed that it had an insurable interest in each of the 4,051 employees it insured in 1988. White, Tr. (1/10 a.m.) at 34, 71, 139. In 1987 through 1989 members of the Michigan Insurance Bureau did express concerns about insurable interest in the marketing of broad-based COLI plans for all of a company's employees. Bartlett, Tr. at 5015–16.

In addition, in 1987, Dow knew that it could not be the beneficiary of a group policy and therefore would not consider companies that only offered group policies. Ex. J1244; Ex. J146; Ex. P446; White, Tr. (1/10 a.m.) at 43–44; Lake, (1/14 a.m.) Tr. 40–41, 47. Dow's Great West COLI plan was filed, issued, administered, and accounted for as a program of individual insurance. Todd, Tr. at 708–09; Dykhouse, Tr. at 2854.

### c. Dow's pre-purchase analysis of financial issues

The COLI Task Force also considered and resolved a number of financial questions, including (1) whether the internal rate of return on COLI proposals was acceptable to the corporation; (2) the potential disadvantages, both qualitative and quantitative; (3) which of the COLI products offered by the carriers had the best risk/reward relationship; (4) whether Dow should place the COLI policies with more than one carrier to avoid the risk of concentration; and (5) whether the contract language met the requirements to avoid

the recognition of gross assets, liabilities, and expenses associated with the COLI policies for off-balance sheet financing. Ex. J77 at A011205–06; Falla, Tr. (1/8 a.m.) at 150–51; White, Tr. (1/10 a.m.) at 17. The off-balance sheet aspect of a life insurance investment that permits policy loans to be netted against the cash value asset on Dow's balance sheet apparently was significant to Dow in the context of its financial ratios and ratings. Falla, Tr. (1/8 a.m.) at 134–37, 150–51. Burdett testified that Dow was willing to pay up to 100 basis points over its normal borrowing cost to obtain the benefits of off-balance sheet financing. Burdett, Tr. at 1373–74. According to Lake, Dow's chief financial concerns were (1) selecting the plan that yielded optimal results on a NPV basis; and (2) obtaining an investment that matched Dow's goal of providing a pool of assets to defray its long-term liabilities while minimizing its short-term cash outlay. Ex. J146; Lake, Tr. (1/14 a.m.) at 43–45.

As a portfolio investment, Dow required rates of return for COLI that were significantly lower than those for plant investments, and Dow's Board typically used an 8% NPV discount rate in its reviews. Falla, Tr. (1/8 p.m.) at 41–42, Tr. (1/9 a.m.) at 19–20. Falla argued that insurance was generally well suited to achieving Dow's long-term funding obligations by optimizing the balance between the NPV of Dow's investment and the build-up of funds for pay-out as death benefits in later years. Falla, White and Burdett all insisted that Dow intended to acquire the policies with a minimum cash outlay, borrow up to $50,000 per policy, withdraw to basis, and then to accumulate unencumbered cash value in the policies. Falla, Tr. (1/9 a.m.) at 17, 108–09, Tr. (1/9 p.m.) at 22–23, Tr. (1/8 a.m.) at 133–34; White, Tr. (1/10 p.m.) at 21; Burdett, Tr. at 1443; Ryan, Tr. at 1692; Jenkins, Tr. at 4623.

### 4. Aborted purchase of Connecticut Mutual & Great West policies

On October 2, 1987, the COLI Task Force attended a meeting with Dow's lobbyist from Washington, D.C. Ex. J95. The lobbyist indicated that two proposals were being considered by Congress: (1) limiting interest deductions to policy loans of $25,000 per employee and (2) disallowing all interest deductions. *Ibid.* Thereafter, Dow executed binders for insurance coverage with Connecticut Mutual and Great West on October 6, 1987. Stip., ¶ 72; Ex. J104. The Connecticut Mutual binder provided coverage for 20,000 employees and the Great West binder provided coverage for 10,000 employees. Stip., ¶ 72; Ex. J104. The binders required as a condition of temporary insurance coverage that Dow pay Connecticut Mutual $3,333,400 and Great West $1,666,700. Ex. J109; Ex. J110. White testified that Dow executed these binders on the advice that tax law changes would likely be prospective, and the policies likely would be protected from pending legislation that would have eliminated several tax benefits associated with leveraged COLI. White, Tr. (1/10 a.m.) at 24–25. Each policy had an annual premium of $16,667 per employee. *Ibid.*

On October 21, 1987, Dow rescinded its binders with both Connecticut Mutual and Great West and requested the return of the binder premiums paid. Dow had determined that it was not yet ready to go forward with its COLI purchase for a variety of reasons, including concerns over insurable interest and Connecticut Mutual's ability to meet Dow's expectations. Stip., ¶ 73. In addition, the legislation that would have curtailed the use of leveraged COLI was not enacted. Ex. J120; Ex. J121; Falla Tr. (1/9 a.m.) at 67. White acknowledged that the binders were a mistake made in haste due to fear of the

possible legislative amendments to the tax code. White, Tr. (1/10 a.m.) at 24–26. Immediately following the rescission of the binders, Dow began a painstaking review of COLI. Dow also decided to open up bidding to a wider group of insurance carriers and brokers in order to better evaluate the marketplace. Ex. J128; White, Tr. (1/10 a.m.) at 28, 31; Lake, Tr. (1/14 a.m.) at 42–43.

### 5. Formal RFP

On November 5, 1987, Dow sent out a formal Request for Proposal to seven insurance carriers. Ex. J127; Stip., ¶ 74. The RFP required bidders to prepare illustrations based on the following ten standardized assumptions:

1. Ages 27, 37, 47, and 57.
2. Up to 20,000 employees (assume 5,000 employees at each age).
3. 36.64% tax bracket.
4. 10.00% loan rate.
5. 7.00% unborrowed crediting rate.
6. $16,667 annual premium per employee.
7. Loans limited to $50,000 per employee.
8. (a) Aggressive COLI approach (i.e., minimum cash flow).
 (b) Traditional COLI approach (i.e., borrow first 3 years, pay next 4 years, no cash withdrawals).
9. Include after-tax cost of outside fees, if any.
10. (a) Mortality based on 60% of the 1960 CSG Table.
 (b) Mortality based on 100% of the 1960 CSG Table.

Ex. J127, Bates A004575. Proposals were required to provide illustrations with the specified information for each policy year, including after-tax outlay, gross and net death benefit, gross and net cash value, profit and loss impact, surrender value, and tax liability. Ex. J127, at A004575–76. The illustrations also were to show the present value of cash flows at 6%, 7%, 8%, 9%, 12%, and 15% and provide options in the event that inside build-up is taxed prospectively or policy loan interest is not deductible prospectively. Ex. J127, at A004576. Requiring illustrations based on alternative mortality assumptions allowed Dow to evaluate the impact of different scenarios for the timing of death benefits. Lake, Tr. (1/14 a.m.) at 12–13. Lake testified that he chose 60% of the 1960 CSG Table because he believed at the time it reasonably approximated Dow's mortality experience. Id. at 113. By standardizing the bid specifications, Dow sought an "apples-to-apples" comparison of the different insurance carriers. Id. at 12.

Section III of the RFP set forth conditions that Dow required bidders to meet in order to be considered. Ex. J127, Bates A004576–77. Subsection five required that "[o]nly Dow's mortality experience can be used in the calculation of the prospective cost of insurance or experience rated refund." Ex. J127, at A004577. Subsection seven required "[a]n unwind provision . . . in the event of legislation adversely impacting COLI during the first year the policy is in force." Ibid.

Section IV of the RFP set forth legal and administrative issues to be addressed by the bidders. Ex. J127, at A004577–79. In subsection A, Dow requested a guarantee from the insurance companies that "the policy does meet the four out of seven test[ ] and that it will not be deemed a single premium policy." Ex. J127, at A004577. However, Dow later backed away from this requirement.

Dow received responses to the RFP from seven or eight brokers, representing nine or ten insurance carriers. Lake, Tr. (1/14 a.m.), at 43. The carriers and brokers were as follows: Great West, Con-

ecticut Mutual, and Connecticut General, all represented by Clark/Bardes; Amex Life and Hartford Life, represented by AYCO Corporation; Travelers, represented by AS & K Resources; Mutual Benefit, represented by MCG Group; Equitable of Colorado, represented by KARR–BARTH; Connecticut General and Metropolitan Life, represented by Marsh & McLennan; and Mutual Benefit, represented by Johnson & Higgins. Ex. J146.

On December 16, 1987, Gary Lake sent a memorandum to Glenn White which included charts summarizing the features of the each of the RFP responses. *See* Ex. J146. It also detailed a three-phase analysis process Lake suggested to eliminate carriers from consideration. In Phase I, based on Lake's understanding that Dow "does not want to have significant cash payments," Lake suggested eliminating "[c]ompanies not quoting on an 'aggressive basis'" and "[c]ompanies requiring large cash outlays even on an 'aggressive' basis." Ex. J146, Bates A008880. Lake also suggested eliminating in Phase I insurance carriers unwilling to file on an individual policy basis and those carriers not large enough to handle the size of Dow's purchase. *Ibid.*

In Phase II, Dow would compare the net present values of the proposal. Ex. J146, at A008881. Phase II also involved decisions by Dow on insurable interest concerns, "whether Dow is comfortable with a loan rate higher than Moody's Corporate Average," what employee groups would be included, and the level of death benefits or premiums per employee. This phase included evaluation of the administrative expertise of the brokers. Ex. J146, at A008881. *Ibid.*

Phase III would "evaluate the remaining carriers from a number of different points of view, the most important of which is the net present value gain produced by the cash flows." Ex. J146, Bates A008882. Phase III was a final evaluation of the remaining bidders in which Dow, with Lake's help, would consider a wide range of "qualitative" factors, including financial performance of the proposals and administrative capabilities of the brokers, legal issues, insurance carriers, and the insurance policy. *Ibid.* Phase III also involved requesting that the bidders consider reductions in charges and commissions. Lake, Tr. (1/14 a.m.) at 48–49, 13–14, 36, 47.

### 6. Pre-purchase Illustrations (Pre-tax and After-tax Policy Performance)

Lake recommended the purchase of the Great West policy because its quantitative and qualitative results produced a conservative approach that he was comfortable recommending to Dow. Lake, Tr. (1/14 a.m.) at 4–5. Lake described his role as showing Dow the bad news that was not included in the broker's and insurance company's illustrations. *Id.* at 10–11. Brokers were providing proposals showing policy loans in excess of $50,000. However, to be considered in the final evaluation, they needed to submit the proposals which capped loans at $50,000. *Id.* at 38–40.

Great West was using a 9% credited rate on unborrowed funds in its proposals. This was a positive feature and would increase inside build-up values on unborrowed funds. (Lake, 0114A, 59). According to Lake, Mutual Benefit was rejected because of its "aggressive" features, which he identified as enhanced policy loan rates and arbitrary dividends. *Id.* at 62–63. The cash flow numbered "2" from the Great West illustration served as the decision illustration. *Id.* at 63–64. Lake testified that the dividends in the Great West policy had a fairly minimal impact. To look at the worse case scenario, Lake looked at the net policy value gains. Had Congress eliminated any of the tax bene-

fits (inside build-up, death benefits, or deductibility of interest), the COLI policy would not perform as well. Therefore, Lake tried to eliminate some of these benefits in terms of the worse policy performance possible. *Id.* at 95–98.

The mortality rates used for pricing cost of insurance were different in Great West's, Mutual Benefit's and Connecticut Mutual's illustrations: they were all using different mortality rates to price the cost of insurance. *Id.* at 114–115. Low mortality charges would show better net present value numbers. *Id.* at 116. In August 1987, Gary Lake requested policy illustrations from Mutual Benefit using an aggressive approach. Lake, Tr. (1/14 p.m.) at 240–41. Lake stated that the main concern in looking at illustrations was the net present value of after-tax cash flow. He also stated that he would sometimes look at the cumulative amount of after-tax cash flows. *Id.* at 252.

Defense Exhibit 697 is an illustration from Clark/Bardes of the Great West policy cash flows. Lake, Tr. (1/15 a.m.) at 103. Lake noted that taking withdrawals above basis would help eliminate the (funding) of negative cash flows. *Id.* at 104. He stated that the purpose of running many illustrations was not to try to figure out a way around having negative after-tax cash flows and the problem of paying taxes. Rather, he stated that illustrations were continuing to be produced because they were not meeting what Dow had asked for. He further stated that Dow wanted to limit loans to $50,000. *Id.* at 105–08.

Lake did receive an illustration with no cap on loans and which showed no negative cash flow. Ex. J294, at GDL65; Lake, Tr. (1/15 a.m.), at 129–30. Lake did not make any illustrations showing the effect on Great West. *Id.* at 138. If Dow borrowed the maximum possible or to the extent of cash value, that, by definition, would produce zero equity. Lake stated that for some of the years the purpose was to have low net equity. *Id.* at 142. Even if an illustration showed significant negative cash flows to Great West, Lake would not conclude that the illustration was flawed; he observed that the illustrations were not guaranteed. *Id.* at 143. Lake was not aware that the Clark/Bardes illustrations were compiled without the involvement of Great West. Lake, Tr. (1/15 p.m.) at 425.

Mel Todd from Great West believed the mortality charges and all the expenses and loans within the Great West policy were properly illustrated when Dow received the illustration when they purchased the program. Todd, Tr. at 921. Ronald Laeyendecker, also from Great West, stated that by signing the illustrations, the mortality assumptions were deemed "reasonable." He did not state that they were necessarily "accurate." Laeyendecker, Tr. at 1170–72. Beginning in 1991, Clark/Bardes used Dow's mortality table when running its illustrations. *Id.* at 1173. Dow evaluated the after-tax cash flows and, according to White, the pre-tax cash flows and found that both the after-tax and pre-tax figures produced a positive cash flow. White, Tr. (1/10 a.m.) at 77. Dow believed that by going with the program offered by Clark/Bardes on behalf of Great West, it would receive a $60 million net present value. *Id.* at 58–60. The recommended operation included withdrawing cash in the policy in excess of basis in the middle years. Ex. J189, at A012466–67; White, Tr. (1/10 p.m.) at 45.

The illustrations from Clark/Bardes for Connecticut General and Great West showed withdrawals in excess of basis about year twenty through year twenty-six of the policy. Ex. J172, at A009160; White, Tr. (1/10 p.m.) at 46–47. The memo from Gary Lake states that "in order to prevent any negative cash flow, cash

withdrawals are taken out above the premiums paid, which would require a tax to be paid, but this does eliminate the negative cash flow." *Id.* at 45. Although one illustration showed withdrawals being made in years nine through thirty-one, White said that only a person who is "very stupid" would make those withdrawals. *Id.* at 46–47.

The illustration prepared by Clark/Bardes on November 11, 1988 indicates that Dow would take loans in years one through three, eight through nine, and eighteen through sixty-seven. White states it was Dow's intent to take loans in years one through three, eight and nine to reach the $50,000–cap, despite the fact that the illustration clearly indicates that loans would not be capped at $50,000. *Id.* at 51–52. White indicated that the illustrations he reviewed were based on interest and premium borrowings up to $50,000, borrowing for the first three years and then for the eighth and ninth year. The illustrations were also based on tax exempt treatment of the inside build-up to create a positive cash flow. *Id.* at 63.

Exhibit J189 is an illustration from Clark/Bardes which capped loans at $50,000. When the cash flow is considered against the tax savings from interest deductions, there is positive cash flow in both the early part and across the entire life of the plan, even when the benefit of the interest deduction is not considered:

*Great West Illustration Dated 2-3-88*
*(in 1,000's)*

| Interval | Tax Savings | Cash Flow | Cash Flow Absent Interest Deduction |
|---|---|---|---|
| 10 yrs | $ 44,476 | $ 48,816 | $ 4,340 |
| 20 yrs | 110,288 | 125,472 | 15,184 |
| 30 yrs | 164,210 | 152,008 | (12,202) |
| 40 yrs | 198,558 | 194,532 | (4,026) |
| 50 yrs | 211,954 | 257,732 | 45,778 |

*See* Ex. J189.

### 7. Decision to Purchase Great West Policy

On March 18, 1988, the COLI Task Force recommended to Falla that Dow purchase the Great West COLI policies and hire Clark/Bardes to perform administrative support. Stip., ¶ 76. On April 11, 1988, Burdett provided a "Resolution to Authorize an Expanded Corporate Owned Life Insurance (COLI) Program" to be placed on the April 14, 1988 agenda of the Board of Directors Meeting. The resolution explained that "[t]hrough a tax arbitrage between tax-deductible interest on policy loans and nontaxable internal build-up in the policy, COLI permits the Company to build a pool of assets available for any future corporate or employee benefit requirement." Ex. J204, at A009027. On April 14, 1988, the Board of Directors approved the resolution authorizing the purchase of the Great West COLI plan. Stip., ¶ 77.

### 8. "Backdating" and Effective Date

Great West received a preliminary census for Dow's Great West program in April 1988, shortly after Dow's Board of Directors approved the resolution authorizing the transaction, indicating 4,359 eligible insureds. Michigan law permits an insurer to issue policies taking effect less than six months before the application for insurance provided it does not result in a more favorable premium. Mich. Comp. Laws § 500.4046. Dow and Great West entered into an Application for Insurance on May 9, 1988. The Common Due Date for individual policies, as defined by the Application, was May 9, 1988.

The specimen policies were delivered to Dow on June 20, 1988. Because of a clerical error, reprinted specimen policies were delivered to Dow in November 1988. The consent forms were reconciled with the

eligible insureds on October 12, 1988. The final census was 4,051 insureds.

### 9. Features of the COLI Contract Purchased

Dow's Great West COLI policy form includes a base policy, Form X105, and the following riders and amendments: Form X2, Form X35, Form X37, Form X92, Form X33CB, and Form X31CB. Stip., ¶ 43.

#### a. Base Policy

The base policy and the X2 rider are the same as in the 1985 Great West COLI policies. Pierce, Tr. at 4331. Dow is both the owner of the 4,051 policies and the beneficiary entitled to receive death proceeds. Stip., ¶ 44. Policy Form X105, the base policy, is a traditional participating, whole-life policy called Life at 95 (L–95). Stip., ¶ 45. Level annual premiums were payable starting at issue and continuing to attained age 95. The base policy's death benefit, premiums, and cash values were fixed at issue. Mel Todd, who designed the L–95, stated that the base policy was designed to minimize cash value and maximize death benefits. Todd, Tr. at 599. As a participating policy, dividends were determined by Great West and may be applied to pay premiums or to purchase paid-up additions of cash value and death benefits. Stip., ¶ 46. No partial withdrawals of cash value are permitted under the L–95 policy.

#### b. The X–Rider

Dow purchased Form X2, the Additional Paid–Up Life Insurance Rider (X–Rider), on its policies. Stip., ¶ 47. The X–Rider allowed a policyowner to purchase additional (paid-up) insurance but offered a different mix of cash value and death benefits without additional expense loads. Stip., ¶ 47; Lake, Tr. (1/14 a.m.) at 68; Todd, Tr. at 612. The purchase of paid-up insurance increased both the cash value and the death benefit of the policy by an age-based factor determined under I.R.C. § 7702. Stip., ¶ 47–48. The X–Rider was available for purchase in multiples ranging from 2 through 10 times the base policy. Dow chose the 10–times multiple option. Stip., ¶ 49. Thus, because the X–Rider's death benefit is based on a multiple of cash value, the death benefit increased as the cash value increased. Stip., ¶ 49. Unlike the L–95, the X–Rider was designed to provide the maximum amount of cash value and the minimum amount of death benefits permissible under I.R.C. § 7702. Todd, Tr. at 612. There were no commissions or expense charges built into the premium of the X–Rider; instead, the entire amount of the X–Rider premium was credited to cash values. *Id.* at 616–17. The expenses and mortality charges of the rider were recovered through the interest rate spread. Lake, Tr. (1/14 a.m.) at 69; Todd, Tr. at 616–18, 781.

#### c. The Term Rider

The Term Life Insurance Option, Form X35 (Term Rider), provided an additional death benefit for ten years, or, if earlier, to the paid-up insurance date of the X–Rider, in the amount of a term insurance factor of one, two, or three times the death benefit of the X–Rider. The term insurance factor depended solely on the issue age of the insured: for ages under 50, the term factor was 3; for ages between and including 51 and 55, the term factor was 2; and for ages between and including 56 and 60, the term factor was 1. Stip., ¶ 55; Ex. J191; Todd, Tr. at 645–48. No additional premium amount was required by the term rider. Rather, the additional COI was covered by increasing the spread between the policy loan interest rate and the crediting rate on the X–Rider's cash value by the same multiple (2, 3, or 4) as the death benefit. Stip., ¶ 56. The term rider had the effect of reducing the amount of Dow's

potential borrowings by expending inside build-up on term insurance. Todd, Tr. at 644–47.

The purpose of the Term Rider was to reduce the impact of proposed Financial Accounting Standard (FAS) 96, initially to become effective on January 1, 1989, by converting cash value into immediate death benefits. *Id.* at 644–45; Ex. J191; Lake, Tr. (1/14 a.m.) at 72; McGill, Tr. at 5473–74. FAS 96 would have required a corporate owner of life insurance to record a deferred tax liability on its financial statements equal to the tax on the inside build-up as if the policy were surrendered at the end of the year. Ex. J191; Lake, Tr. (1/14 a.m.) at 73; Todd, Tr. at 644. When FAS 109, Accounting for Income Taxes, was implemented, it superseded proposed FAS 96; therefore, FAS 96 was never implemented. Ex. J191; Lake Tr. (1/14 a.m.), at 73. In 1997, the Term Rider was extended for ten years. Stip., ¶ 55.

#### d. Paid-up Insurance Amendment

The Paid–Up Life Insurance Amendment, Form X37, modified the paid-up insurance benefit of the X–Rider so that coverage would continue with the cash value and death benefit computed in the same manner as before the policy went paid-up. Stip., ¶ 50. This rider applies only to the X–Rider. Lake, Tr. (1/14 a.m.) at 70–72. The Paid–Up Life Insurance Amendment allowed Great West to continue to adjust the loan interest spread once the rider became paid-up instead of, as required by the rider's provisions, paying a dividend. Laeyendecker, Tr. at 1328; Sayre, Tr. at 5472–73; Ex. J191, at A005981.

#### e. Modified Cash Surrender Benefit Rider

Because the L–95 policy had no cash value in the first year and low cash values in the early policy years, the Modified Cash Surrender Benefit Rider, Form X33CB, provided enhanced early year cash surrender values for the L–95 base policy by deferring certain expenses (commissions and certain marketing overrides) so that cash value could accumulate in year one of the policy. Stip., ¶ 51; Todd, Tr. at 868. Under Form X33CB, the L–95 base policy had a first year cash value equal to 90% of the premium. Todd, Tr. at 597. A non-commissionable single premium of $15.38 per policy was assessed for the rider. The rider had the effect of deferring commissions on the base policies for three years. *Id.* at 696–98; Lake, Tr. (1/14 a.m.), at 71; Ex. J191. Ultimately, Great West stripped the commissions out of the product. Sayre, Tr. at 5476–77. The rider also improved the impact of the policies on Dow's profit and loss statement, because without the rider, Dow would have had to record premium expenses on the L–95 base policy without an offsetting entry for the increased cash value. *See* Stip., ¶ 50. Neither the Paid–Up Life Insurance Amendment (Form X37) or the Modified Cash Surrender Benefit Rider (Form X33CB) increased Dow's ability to the leverage. Lake, Tr. (1/14 a.m.) at 72.

#### f. Partial Withdrawal Provision Amendment

The Partial Withdrawal Provision Amendment, Form X31CB, allowed one partial withdrawal per year from the X–Rider beginning in the second policy year and before the X–Rider became paid up. Stip., ¶ 52. The amount of the partial withdrawal was limited by the amount of unencumbered cash value at year-end. Laeyendecker, Tr. at 1220–21; Ex. J1147, at CBTX020204. The purpose of the Partial Withdrawal Rider was to allow the policyholder to withdraw cash value from the X–Rider while maintaining the same death benefit for a certain period. Todd, Tr. at 597, 691–93. Thus, the amendment provides that for each withdrawal in years two through seven, the death benefit just

prior to the withdrawal was maintained for the term of the amendment. Stip., ¶ 53. After the seventh year, the death benefit was reduced by the amount of the prior withdrawals. In the absence of the amendment, the reduction in cash value from the partial withdrawal would have lowered the total available death benefit, which could have caused adverse tax consequences under I.R.C. § 7702, the section of the code which, essentially, distinguishes cash value insurance contracts, which enjoy the favorable tax treatment discussed herein, from annuity contracts, which are treated less advantageously under the tax code. Todd, Tr. at 597, 691–93. Form X31CB was extended through the fifteenth policy year to maintain compliance with I.R.C. § 7702(f)(7). Stip., ¶ 53. The charge for a partial withdrawal was 2.5% plus the state premium tax rate times the withdrawn amount. Stip., ¶ 54. The 2.5% charge was intended to cover the cost of insuring the additional net amount of risk created by maintaining the higher death benefit following the withdrawal. Laeyendecker, Tr. at 1103–04.

This combination of riders and amendments was unique to Dow; Great West did not sell this particular product to any other customer. However, Dow's Great West COLI policies were part of a pool of participating policies in which all of the policy owners shared in the mortality experience of the overall pool. Todd, Tr. at 599; Laeyendecker, Tr. at 1042–43.

### 10. Payment of the Premiums

Each of the 4,051 Great West COLI policies required a premium of $10,015 in the first policy year: $932 for the base policy, $9,068 for the X–Rider, and $15 for the Modified Cash Surrender Benefit Rider. Stip., ¶ 84. In policy years two through nine, each Great West policy required a $10,000 premium: $932 for the base policy and $9,068 for the X–Rider.

In policy years 10 and later, premiums were only required to be paid on the base policy. Stip., ¶ 85. Premiums for the X–Rider were projected to stop after the ninth policy year because Dow would "voluntarily" stop paying premiums, causing the rider to enter non-forfeiture status and allowing the rider to be treated as "paid up." Sayre, Tr. at 5572–77.

In the first twelve years, the total amount of gross premiums under Dow's Great West program was $373,400,000. Dow took policy loans totaling $50,000 per policy to pay premiums for the first, second, third, eighth, and ninth policy years. Dow took partial withdrawals to pay premiums in the fourth through seventh policy years. As a result of the payment offsets in the form of policy loans, dividends, and partial withdrawals, Dow only paid $56,893,000, or 15.2%, of the gross premium amount in cash. *Ibid;* Ex. D813.

### a. Policy Loans

The Great West COLI policies allowed Dow to take policy loans using the cash values of the L–95 base policies and the X–Rider as collateral. Stip., ¶ 57. The maximum loan value was equal to the end-of-year cash value (including premiums deemed paid in simultaneous netting transactions on the policy anniversary) less the loan interest payable to the end of the policy year. Ex. J1147, at A020188; Laeyendecker, Tr. at 1221; Todd, Tr. at 625–27, 637–38, 892–99. Policy loans and repayment of loans were first applicable to the X–Rider, unless otherwise specified by the policyholder. Stip., ¶ 58. None of Dow's loans from Great West reduced policy cash values or the amount of interest credited to policy cash value. *See* Ex. J1147, at CBTX020188. The credited rate on the Great West policies was the same for both borrowed and unborrowed funds. Great West's computer system was not capable of assigning different crediting rates to the

borrowed cash value on one hand, and cash value that remained in the policy on the other.

Each of Dow's loans from Great West required the annual payment of interest in arrears on the policy anniversary. Stip., ¶ 308. Failure to pay interest resulted in the interest being "added to the loan and [ ] bear[ing] interest at the loan interest rate." Ex. J235, at 10. Each loan from Great West that was outstanding upon termination of the policy was repaid as an offset against death benefits or against the amount payable upon the full surrender of the policy. Ex. J235, at 11; Ex. J1147, at CBTX020189; McGill, Tr. at 5153–54, 5324. Dow had the right to pay off each of its policy loans, or any part thereof, at any time. Ex. J235, at 11.

The maximum variable policy loan interest rate under Dow's Great West COLI policies was the greater of (1) the Moody's Corporate Average for the calendar year ending two months before the beginning of the policy year or (2) the rate used to compute the cash surrender values under the policy during the applicable period plus 1% per annum. The loan interest rate was determined at the beginning of each policy year and was guaranteed for all loans outstanding in that year. Stip., ¶ 59.

### b. Partial Withdrawals

As stated above, the Partial Withdrawal Provision Amendment allowed one partial withdrawal per year from the X–Rider, limited by the amount of unencumbered cash value at year-end, beginning in the second policy year and before the X–Rider became paid-up. It was both the opinion of Mel Todd, former Great West Vice President and Actuary, and Great West's formal position, that the partial withdrawal should not be performed in a netting transaction. An internal Great West memorandum stated that "[p]remiums must be credited to the X–Rider cash value first in order to have enough cash value to do a partial withdrawal. The money will then come out of the policy as a partial withdrawal. Premium payment is also important to clients who wish to leave a paper trail of premium payments." Ex. J191, at A005983; Todd, Tr. at 842, 849–50; Burdett, Tr. at 1623, 1625–26; Ex. J424, at A006356.

Dow took partial withdrawals to cover the premiums for policy years four through seven, inclusive. This procedure was different from Dow's 1985 Great West COLI polices where Dow paid the premiums in cash in years four through seven. The partial withdrawal transactions were structured to occur on separate days in a three-step transaction: (1) Dow sent a check for the full premium by overnight mail to Great West on May 8, (2) Great West received and deposited the check on May 9, and (3) after the premium check cleared on May 10, Great West wired the partial withdrawal to Dow. Todd, Tr. at 849; Burdett, Tr. at 1622–25; McGill, Tr. at 5155–56; Ex. J448.

### c. Loading Dividends

Great West determined that the use of a loading dividend structure was an inappropriate mechanism to pay premiums in policy years four through seven because the dividend formulas did not follow industry norms and practices or actuarial standards. Dow's Great West COLI policies did not provide for loading dividends.

### 11. Calculation of Mortality and COI

The COI for the X–Rider was paid through the spread—the difference between the interest rate charged on borrowed funds and the amount credited on policy cash value. The annual COI charges were calculated based on actuarial data intended to reflect Dow's actual mortality experience, using Great West's proprietary 1982 Asset Share Pricing Mortali-

ty Table, adjusted to reflect Dow's actual experience as measured by analyzing the medical claims of a portion of the proposed insured group. Based on this information, Great West initially set the spread for the X–Rider at 100 basis points, and provided that it could be adjusted up or down to reflect Dow's actual experience going forward. In actuality, Dow's mortality experience was more favorable (i.e., Dow experienced fewer employee deaths) than anticipated, resulting in a reduction of the spread. But this was done on a prospective basis. There was no retrospective adjustment—or refund of excess COI—paid by Great West to Dow at year end. Dividends were paid, but only in accordance with the experience of the entire pool of policyholders of par policies in conformity with industry practice.

### 12. Actual Performance of the Policies

Dow and Clark/Bardes entered into an Administrative Services Agreement for Dow's Great West COLI program on May 2, 1988. Stip., ¶ 93. The Administrative Services Agreement outlined the services previously rendered and to be rendered by Clark/Bardes in relation to Dow's Great West COLI policies. Stip., ¶ 93.

Clark/Bardes provided Dow with various initial, ongoing, annual, and consulting services. The initial services included (1) electronically storing Dow's demographic data, (2) recommending alternative funding mechanisms for the purchase of Dow's Great West COLI policies, (3) preparing cash flow analyses with varying tax brackets for the final funding design, (4) preparing projected profit and loss impact analyses in accordance with FAS 96, (5) consulting with Dow on potential tax law changes, (6) illustrating modifications to the plan design and objectives, and (7)

assisting in the selection of the appropriate life insurance carrier. Ex. J229, at A008486–87. The ongoing administrative services include (1) processing death claims, (2) inventorying policies on terminated participants, (3) furnishing any information requested by Dow regarding life insurance policies, and (4) interacting with outside counsel and auditors, if necessary. Ex. J229, at A008487. On an annual basis, Clark/Bardes would (1) review I.R.C. § 264 prior to Dow's billing date, (2) prepare supplemental billing statements illustrating which premiums to pay or borrow, (3) prepare cash value reports, and (4) prepare revised cash flow and profit and loss projections reflecting changes in the status of the plan. Ex. J229, at A008488. Clark/Bardes agreed to perform the following consulting services: (1) review new product enhancements on existing policy contracts, (2) review changes in tax laws or proposed tax laws that could impact Dow's Great West COLI, and (3) review with Dow's accountants changes to Dow's COLI plan that would be favorable. *Ibid.*

Under the terms of the Administrative Services Agreement, Dow agreed to pay Clark/Bardes an initial administrative fee of $800,000, payable six months after the policy date. Dow also agreed to pay Clark/Bardes an additional administrative fee of $2 million if the policies were still in force at the end of the thirtieth month and an ongoing administrative fee of $40 per policy on the actual number of policies renewed each year. Stip., ¶ 94. Clark/Bardes received compensation from Great West as commissions for serving as broker on Dow's Great West COLI purchase. Stip., ¶ 95.

The table below reflects Dow's operation of its Great West COLI policies:

| | | | Policy | | | |
|---|---|---|---|---|---|---|
| | | Policy | Loan | | | Dow Cash |
| Year | Premium | Loan | Interest | Dividend | Withdrawal | Payment |

Great West Cash Payment—Aggregate (In Thousands)

| Year | Premium | Policy Loan | Policy Loan Interest | Dividend | Withdrawal | Dow Cash Payment |
|---|---|---|---|---|---|---|
| 5/9/88 | $ 40,582 | $ 38,866 | 0 | 0 | 0 | $ 1,717 |
| 5/9/89 | $ 40,470 | $ 38,021 | $ 3,827 | 0 | 0 | $ 6,276 |
| 5/9/90 | $ 40,440 | $ 40,440 | $ 7,594 | 0 | $ 1,751 | $ 5,842 |
| 5/9/91 | $ 40,360 | 0 | $ 11,278 | 0 | $ 45,149 | $ 6,489 |
| 5/9/92 | $ 40,300 | 0 | $ 10,934 | 0 | $ 44,878 | $ 6,356 |
| 5/9/93 | $ 40,160 | 0 | $ 10,185 | 0 | $ 42,912 | $ 7,434 |
| 5/9/94 | $ 40,090 | 0 | $ 9,308 | 0 | $ 45,185 | $ 4,213 |
| 5/9/95 | $ 40,050 | $ 44,240 | $ 8,576 | 0 | 0 | $ 4,387 |
| 5/9/96 | $ 39,880 | $ 39,751 | $ 13,570 | 0 | $ 7,290 | $ 6,409 |
| 5/9/97 | $ 3,702 | 0 | $ 14,442 | $3,685 | $ 12,343 | $ 2,116 |
| 5/9/98 | $ 3,689 | 0 | $ 15,024 | $3,169 | $ 12,616 | $ 2,925 |
| 5/9/99 | $ 3,677 | 0 | $ 13,709 | $1,122 | $ 13,667 | $ 2,597 |
| 5/9/00 | $ 3,661 | 0 | $ 13,539 | $1,228 | $ 13,054 | $ 2,919 |
| TOTAL | $377,062 | $201,317 | $131,986 | $9,203 | $238,844 | $59,679 |

*See* Stip., ¶ 92.

In 1996, the policies went into "paid-up"status. At that time, the death benefit became level. J1147, at CBTX010198.

The financial performance of the Great West policy was very disappointing to Dow, primarily because of its favorable mortality experience. For instance, between 1989 and 1997, Dow expected 266 deaths based on the mortality table used in the RFP. However, it experienced only 79 deaths. Great West had used pricing data projecting 216 deaths over the same period. The result was that Dow received $35 million less in death benefits than Great West projected. Dow's projected net annual after-tax cash flow was a positive $26 million. The actual after-tax cash flow to Dow was a negative $4 million. Laeyendecker, Tr. at 1067–69. Dow's reaction was motivated by its strong belief that it was overcharged for COI. In fact, Falla was "outraged" because the mortality of Dow was lower than the projections. Dow expected Great West to "come up to the plate" to make up a portion of that difference. Falla, Tr. (1/9 a.m.) at 111–116. Representatives met on January 31, 1991, and according to a memo from the meeting, J404, the purpose was to analyze Dow's cumulative mortality experience to date compared to what Great West and Clark/Bardes originally expected. According to the Great West representatives, "Our objective will be to adjust the policies to more accurately reflect your current and ongoing mortality and, thus, create a revised financial projection." *Id.* at 115.

Great West did, in fact, make adjustments. For instance, the spread for COLI policies, other than Dow's, was being increased to 1.25% due to the DAC tax, but Dow's spread remained at 100 basis points for 1991. Todd, Tr. at 965, 1012. The March 22, 1991 memo from Clark/Bardes (J416) indicates that "Great West is willing to reimburse Dow most of this unexpected gain" from favorable claims experience. Falla testified that this adjustment was on a "prospective basis." Great West would "reimburse" through "a major reduction in the crediting rate spreads between the interest rate Dow has on the borrowed funds and the rate credited by Great West to these borrowed funds." Falla, Tr. (1/9 a.m.) at 116–17. Thereafter, "Dow's actual mortality experience may be used in the calculation of the X–Rider interest spread which is used to recover cost of insurance." Ex. D94, at A012184; Falla, Tr. (1/9 a.m.),

at 120. In the unlikely event that Dow's actual death claims would continue at a level much lower than expected, Great West would (1) lower interest rate spreads, including using a negative interest spread, or (2) pay higher dividends on the base policy. Ex. J432; Falla, Tr. (1/9 a.m.) at 123–24.

Great West reduced the spread on the X–Rider below 100 basis points, even to as low as 25 basis points one year. In 1997, it released $4.5 million to divisible surplus and paid it to Dow as a dividend. However, this decision was driven by a belief that a reserve that had been set aside in the participating account had become "redundant," and was no longer needed to cover the risk in connection with Dow's policies.

The government points to Dow's strongly-worded demands for a "refund" as evidence that Dow expected—and intended—some true-up mechanism in mortality pricing. However, based on the testimony and exhibits, the Court is convinced that Dow was protesting what it believed was an overcharge on the mortality risk from the beginning of the arrangement. Dow was protesting pricing, not performance. Dow was not seeking to cancel its mortality bet and back out of the game. Rather, it was complaining that the game was rigged from the outset. That, essentially, is the difference between the risk-eliminating "true-up" mechanism used in the MBL policies in *AEP* and *CM Holdings,* and the prospective odds-improving mechanism in

the Great West policies. In the former, past risk was eliminated. In the latter, future risk—still extant—was managed.

The government argues that when the X–Rider spread was reduced below the level necessary to cover prospective COI for the coming year, it amounted to a refund of the prior year's mortality charges. However, this mechanism still was subject to the risks attendant to projecting future mortality experience, albeit reduced. There was no retrospective "truing-up" mechanism built into the Great West policies.

## G. *Dow's Purchase of MetLife Policies*

### 1. *Business Purpose and Change in Michigan Insurable Interest Law*

On December 1, 1990, the Michigan Legislature passed Public Act 349, amending Section 2210 of the Michigan Insurance Code, Mich. Comp. Laws § 500.2210. The new statute recognized an employer's insurable interest in the lives of its officers, directors, management, non-management, and retired employees, subject to the employee's consent.[2] Ex. J564. For non-management and retired employees, the insurable interest is limited to a level commensurate with the employer's projected unfunded benefit liabilities.

Because of the law change, Dow began in 1991 exploring an expanded COLI program. Stip., ¶ 96. Another COLI Task

---

2. Section 500.2210 of Michigan's Insurance Code provides that

[n]otwithstanding any other section of this act, an employer or a trust has an insurable interest in, and may, with the written consent of the insured, insure on an individual or group basis for its benefit the lives of the employer's directors, officers, managers, nonmanagement employees, and retired employees. An employer or a trust may insure the lives of the employer's non-management employees and its retired em-

ployees only if those persons give written consent to be insured and the coverage is limited to an amount reasonably commensurate with the employer's projected unfunded liabilities to nonmanagement and retired employees for employee benefit plans, calculated according to accepted actuarial principles. An employer shall not retaliate in any manner against an employee or a retired employee for refusing consent to be insured.

Mich. Comp. Laws § 500.2210 (1991).

Force was appointed by Falla in June; the members of the 1991 COLI Task Force were Burdett, who was the chair; Paul Brink, head of Dow's corporate tax department; Anita Jenkins, attorney in the tax department; Loren Pierce, corporate compensation and benefits; Kevin Rowe, accounting; VanAlsten, legal; and Heino Zell, head of human resources. Stip., ¶ 98. Gary Lake was again hired as the Task Force's actuarial consultant. Stip., ¶ 98. Because four of the members (Burdett, Jenkins, Pierce, and VanAlsten) of the 1991 COLI Task Force participated in 1988 and were already familiar with COLI, the process concluded with signed agreements in about six months. Because the tax law had not changed and Dow's 1988 analysis of the tax issues was viewed as correct, little work in the legal area was necessary for the COLI Task Force. Brink, Tr. at 2395–97.

Dow's unfunded retiree medical liability in 1991 was still estimated at over $1 billion NPV. However, as of 1990, Dow was in Alternative Minimum Taxpayer (AMT) status. As an AMT taxpayer, seventy-five percent of the otherwise tax-exempt inside build-up of interest, withdrawals, and death benefits were includable in alternative minimum taxable income in those years under the Alternative Current Earnings adjustments in I.R.C. § 56(g). The value of the interest deduction was also reduced from the illustrated 34% corporate tax rate to the AMT rate of 20%. Dow emerged from AMT status in 1995 and recovered $22 million in adjustments.

The 1991 COLI Task Force received presentations on August 25, 1991 by Great West, MetLife, Hartford Life Insurance Company, and CIGNA. Based on performance of the Great West policies, Dow determined it wanted its actual mortality reflected in these new policies while still maintaining some type of transfer of risk.

Following the presentations, the Task Force compared the economics of the proposals submitted.

### 2. Pre-purchase Illustrations

Following the August 1991 interviews, Clark/Bardes and Lake obtained illustration from several carriers enabling Dow to compare the "policy economics" of the various proposals. Burdett, Tr. at 1425–26. On September 23, 1991, Lake received from Clark/Bardes a "Carrier Analysis" including two sets of projections for the MetLife plan, titled Scenario 1 and Scenario 2. *Id.* at 1427–29; Ex. J523. Scenario 1 was based on a payment strategy of capping loans at $50,000, thereby requiring Dow to contribute cash to the plan after the period of withdrawals to basis. Scenario 2 was based on an uncapped loan strategy, requiring Dow to contribute only minimal cash to the plan after the period of withdrawals to basis. The analysis showed the undiscounted cash flows, net present values at 8% and 12%, and internal rates of return for both scenarios. Ex. J523. Burdett stated that the economics of the Scenario 1 was more appropriate because it had larger undiscounted cash flows projected to occur principally in the later plan years. Burdett, Tr. at 1428–29.

From August 6, 1991 to October 9, 1991, Winkelvoss Consulting, Inc., an outside service with whom MetLife had contracted, ran several cash flow and earnings illustrations of the MetLife program for Dow using a variety of assumptions, including loans capped at $50,000 and maximum loans beyond the $50,000 cap. Yau, Tr. at 2178; *E.g.,* Exs. J528, J556. The final two pre-purchase illustrations were the Case 23 and Case 24 illustrations.

Case 23 capped loans at $50,000; it represents an illustration for one person, age 40. Ex. J557. It reflected premium payments of approximately $10,000 each year for the first eight years with borrowing in

the first three years (totaling about $30,000), no borrowing for the fourth through seventh years inclusive (but partial withdrawal of approximately $11,900 each year), and borrowing in years eight through eleven inclusive until the $50,000 cap is reached. Ex. J557. Partial withdrawals continued in years eleven through eighteen, inclusive. Ex. J557. The illustration calculated net present value at discount rates of 7%, 8%, and 12%. Ex. J557.

Case 24 did not cap loans at $50,000. Like Case 23, it represented an illustration for one person, age 40. Ex. J557. It reflects premium payments of approximately $10,000 per year for the first eight years with borrowing in the first three years (totaling about $30,000), no borrowing the fourth through seventh years inclusive (but partial withdrawals years three though seven inclusive totaling about $48,000), and borrowing in years eight through fifty-nine inclusive, totaling about $280,000. Ex. J557. The illustration provided for the net present value calculations at 7%, 8%, and 12% discount rates. Ex. J557.

Case 23 provided for an increased unborrowed crediting rate of 8.75% after policy year seventeen. In contrast, Case 24 provided for a crediting rate of 5.5% in all years. Ex. J1274, at A013568. These cases also reflected a 2.2% retention rate negotiated between Dow and MetLife. *Ibid.* Dow states that because it was its intention to cap loans at $50,000, the Board of Director's decision was based on Case 23, not Case 24, because the net present value was higher and the payouts on a year-by-year basis would come in the later years. Lake, Tr. (1/14 p.m.), at 173–78; Ryan, Tr. at 1692; Burdett, Tr. at 1443.

Exhibit J550, a letter from John Ryan of MetLife to Gary Lake dated October 8, 1991, contains the Case 23 illustration which shows the policy performance over the full 60 years. When the cash flow is considered against the tax savings from interest deductions, there would be negative cash flow without the tax deductions until later in the plan. The overall plan performance, however, would be positive even without the loan interest tax deductions.

*MetLife "Case 23" Illustration*

| Interval | Tax Savings | Cash Flow | Cash Flow Absent Interest Deduction |
|---|---|---|---|
| 10 yrs | $ 10,032 | $ 6,559 | $ (3,473) |
| 20 yrs | 25,358 | 11,809 | (13,549) |
| 30 yrs | 39,112 | 1,538 | (37,574) |
| 40 yrs | 49,308 | 47,781 | (1,527) |
| 50 yrs | 54,155 | 172,593 | 118,438 |
| 60 yrs | 55,020 | 268,282 | 213,262 |

*See* J550.

### 3. Decision to Purchase MetLife Policy

The COLI Task Force met in September 24, 1991 and selected MetLife as the carrier and Ayco as the administrator for the 1991 COLI policies. In Burdett's letter to MetLife on October 1, 1991, he stated that "it is important to Dow that this COLI program be up and running by January 1, 1992." Ex. J536. The next day, Dow's Treasury Department submitted a board resolution seeking authorization to purchase the MetLife COLI program. The memorandum accompanying the resolution stated that the MetLife program "works by using tax arbitrage between tax-deductible interest on policy loans and the non-taxable build-up of premium income and dividends." Ex. J543, at A010266. The description of the COLI program stated that approximately 17,800 salaried full-time U.S. employees would be covered with average earnings impact and cash flow of $10 million per year after year three and no start-up losses in any year. Ex. J543, at A010267. The description further stated that the program would

have a $200 million NPV at an 8% discount rate. Ex. J543, at A010267.

On October 9, 1991, Dow's Finance Committee met and discussed the proposed MetLife COLI program, which included a slide presentation by Burdett. Burdett, Tr. at 1430–31. After Burdett's presentation, the Finance Committee unanimously approved the purchase of the MetLife COLI program. The next day, Dow's Board of Directors approved the resolution. The COLI purchase was approved for the following Dow subsidiaries: DORINCO; Liana Limited; Admiral Equipment Company; Essex Specialty Products, Inc.; DowBrands Inc.; FilmTec Corporation; Boride; and DCOMCO. Stip., ¶ 102. The features of the policy purchased later were outlined in a Memorandum of Understanding (MOU) which modified the terms of the insurance contract.

#### 4. Decision to Add Union Employees

The 1991 COLI program was initially limited to salaried employees. As an incentive to consenting to be covered under Dow's COLI program, Dow offered the beneficiaries of each participating salaried employee a $5,000 death benefit and the beneficiaries of each former salaried employee a $2,500 death benefit. Stip, ¶ 107. This death benefit would also be offered to employees covered under the Great West COLI program. *Ibid.*

By December 20, 1991, the census on the salaried employees was complete and 15,422 employees had consented. Ex. J629, at A013400–01; Burdett, Tr. at 1461. Dow's hourly union employees in Dow's Michigan Division also asked to be included in the COLI program, and Dow agreed. Burdett, Tr. at 1463; Ex. J623; Ex. J618, at H000332; Stip., ¶ 106. For the hourly employee-insureds who consented to participate in the MetLife COLI program, the beneficiaries would receive $4,000 death benefits for current hourly employees and $2,000 for beneficiaries of former hourly employees. Stip., ¶ 107.

The approximately 2,000 hourly union employees were included in the original authorization for 17,800 because the salaried employees consenting was less than 15,800 at the time and because it would be easier administratively to include them in the original program. Burdett, Tr. at 1463–64; Ex. J623, at A009332; Ex. J618, at H000332; Ex. J620, at H000333; Ryan, Tr. at 1824–25. MetLife issued a separate group policy for the hourly employees and agreed to combine the experience of both policies for the purpose of experience rating and apply the Memorandum of Understanding (MOU) to the new policy. Ex. J627, at A013041–42; Ryan, Tr. at 1824–25. The consent forms were mailed on or about December 30, 1991 and the census was completed in April 1992 with 1,641 employees consenting. Ex. J632, at B010972; Burdett, Tr. at 1465; Ex. J661; Ryan, Tr. at 1698–99.

#### 5. Features of the MetLife Policy

MetLife issued Dow two MetLife Eight Pay Group Permanent Life Policy Forms G.2332 on the lives of 17,061 Dow employees. Stip., ¶ 109. Policy number 34181–G was issued on the 15,420 nonunion employees and policy number 34406–G was issued on the 1,641 union employees. Stip., ¶¶ 104, 106. The permanent life policies covered the insureds for the remainder of their lives, as opposed to a specific term or number of years. Yau, Tr. at 1977. The policies were owned by Dow and Dow was the beneficiary of the death proceeds under both policies. Stip., ¶ 110.

The policies required Dow to pay eight level annual premiums of $10,000 for each insured. Stip., ¶ 111. After the payment of eight annual premiums, the policies were considered paid-up, and no additional

premiums were due. Stip., ¶ 114. The MetLife policies required the payment of the gross premium to maintain the scheduled level death benefit, which was based on the age of the insured. The age-based factor was designed to comply with IRC Section 7702, which prescribes the minimum permissible ratio between death benefits and cash value. DesRochers, Tr. at 3345–46. Under the terms of the MetLife policy, failure to pay the annual premiums would cause the policies to lapse, subject to the nonforfeiture provisions of the policy. The policies provided certain nonforfeiture options in the event that the stated annual premiums were not paid and the policy had unencumbered cash value. Stip., ¶ 118.

MetLife maintained an accumulation fund for each of Dow's insureds. Stip., ¶ 112. For each gross premium paid by Dow, MetLife credited the accumulation fund of the individual insured with the gross premium less an expense charge of 2.057% for state premium taxes. Stip., ¶ 113. Interest earned was also credited to the accumulation fund while cost of insurance charges, expenses charges, and partial withdrawals were deducted from the accumulation fund. Stip., ¶ 112.

Although Dow's COLI policy was written on a group policy form, it was MetLife's position that the Dow COLI program was a series of individual policies which were administered as a collection on individual insurance contracts with the premiums, COI, cash values, loans, withdrawals, policy values, and charges computed separately in each insured's accumulation fund. Ex. J483, at 010326; Ex. P85, at 2; Burdett, Tr. at 1422–23; Ryan, Tr. at 1744–45; DesRochers, Tr. at 3565, 3566; Ex. J499.

On December 20, 1991, Dow and MetLife signed a Memorandum of Understanding (MOU), referenced above, dated December 18, 1991 in conjunction with the policies which set forth the administrative and technical details of how the policies were intended to operate, including adjustments to COI, retention charges, the credited rate, experience rating, and the unwind provision. Stip., ¶ 105; Ex. J580; Rogalski, Tr. at 2526; Lake, Tr. (1/14 a.m.) at 146–47. Dow and MetLife also signed an agreement that MetLife would provide additional specialized services to Dow with respect to the MetLife COLI plan. Stip., ¶ 105.

Similar to universal life products, all the costs of Dow's MetLife COLI policies, such as COI and expense charges, were transparent to Dow. Dow was aware of four explicit costs associated with the MetLife program: (1) a 2.057% load for premium taxes, (2) the COI, (3) the spread between the loaned and credited interest rates, and (4) a 2.2% retention charge. Ryan, Tr. at 1742–43.

### 6. Cost of Insurance, Dividends and Mortality Charges

Based on the rate set forth in the MOU, MetLife calculated the COI for each individual employee based on his or her age and net amount of risk. The individual COI charges were totaled to determine the aggregate amount owed by Dow. Yau, Tr. at 2062–63. In response to Dow's request, MetLife agreed to a decremental spread between the loan rate and the credited rate, stated as follows in the MOU: (a) 25 basis points on the first $800 million of outstanding policy loans, (b) 20 basis points on the next $800 million of outstanding policy loans, (c) 15 basis points on the next $800 million, and (d) 10 basis points for the policy loans over $2.4 billion. Ex. J580, at CBI260.

The MOU detailed the dividend calculation and experience rating process which applied to Dow's MetLife COLI program

and was to be conducted every October. Ryan, Tr. at 1785. The formulae, provided in Attachment 3 to the MOU, were based on Dow's mortality experience and applied for all policy years; they could not change absent mutual agreement of the parties. Ryan, Tr. at 1743–44, 1789; Bartlett, Tr. at 4746–48; Ex. J580, at CBI261. In years in which the COI charges were greater than the death benefits, Dow was entitled to a dividend in the amount of the cumulative COI charges, less the incurred claims (cumulative claims plus the change in the IBNR[3] claims), less the retention charge of 2.2%. Ex. J580, at CBI264. The entire amount of the dividend was accessible to Dow and could be encumbered with a policy loan or withdrawal. Rogalski, Tr. at 2533–34.

The COI charges were adjusted in a manner that reflects both retrospective and prospective components, but once again there was no fully retrospective true-up mechanism which eliminated the risk associated with the prediction of mortality rates. For instance, the MetLife policy did not contain an imbedded margin in the COI charges to cover potentially volatile experience, Yau, Tr. at 2364; Rogalski, Tr. at 2457–58; Hickman, Tr. at 2968–69; a claim stabilization reserve to recover losses in years when the policy owner experienced deaths in excess of expectations, Yau, Tr. at 2084–85; Rogalski, Tr. at 2459, 2461; Ryan, Tr. at 1780, 1787; Sayre, Tr. at 5832–33, 5834–35; a loss carryforward provision which would give the insurance company the ability to carry its losses forward to subsequent policy years and to recoup those losses through future policy year surpluses, Rogalski, Tr. at 2456; or a "terminal"retrospective de-

duction which would enable the insurance carrier to call on additional COIs to cover claim losses over and above COIs that were collected by charging a deduction in the year the contract surrenders or terminates, Rogalski, Tr. at 2458. All of these are common features in fully experience-rated group policies.

Rather, Dow's retrospective experience rating mechanism, set forth in Attachment 3 of the MOU, had three significant components: (1) in years when Dow paid out more in COI than it received back in death benefits, MetLife paid Dow a dividend as noted above; (2) in years when Dow received more in death benefits than it paid in COI, MetLife had the right to collect from Dow up to an additional 15%; and (3) Dow paid an annual charge of 2.2% of actual claims up to 115% of expected claims for the risk that MetLife assumed. Ex. J624, at A000570. The pricing was established by MetLife's actuary, Joseph Yau. Yau used the mortality experience which Gary Lake had complied from Dow's group term life program after comparing it to a standard mortality table, the New York Table Y, which was based on data complied by the New York Insurance Department. Yau considered Lake's actuarial study to be preferable to a standardized mortality table alone. Yau then converted the mortality rates into monthly COI rates, and then set the stop loss amount in accordance with accepted actuarial principles. The stop loss at 115% of expected claims transferred risk to MetLife that the actual claims experience could result in a mortality profit to the policyholder. The amount paid to MetLife by Dow, the 2.2%

---

3. IBNR is a reserve of "incurred but not yet reported" claims. In calculating the dividend, MetLife included an estimate of individuals who died, but whose claims had not been reported to MetLife as of the end of the policy year. Each time a dividend was paid, the old IBNR was released and a new IBNR was created. Yau, Tr. at 2087–88; Ryan, Tr. at 1784–87.

retention charge, was reasonable in light of the risk calculated by Yau.

Based on the experience rating formula, MetLife paid dividends to Dow as follows:

| Policy Year Beginning | Dividends (In Thousands) |
|---|---|
| 10/29/91 | $ 3,873 |
| 10/29/92 | $ 2,683 |
| 10/29/93 | $ 2,903 |
| 10/29/94 | $ 3,623 |
| 10/29/95 | $ 2,711 |
| 10/29/96 | $ 0 |
| 10/29/97 | $ 9,111 |
| 10/29/98 | $ 3,842 |
| 10/29/99 | $ 1,978 |
| TOTAL | $30,723 |

Stip., ¶ 131. The dividend for the 1997 policy year was substantially higher than dividends paid to Dow in other policy years because it included a refund of Deferred Acquisition Cost (DAC) taxes paid by Dow to MetLife. Ex. J998, at A002883; Yau, Tr. at 2257–58; Rogalski, Tr. at 2520. The 1997 dividend also included an adjustment to the IBNR reserve.[4] Bartlett, Tr. at 4802–04; Ex. J905.

The MOU also provided that, if mortality experience was higher than anticipated, MetLife could increase the COI charges; this is a form of prospective experience rating. Yau, Tr. at 2310; Bartlett, Tr. at 4813. MetLife could not change the COI charges for the first two policy years and could only change the COI charges in the third year if the actual mortality experience in each of the first two years exceeded 125% of the annual COI charges. Ex. J580, at CBI257. Beginning in the fourth

year, MetLife had the right to change the COI charges as long as the COI charges did not exceed the average mortality experience over the prior three policy years and did not exceed the maximum COI charges contained in the policy form. *Ibid;* Ex J593, at A014138. MetLife did not interpret its "right" to change COI charges in and after the fourth year as requiring it to decrease COI charges in the event that the prior years' mortality experience was lower than the current mortality charges. Yau, Tr. at 2311–12.

### 7. Loan Mechanism and Rate Formula

Dow's MetLife COLI policies provided for policy loans secured by the value of the accumulation fund for each of the covered employees. Stip., ¶ 115. The maximum loan rate under Dow's group MetLife policies was the greater of Moody's Corporate Bond Yield Average or the credited loaned interest rate plus no more than 0.77% in policy years one through eight and 0.25% in policy years nine and later. Stip., ¶ 116. The actual policy loan rate was always equal to or less than Moody's Corporate Average. Stip., ¶ 116.

Dow's MetLife COLI policies provided for a variable policy loan interest rate based on the Moody's Corporate Bond Yield Average—Monthly Average Corporate as published by Moody's Investors Service, Inc. Stip., ¶ 119. Dow's MetLife COLI policies also provided for a fixed loan interest rate of 8%. Stip., ¶ 120. Dow had the right to choose the fixed or variable rate each year. Stip., ¶ 121. The loan interest rates charged by MetLife were as follows:

---

4. The IBNR reserve refers to funds set aside to cover claims in the policy period that were "incurred but not reported."

| Policy Year Ending | Loan Interest Rate |
|---|---|
| 10/29/92 | 9.42% |
| 10/29/93 | 8.44% |
| 10/29/94 | 7.50% |
| 10/29/95 | 8.42% |
| 10/29/96 | 7.66% |
| 10/29/97 | 7.66% |
| 10/29/98 | 7.66% |
| 12/29/98 | 6.75% |
| Effective 12/30/98 | 4.25% |
| 10/29/00 | 4.25% |
| 3/29/01 | 4.25% |
| Effective 3/30/01 | 4.25% |

Stip., ¶ 123.

Under the Generally Accepted Accounting Principles (GAAP), policy loans obtained from MetLife were netted against policy values on the asset side of the balance sheet and were not shown as a separate liability for financial reporting purposes. Stip., ¶ 124.

Under the MetLife COLI policies, the rate credited to Dow's accumulation fund would never be less than 4% compounded annually. Stip., ¶ 128. Under the policy, the "credited unloaned interest rate," the interest rate credited on the unloaned portion of the accumulation fund, was set by MetLife from time to time. Stip., ¶ 128. The "credited loaned interest rate," the interest rate credited on the loaned portion of the accumulation fund, was equal to the greater of (1) Moody's Corporate Bond Yield Average—Monthly Average Corporate for the calendar month ending two months before the start of the policy year minus up to 0.77% in policy years one through eight and minus up to 0.25% beginning in policy year nine; (2) the credited unloaned interest rate in effect on the first day of the calendar month ending two months before the start of the policy year;

or (3) the guaranteed interest rate of 4%. Stip., ¶ 129. The actual credited loaned interest rate and credited unloaned interest rate for the MetLife COLI policies was as follows:

| Policy Year Ending | Loaned Credited Rate | Unloaned Credited Rate |
|---|---|---|
| 10/29/92 | 8.65% | 5.50% |
| 10/29/93 | 7.67% | 4.00% |
| 10/29/94 | 6.73% | 4.00% |
| 10/29/95 | 7.65% | 4.93% |
| 10/29/96 | 6.89% | 5.29% |
| 10/29/97 | 6.89% | 4.50% |
| 10/29/98 | 6.89% | 5.16% |
| 12/29/98 | 6.50% | 4.78% |
| Effective 12/30/98 | 4.00% | 4.78% |
| 10/29/00 | 4.00% | 5.00% |
| 3/29/01 | 4.00% | 5.00% |
| Effective 3/30/01 | 4.00% | 6.81% |

Stip., ¶ 130.

Section 3 of the MOU provided specific guarantees regarding Dow's right to unwind the policies in the event of "adverse tax legislation," defined as "a change in the tax law that would disallow the loan interest deduction on a prospective basis or legislation or regulation that has an adverse impact on the Corporate Owned Life Insurance purchased by Dow and Dow's COLI plan design." Ex. J580, at CBI252; Ex. J565, at A014202. If unwind occurred during the first policy year, MetLife would return the gross premium plus interest, less claims paid plus interest, less policy loans plus interest, less interest adjustment for state premium tax and DAC tax paid. If unwind occurred after the first policy year, MetLife would apply the first-year procedure to the current policy year and then pay the surrender value as of the last day of the prior policy year. Ex. J580, at CBI253.

## 8. Ayco

Although Clark/Bardes was initially involved in promoting the MetLife policy to Dow and actively sought to become Dow's broker of record, Dow's MetLife COLI policies were administered by Ayco pursuant to two Administrative Service Agreements, one for each of the two group contracts. Stip., ¶ 97, 133. Under the terms of the agreements, with an effective date of October 30, 1991, Ayco agreed to perform a number of administrative tasks for Dow, including tasks related to the implementation of the policies and tasks related to the on-going management of the policies. Stip., ¶¶ 133–34. For Ayco's management of the enrollment and consent process, Dow agreed to pay Ayco $3.75 for each Dow insured to (1) prepare and mail consent forms to employees eligible for coverage under Dow's MetLife COLI program for the purpose of acquiring insurance on their lives, (2) maintain a toll-free telephone number for eligible employees to call with respect to inquiries relevant to the insurance being purchased by Dow on their lives, (3) follow up with eligible employees delinquent in submitting consent forms, and (4) coordinate services with MetLife regarding the issuance and processing of Dow's MetLife COLI policies. J634, at A009690–91; Burdett, Tr. at 1462.

In exchange for ongoing management of the policies, Dow agreed to pay Ayco an "annual fee" of $50,000, due on or before October 30 of each year, to (1) consult regarding GAAP to ensure that proper accounting methods for the MetLife COLI policies are used, (2) provide annual reports that summarized past performance of the MetLife COLI policies and projected future performance, (3) prepare composite data for detailed projections and composite illustrations, (4) arrange and process policy loans and withdrawals with MetLife, (5) compute policy values and expenses to insure that MetLife's calculations were correct, and (6) assist Dow and MetLife in processing death claims and the payment of death proceeds. Ex. J634, at A009691; Burdett, Tr. at 1672–73; Ex. J622, at A013070. The annual fee was adjusted each year by a cost of living increase that was the lesser of the annual change in the Consumer Price Index as calculated on June 30 of applicable year, or 105% the prior year's annual fee. Stip., ¶ 136. In addition, Dow agreed to pay Ayco an annual "service fee" of $75 per insured on the first 500 insureds, $50 per insured on the next 500 insureds, $25 per insured on the next 2,000 insureds, $15 per insured on the next 2,000 insureds, and $10 per insured on the remaining insureds. The first service fee was due on December 31, 1991. Thereafter, the service fee was payable in quarterly installments on October 30, January 30, April 30, and July 30. Stip., ¶ 137. For tax year 1991, Dow paid a total of $174,506 to Ayco.

## 9. Effective Policy Date

It was originally assumed that Dow's MetLife policies would have an effective date of December 1991, the month when the census of the salaried employees was expected to be finalized. Lake, Tr. (1/16 a.m.), at 495–96; Ex. J555, at A010294. On October 9, 1991, however, it was recommended that Dow change the effective date to October 1991 to have a higher policy loan interest rate (9.42% instead of 8.91%); MetLife was willing to "backdate" the policies even if the census was not finalized until December. Ex. J555, at A010294; see also Lake, Tr. (1/16 a.m.) at 496–97; Yau, Tr. at 2215–16. On October 30, 1991, Dow executed an application for Eight Pay Group Permanent Life Insurance with MetLife and paid the net premium due of $12,505,613.14. Sayre, Tr. at 5816; Ex. J581; Stip., ¶ 103. The premium represented all potentially eligible lives

(18,548). Ex. J565, at A014203; Burdett, Tr. at 1459–60. Dow received a refund for the salaried employees who did not consent by December 31, 1991. Burdett, Tr. at 1461.

Both of the MetLife COLI policies had an effective date of October 30, 1991.

On December 23, 1991, when Dow decided to add union employees to the COLI program and policy number 34406–G was issued to cover the unionized employees, the preliminary census yielded 2,161 eligible union employees; a re-estimated census on January 14, 1991 yielded 2,199. Sayre, Tr. at 5818; Ex. J643. Ultimately, 1,641 union employees returned consent forms by May 5, 1992 and the census was finalized. Sayre, Tr. at 5818–19; Ex. D685.

### 10. Post–Purchase Illustrations

After the Dow Board of Directors approved the resolution authorizing the purchase of the MetLife plan in October 1999 through the completion of the census in March 1992, MetLife and Winkelvoss ran several illustrations based on the estimated total population of Dow's program. Exs. D240, D622, D627, D682, J604, D641; Yau, Tr. at 2269–78; Sayre, Tr. at 5787–89; Ex. D840. The Winklevoss illustrations did not cap loans at $50,000 because, according to John Ryan, MetLife's vice-president, (1) it was administratively easier to and less costly to run illustration for a single scenario (which happened to be uncapped loans) and (2) Dow had already made its purchase decision based on prior illustrations. Ryan, Tr. at 1826–28.

Reillustrations were also provided by Ayco. Burdett stated that these reillustrations were prepared to help Dow manage and track the *current* performance of the program; therefore, whether the loans were capped at $50,000 or not affected only year 17 and later was irrelevant to current performance. Burdett, Tr. at 1676.

### 11. Payment of the Premiums

#### a. Policy Loans

Dow's MetLife COLI policies provided for policy loans secured by the value of the accumulation fund for each of the covered employees. Stip., ¶ 115. The loan value was equal to the cash surrender value of the policy at the date of the policy year, less any unpaid premiums or loan interest payable to the end of the policy year. Ex. J409, at 14; Ex. J593, at A014131; Ex. J408, at A00591; Yau, Tr. at 2081–82. The maximum policy loan was calculated such that when cash inflows and outflows for the remainder of the year were considered, there was a non-negative cash value remaining. Yau, Tr. at 2081–82. The policy loans could be repaid at any time and if not repaid before death were to be repaid from death benefit proceeds. Ex. J408, at A000589, A000592; Ex. J409, at 12, 15. Each of Dow's loans from MetLife required the payment of interest in arrears on the policy anniversary date. Stip., ¶ 117. Policy Form G.2332 provided for certain nonforfeiture options in the event that the stated annual premiums were not paid and the policies had unencumbered cash value. Stip., ¶ 118. The policy provides that "[f]ailure to repay a loan or to pay loan interest will not result in Discontinuance of the Policy unless the Cash Surrender Value is insufficient to pay the Monthly Deduction due on a Monthly Date. In that case, the Group Policy will terminate." Ex. J408, at A000592; Ex. J409, at 15.

Dow took policy loans totaling $50,000 per policy to pay premiums for the first, second, third, eighth, and ninth policy years. The policy loans and premium payments in the MetLife COLI program were achieved by means of netting transactions. Ryan, Tr. at 1909–14; Ex. J555, at

A010295. Dow did not obtain policy loans under its MetLife COLI policies in years four through seven. Stip., ¶ 125. Dow also did not obtain policy loans in excess of $50,000 per insured employee under its MetLife COLI policies. Stip., ¶ 126. The MetLife COLI policies did not go into nonforfeiture status during the first five policy years. Stip., ¶ 127.

### b. Partial Withdrawals

Dow's MetLife COLI policies also provided Dow the right to request a partial cash withdrawal from the available cash value. Ex. J580, at CBI254; Ex. J593, at A014130. A partial withdrawal would reduce individual accumulation funds on a dollar-for-dollar basis except during the first ten policy years. Ex. J408, at A000590; Ex. J409, at 13. A partial withdrawal made in the first ten policy years would not affect the death benefit until the tenth policy anniversary. Ex. J593, at A014130; Ex. J580, at CBI254. The methodology for calculating the maximum partial withdrawal was the same as for the maximum policy loan: MetLife determined the current cash value, cash inflows and outflows to the policy, and determined the maximum withdrawals such that the end of the year cash value would not be negative. Yau, Tr. at 2081–82. Dow used partial withdrawals to finance premiums in years four and five to finance premiums and policy loan interest and years six and seven to finance policy loan interest.

The premium payment and partial withdrawals were also achieved by means of a simultaneous netting transaction. This was somewhat problematic because at the end of each policy year, the cash values were fully encumbered, as with the Great West policies. However, in the fourth through seventh policy years, MetLife deemed the annual premium paid, thereby creating additional cash value. That "new" value then supported the partial withdrawals which were considered to have paid approximately 90% of the premium and accrued loan interest. The balance of the premium was paid in cash.

### c. Loading Dividends

MetLife determined that the use of a loading dividend structure was an inappropriate mechanism to pay premiums in years four through seven and comply with I.R.C. § 264. Dow's MetLife COLI program did not provide for loading dividends.

### 12. Performance of the Policies

The table below reflects Dow's operation of its MetLife policies over the first seven years:

| MetLife Cash Payment—Aggregate (In Thousands) | | | | | |
| Year | Premium | Policy Loan | Policy Loan Interest | Dividend | Withdrawal | Dow Cash Payment |
| --- | --- | --- | --- | --- | --- | --- |
| 10/30/91 | $170,510 | $158,756 | 0 | 0 | 0 | $11,754 |
| 10/30/92 | $170,250 | $175,540 | $14,990 | 0 | $ 10 | $ 9,690 |
| 10/30/93 | $170,000 | $175,278 | $27,367 | 0 | $ 10,695 | $11,395 |
| 10/30/94 | $169,770 | 0 | $38,132 | 0 | $195,779 | $12,123 |
| 10/30/95 | $169,360 | 0 | $42,737 | 0 | $200,071 | $12,026 |
| 10/30/96 | 0 | 0 | $38,894 | 0 | $ 28,665 | $10,229 |
| 10/30/97 | 0 | 0 | $38,676 | 0 | $ 25,065 | $13,611 |
| 10/30/98 | 0 | 0 | $38,575 | 0 | $ 35,559 | $ 3,016 |
| TOTAL | $849,890 | $509,574 | $239,371 | 0 | $495,844 | $83,844 |

Stip., ¶ 132.

### H. Disposition of the Policies

In August 1996, Congress enacted the Health Insurance Portability and Accountability Act of 1996 (HIPA), Pub.L. 104–191, § 501, 110 Stat.1936. HIPA amended I.R.C. § 264 to disallow policy loan interest deductions under broad-based COLI programs with one exception effective January 1, 1996. The exception allowed COLI policy loan interest deductions that were otherwise deductible under prior law to continue for up to 20,000 employees through the 1998 tax year. However, only 90% of the interest was deductible for the 1997 tax year, and only 80% of the interest was deductible for the 1998 tax year.

Because they believed that HIPA would substantially change the performance of Dow's COLI policies, both Clark/Bardes and Ayco proposed mechanisms for Dow to phase-out its COLI policies. Wimberly, Tr. at 4506–07; Jenkins, Tr. at 4538–39; Exs. J1013, J1057, J1064, J1041, J1042, J1059. Based on the brokers' initial illustrations, Stefan Koch, a finance manager in Dow's corporate treasury group, assessed the financial performance of the COLI programs. Koch requested additional illustrations to reflect four alternatives: (1) surrender the policies and prepay all the loans; (2) withdraw to basis and prepay part or all of the loans; (3) maintain the policies and prepay part or all of the loans; (4) maintain the policies and loans as is. Ex. J1169; Koch, Tr. at 2592, 2594; Exs. J236, J238, J1041, J1042, J1059, J. 1057; Koch, Tr. at 2598–2601, 2609, 2614–15, 2616, 2628, 2631.

Koch recommended that Dow maintain the Great West COLI policies "as is" because the high cash values would maintain the death benefits as a high level, resulting in a favorable financial impact in terms of cash flows and earnings. Koch, Tr. at 2611; Ex. J1169, at B014286. Koch discounted the cash flows using two interest rates: (1) Dow's Weighted Average Cost of Capital (WACC), which was at 10.75% at the time, and (2) Dow's Cost of Funds (COF), which was at 4.03% at the time. Exs. P199, J1057, J1169; Koch, Tr. at 2602, 2603–05, 2611, 2613. Using the COF, Koch projected Dow would receive a positive cash flow on a NPV basis of $75.9 million over the life of the Great West COLI program. Ex. P199. Koch projected earnings of $6.5 million in 1999, $7.2 million in 2000, and $8 million in 2001 by keeping the policies "as is." *Ibid.* An independent analysis by Clark/Bardes also concluded that leaving the Great West COLI policies in force and capping the loans at $50,000 would yield the best financial performance based on a present value basis. Wimberly, Tr. at 4507–10; Exs. J1057, J1013, J1064. The government contends that the death benefit projections were overstated and thus would cause economic losses to Great West. Those losses, the government argues, would cause Great West to adjust the spread and reduce or eliminate the cash flows to Dow—a factor not taken into account by Koch in his analysis. *See* Koch, Tr. at 2634–35, 2637–39; Exs. J328, 1057. In November 1998, Dow adopted Koch's recommendation and decided to keep the Great West COLI policies in force. Koch, Tr. at 2613.

For the MetLife COLI program, Dow elected to discontinue premiums after the fifth policy year. Stip., ¶ 132. Therefore, the only amount due each subsequent year was the accrued policy loan interest. *Ibid.* Koch recommended that Dow take partial withdrawals to basis and pay off outstanding loans through netting transactions. Koch's recommendation would have generated a $37.2 million net cash flow when

discounted at the 4.03% COF rate and a $8.7 million net cash flow when discounted at the 10.75% WACC rate. Ex. J1169, at B014282. Short-term earnings, however, were superior if Dow kept the MetLife COLI policies "as is." Under the "as is" strategy, Dow could expect positive earnings of $3.3 million in 1999, $6.5 million in 2000, and $6.9 million in 2001. Long term, Dow could expect a negative cash flow of $10.9 million when discounted at the 4.03% COF rate and a negative cash flow of $68.2 million when discounted at the 10.75% WACC rate. Koch, Tr. at 2627–18; Ex. J1169, at B014282. Pedro Reinhard, Dow's Chief Financial Officer, rejected Koch's recommendation and decided to keep the MetLife COLI policies "as is" because the earnings profile was better. Koch, Tr. at 2627–18; Ex. J1169, at B014282.

### I. Dow's Filing of Tax Returns, Challenges, Payment of the Tax, and Claim

Dow timely filed its corporate federal income tax returns for the 1989, 1990 and 1991 calendar years with the IRS's Detroit, Michigan office and paid the tax shown on the return. Stip., ¶ 6. The IRS assessed an income tax deficiency against Dow of $1,367,383 for 1989; $3,043,326 for 1990; and $6,836,910 for 1991. On March 12, 1999, Dow paid these deficiencies together with interest in an amount totaling $22,209,570:

| | 1989 | 1990 | 1991 |
|---|---|---|---|
| Federal Income Tax | $1,367,386 | $3,043,326 | $ 6,836,910 |
| Assessed Interest | $1,781,778 | $3,235,630 | $ 5,944,540 |
| TOTAL | $3,149,164 | $6,278,956 | $12,781,450 |

On December 22, 1999, Dow timely filed form 1120X, claiming a refund for tax years 1989, 1990, and 1991. For tax year 1989, Dow is claiming a refund of the deficiency and assessed interest, totaling $3,149,164, based on Dow's position that it was entitled to deductions in the amounts of (1) $3,843,813 from interest payments made on loans secured by Dow's COLI policies and (2) $168,563 from consulting fees paid by Dow for the administration of its COLI policies to Clark/Bardes. For tax year 1990, Dow is claiming a refund of the deficiency and assessed interest, totaling $6,278,956, based on Dow's position that it was entitled to deductions in the amounts of (1) $12,968,778 from interest payments made on loans secured by Dow's COLI policies and (2) $2,175,160 from consulting fees paid by Dow for the administration of its COLI policies to Clark/Bardes. For tax year 1991, Dow is claiming a refund of the deficiency and assessed interest, totaling $12,781,450, based on Dow's position that it was entitled to deductions in the amounts of (1) $13,491,825 from interest payments made on loans secured by Dow's COLI policies, (2) $181,715 from consulting fees paid by Dow for the administration of its COLI policies to Clark/Bardes, and (3) $174,506 from consulting fees paid by Dow for the administration of its COLI policies to Ayco.

The IRS issued full disallowances of Dow's 1989, 1990, and 1991 claims for refund on May 23, 2000. Dow timely filed this action, claiming a refund of the federal income tax and assessed interest for tax years 1989, 1990, and 1991 on the basis of the deductions taken, as described above.

### II. Analysis

Dow claims that it is entitled to deductions for interest payments on policy loans in the years after 1989 for the Great West COLI plan and after 1991 for the MetLife COLI plan. Generally, for corporations, "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." IRC § 163, 26 U.S.C. § 163(a). For the purpose of the Internal Revenue Code, "interest" represents compensation or consideration for the use or forbearance of money. *Old Colony R.R. Co. v. Comm'r*, 284 U.S. 552,

561–62, 52 S.Ct. 211, 76 L.Ed. 484 (1932). "Indebtedness" under IRC § 163 consists of "an unconditional and legally enforceable obligation for the payment of money." *Autenreith v. Comm'r,* 115 F.2d 856, 858 (3d Cir.1940).

■ The taxpayer bears the burden of proving the validity of its claimed deductions. *National Starch & Chem. Corp. v. Comm'r,* 918 F.2d 426, 429 (3d Cir.1990) *aff'd sub nom INDOPCO, Inc. v. Comm'r,* 503 U.S. 79, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992).

Where the interest payment is made on a loan secured by a life insurance policy, special rules apply. These rules have evolved as Congress has attempted to keep pace with insurance industry development of various whole life and universal life products utilized by corporations as investment and revenue producing vehicles. For several years, many businesses have purchased insurance on the lives of its key employees in order to protect the company from the economic loss that might result from the untimely death of a person important to the success of the business. When the form of the insurance policy was one which allowed for the accumulation of cash value, such as whole life or universal life, borrowing against the policy value to pay the insurance premiums became prevalent. *See Woodson–Tenent Labs., Inc. v. United States,* 454 F.2d 637 (6th Cir.1972). Interest paid on these loans secured by the cash value of the life insurance policies was deductible under the Internal Revenue Code. As noted above, Congress limited the practice of leveraging premium financing by enacting the "4–of–7 rule," confining the interest deduction to loans of $50,000 or less, and ultimately phasing out the interest deduction after 1996. *See* Pub.L. 88–272 (1964); Pub.L. 99–514, § 1003, 100 Stat.2085 (1986); Health Insurance Portability and Accountability Act of 1996, (HIPA), Pub.L. No. 104–91, 110 Stat.1936 (1996).

The interest deductions claimed by the plaintiff in this case predate the phase-out effectuated by HIPA. However, undergirding the application of IRC § 264 is an additional statutory provision which defines "life insurance" as "any contract which is a life insurance contract under the applicable law," and which also meets certain actuarial rules relating to the ratio of the investment portion of the life insurance contract to the pure insurance element. *See* IRC §§ 7702, 7702A.

In this case, Dow claims that the COLI plans complied with chapter and verse of the relevant IRC sections which render the interest payments made in connection with its COLI plans' deductible. Dow also claims that, pursuant to IRC § 162(a), the expenses it incurred in developing both of the COLI plans are deductible as "ordinary and necessary expenses paid or incurred during the taxable year in carrying on [its] trade or business."

The government has disallowed Dow's claimed deductions for several reasons. First, the government claims that the Great West and MetLife COLI plans were devoid of economic substance because there were no practical economic effects of the transactions except to create income tax deductions. Accordingly, the government claims that both of the COLI plans were shams in substance, or economic shams.

Second, the government attacks the use of simultaneous netting transactions by Dow to pay premiums on the policies in the first eight years of their existence, reasoning that the premium payments never really occurred because they were factual shams. The government contends that, consequently, the interest deductions are claimed on sham loan transactions, and

the plans fail the 4–of–7 test of IRC § 264(c)(1) because the use of policy withdrawals to pay premiums constituted nothing more than circular transactions without factual substance.

Third, the Great West COLI plan is under attack by the government as not qualifying as "life insurance" under IRC § 7702 for the reason that the plan does not constitute a life insurance contract "under the applicable law," that is, under Michigan law.[5] The government contends that Dow did not have an insurable interest in the lives of all of the 4,051 employees insured under the Great West plan, as that concept is defined under the common law of Michigan, and therefore Dow is not entitled to the favorable tax treatment afforded life insurance contracts, including the deductibility of policy loan interest, afforded under the Internal Revenue Code.

Fourth, because both Great West and MetLife issued insurance binders upon payment of the first year premiums, but did not deliver the policies until a much later date after the final census was transmitted to the respective insurance companies, the government claims that the insurance policies were effectively backdated and that interest and expense deductions for the interim period must be disallowed.

Finally, the government contends that, because the COLI programs were economic shams, any business expenses incurred in implementing the programs are not deductible.

### A. The Sham Transaction Doctrine

■ There is no question that a taxpayer is entitled to reduce tax obligations by any means allowed by the law. *See* *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596 (1935) ("The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."). However, transactions that are invented solely to create tax deductions and otherwise have no economic substance, even though formally complying with the letter of the Internal Revenue Code, will not be recognized. *See Knetsch v. United States*, 364 U.S. 361, 365–66, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960). Such transactions are deemed "shams" and will not support tax deductions where their substance is not consistent with their form. *ACM Partnership v. Comm'r*, 157 F.3d 231, 247 (3d Cir.1998).

Discussions of the sham transaction doctrine typically begin with *Gregory v. Helvering*, where the Supreme Court found that a transaction that was devoid of any real business purpose and designed solely to avoid the payment of taxes was a nullity for federal income tax purposes. In that case, Evelyn Gregory, the sole shareholder of United Mortgage Corporation, sought to transfer to herself one thousand shares of Monitor Securities Corporation held as an asset by United Mortgage. To achieve that objective, Gregory formed Averill Corporation, of which she was the sole shareholder, and caused United Mortgage to transfer the Monitor Security stock to Averill as Averill's sole asset. A few days later, Averill was dissolved and liquidated by distributing its assets—i.e., the Monitor Security stock—to Gregory. She then immediately sold the stock for $133,333, declaring a capital gain of $76,000 on which she paid tax. However, her tax would have been much higher if United Mortgage had sold the Monitor stock and distributed the proceeds to her. *Gregory*, 293 U.S. at 467, 55 S.Ct. 266.

---

**5.** The government also asserts, belatedly, that the Court must consider the same question under Texas and Louisiana law because a significant portion of Dow's insured workforce resided in those states.

The Commissioner of Internal Revenue disregarded the corporate reorganization and imposed a tax as if United Mortgage had sold the stock and paid Gregory a dividend. That decision was upheld by the court of appeals, and the Supreme Court affirmed. The Court drew a distinction between the purposeful but legal avoidance of taxation, which it found to be proper, and the creation of a device that is not what it purports to be. Although the corporate reorganization in this case followed the statutory requirements to the letter, it created

> an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner. No doubt, a new and valid corporation was created. But that corporation was nothing more than a contrivance to the end last described. It was brought into existence for no other purpose: it performed, as it was intended from the beginning it should perform, no other function. When that limited function had been exercised, it immediately was put to death....
>
> The rule which excludes from consideration the motive of tax avoidance is not pertinent in this situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose.

*Id.* at 469–70, 55 S.Ct. 266.

Thus, the Supreme Court set forth an analytical framework for detecting shams which first calls for an examination of the transaction objectively to determine its economic substance irrespective of taxpayer motivation to avoid taxation. *Id.* at 470, 55 S.Ct. 266.

The Supreme Court applied the same analysis in *Knetsch v. United States,* a case dealing with the tax arbitrage opportunities presented by the deductibility of policy loan interest. The policies at issue in that case were ten thirty-year annuity policies which Karl Knetsch purchased, each with a face value of $400,000 earning 2.5% interest compounded annually, at a price totaling $4,004,000. Knetsch paid the purchase price with $4,000 in cash and a non-recourse note in the amount of $4,000,000 at 3.5% interest. The note was secured by the annuity policies. The annuities included loan privileges which allowed Knetsch to immediately borrow amounts secured by the value in excess of his indebtedness. The cash value of the annuities at maturity (when Knetsch would have been ninety years old) would have been $8,388,000 paying $90,171 monthly. *Knetsch,* 364 U.S. at 364, 81 S.Ct. 132.

On the same day he bought the annuities, Knetsch paid the first year's interest on the notes in the amount of $140,000. Five days later, Knetsch borrowed $99,000 secured by the excess policy cash value, leaving the annuities with excess cash value of $1,000. On his tax return for that year, Knetsch deducted $143,465 from gross income as "interest paid ... within the taxable year on indebtedness" pursuant to § 23(b) of the 1939 tax code. Knetsch repeated this practice in the second and third contract year, stripping policy values by borrowing, and deducting interest payments on his tax returns. He cancelled the contract sixteen days after the fourth contract year began. The total

cash value of the annuities at the time was $4,308,000 and the total indebtedness was $4,307,000. Knetsch surrendered the annuities and received $1,000 in cash. *Ibid.*

The Commissioner of Internal Revenue disallowed Knetsch's tax deductions on each of his three returns, and Knetsch brought suit for a refund after he paid the deficiencies. The lower courts found that there was no economic substance to the transaction, and the Supreme Court affirmed that decision. Once again, the Supreme Court noted the irrelevance of the Commissioner's contention that the taxpayer's sole motive was to gain taxable benefits. The Court reaffirmed that "the legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted .... But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." *Id.* at 365, 81 S.Ct. 132 (citing *Gregory*, 293 U.S. at 469, 55 S.Ct. 266). In examining "what was done," the Court concluded that the series of transactions was a sham. The taxpayer paid $294,570 during the first two years in premium and received $203,000 back in the form of "loans." Although in exchange for this out-of-pocket difference, the taxpayer ostensibly had a monthly annuity payment coming of $90,000 at maturity, the Court noted that this "was a fiction, because each year [the taxpayer's] annual borrowings kept the net cash value, on which any annuity or insurance payments would depend, at the relative pittance of $1,000." *Id.* at 366, 55 S.Ct. 266. It was obvious to the Court, therefore, that the "transaction with the insurance company did not appreciably affect his beneficial interest except to reduce his taxes." *Id.* (internal quotes and citation omitted). The Court did not condemn all transactions of this type, however, and focused on its fact-specific analy-

sis. "There may well be single-premium annuity arrangements with nontax substance which create an 'indebtedness' for the purposes of § 23(b) of the 1939 Code and § 163(a) of the 1954 Code. But this one is a sham." *Id.*

In the three previous challenges to highly-leverages COLI plans, the government successfully argued that the insurance plans were devoid of economic substance and their sole economic purpose was to provide a platform for loans which generated interest deductions. However, insurance policy loan interest deductions were allowed against a sham challenge to a form of COLI in *Campbell v. Cen–Tex, Inc.*, 377 F.2d 688 (5th Cir.1967). In that case, Cen–Tex had established a deferred compensation plan for members of its board of directors that would pay monthly benefits to surviving spouses and dependents for ten years. To finance the plan, the corporation purchased life insurance on the lives of five board members, prepaying the first five annual premiums (which were substantially front-loaded) and borrowing against the policy loan values to finance those premium payments. After the Commissioner disallowed the interest deductions, the taxpayer successfully sought a refund in the district court, which found that borrowing against policy loan values and the prepayment of premiums were in pursuit of a substantial business purpose. The court of appeals, affirming, noted that the transactions literally fit through a loophole that existed in the tax code. The government's response, the court observed, was to offer the sham transaction doctrine as a "thumb-in-the-dike to thwart the use of tax escape devices." *Id.* at 691. In comparing the plan in that case to the annuities in *Knetsch*, the court found that after twenty years there were potential death benefits and cash surrender values that exceeded the maximum loans beyond

the "relative pittance" of Knetsch's $1,000. The Court concluded:

It cannot be denied that the tax incidence was important to Cen–Tex and an inducement to casting the transactions into the form which they took. But for Cen–Tex it must be said that the tax saving result of the transaction was not the sole motive and purpose for entering into it. The policies purchased provided for a beneficial interest. The transaction was not without economic value, economic significance, economic substance, or commercial substance.

*Id.* at 693 (footnotes omitted).

The Court of Appeals for the Sixth Circuit adopted the *Cen–Tex* reasoning in *Woodson–Tenent Laboratories, Inc. v. United States,* 454 F.2d 637 (6th Cir.1972), in which the court affirmed a judgment ordering a refund for disallowed interest deductions. There, the corporation took substantial loans against policy cash value to finance the premiums for "key man" COLI. The court rejected the sham argument, finding economic substance in the transactions which actually occurred.

Courts have identified two types of sham transactions: 1) "shams in substance," also referred to as "economic shams," in which the transactions "actually occurred but . . . lack the substance their form represents;" and 2) "[s]hams in fact" in which the reported transactions really never occurred. *Kirchman v. Commissioner,* 862 F.2d 1486, 1492 (11th Cir.1989). The government contends that the COLI plans at issue are economic shams, and that they possess features which are shams in fact.

### 1. Shams in Substance

▮ Economic shams, or shams in substance, are assessed in this Circuit by application of a test involving both an objective and a subjective component. *See Rose v. Comm'r,* 868 F.2d 851, 854 (6th Cir.1989) (citing *Mahoney v. Comm'r,* 808

F.2d 1219 (6th Cir.1987)). The Court first examines the transaction to determine whether it "has any practicable economic effects other than the creation of income tax losses." *Bryant v. Comm'r,* 928 F.2d 745, 748 (6th Cir.1991) (quoting *Rose,* 868 F.2d at 853). Although the taxpayer's subjective intent may be "relevant to this inquiry," *Rose,* 868 F.2d at 853, it is neither controlling nor dispositive at this level of the inquiry, since the objective component focuses on the transaction, not the taxpayer. *Thomas v. United States,* 166 F.3d 825, 834 (6th Cir.1999) (quoting *Illes v. Comm'r,* 982 F.2d 163, 166 (6th Cir. 1992)). Thus, the Court may inspect the transaction to determine if the form is consistent with the taxpayer's avowed purpose for engaging in it. The taxpayer's intent provides the context; to meet its burden, the taxpayer must articulate a legitimate business purpose for placing its assets at risk. For example, a taxpayer who states that it seeks to generate an immediate stream of current income but enters into a transaction which is structured to return only long-term gains will have a basic difficulty in proof. The objective component calls for an examination of the structure of the transaction to determine if its form mirrors its substance. The question is whether the transaction has *any* economic purpose other than to generate tax deductions. *Bryant,* 928 F.2d at 748. Of course, the business purpose must also "fit" in some fashion into the subjective goals as articulated by the taxpayer. Thus, courts have held that a proper business purpose alone will not "breathe substance" into a transaction that objectively has no reasonable prospect of profitability absent tax considerations. *AEP,* 136 F.Supp.2d at 791–92 (quoting *Winn–Dixie,* 113 T.C. at 287, 1999 WL 907566). Likewise, a business purpose which is markedly inconsistent with the

form of the transaction chosen will cast doubt on the *bona fides* of the taxpayer.

■ If the transaction is objectively economically viable, the Court must determine whether the taxpayer had a legitimate profit motive in entering into the transaction. However, the subjective component does not become determinative unless the transaction has satisfied the objective requirement of the sham test. *Illes,* 982 F.2d at 165.

> [T]he question of whether a transaction has economic substance is a threshold issue designed to winnow out the most abusive tax shelters without engaging in the more difficult question of whether a transaction was profit-motivated. Therefore, in determining whether a transaction was a sham, the court should not address whether, in the light of hindsight, the taxpayer made a wise investment.... Instead, the court must address whether the taxpayer made a *bona fide* investment at all or whether he merely purchased tax deductions.

*Bryant,* 928 F.2d at 749.

Like it did in the other COLI cases, the United States contends that Dow's plans with both Great West and MetLife are economically empty transactions whose worth to Dow comes solely from the tax deductions. According to the government, under neither plan could Dow expect to benefit financially from proceeds generated by the plans' tax-free inside build-up or from the payment of death benefits, since the plans were designed to be "mortality neutral." The government argues that Dow intended to operate the plans on a minimum cash outlay strategy, so that in no year would there be positive cash flow absent the tax deductions for policy loan interest, and at certain discount rates there would be a negative net present value without the tax deductions. The Court will examine the arguments separately as to each of the two plans.

### a. Great West COLI Plan

■ In the previous three COLI cases, the government contended that the courts could find that the plans were economic shams by comparing the pre-tax performance with after-tax performance, which demonstrated that the plans were a losing proposition without the tax deductions. It makes the same argument here. However, unlike the other cases, there are pre-purchase illustrations that show positive cash flow coming from the plan even without the tax deduction for policy loan interest. In the case of the Great West plan, the government insists that these illustrations are not reliable because the illustrations are flawed, and they rely on a payment strategy which Dow would not likely adopt because it would require the infusion of significant amounts of cash in the middle years of the plan. Moreover, even these illustrations show that the plan yielded negative cash flow without the tax deductions in the first eighteen years and, on a net present value basis, over the life of the plan. Alternatively, the government urges the Court to conclude that the insurance plan was "mortality neutral" so that Dow could not profit from the payment of death benefits, and that Dow intended to strip all excess cash from the plan, thus precluding profitability from inside build-up.

### i. Illustrations

Insurance policy illustrations are, essentially, predictions of the future financial performance of the transaction. They are based on certain assumptions concerning mortality rates and financial returns, which may or may not eventuate. The government points to the November 11, 1988 illustration (J293) to make its point that the Great West illustrations are

flawed, although the plaintiff argues that it did not rely on this illustration to make its purchase decision, but rather based its decision on an illustration dated February 3, 1988 (J189) showing loans capped at $50,000. Nonetheless, neither the assumptions which Gary Lake prescribed in the RFP, nor those used by Great West in its November 11, 1988 illustration (J293), were unreasonable, according to the plaintiff's experts, Great West's actuaries, and even the defendant's witness, Dwight Bartlett. The government observes that Great West used a mortality table to price the policies that was different from the mortality assumption which Lake prescribed in the RFP, thus predicting a more optimistic performance than might have been justified (and, if Lake's assumption turned out to be correct, resulting in a loss to Great West). However, as Lake observed, he was not the insurance company's actuary nor was he responsible for its pricing, and the insurer's decision to price the policy based on a mortality table that it believed better reflected anticipated experience does not diminish the reasonableness of Dow's reliance on Lake's recommendation. The difference between the so-called "inside" and "outside" mortality assumptions proves no more than a professional disagreement on the actual mortality experience Dow more likely would realize, and does not justify the government's attempt to undermine the illustration through Ralph Sayre's *post hoc* "correction"; which uses mortality assumptions different than prescribed by Lake. The Court finds that Dow reasonably relied on Great West's prepurchase illustrations in making its decision to purchase the Great West policies. The illustrations showing a capped loan strategy demonstrated that Dow could expect to profit from the plan if it operated it on a basis other than a minimum payment strategy.

### ii. Loan Strategy

Of course, this frames a principal factual dispute in this case: whether Dow intended to operate the plan on a minimum payment strategy, or, rather, whether it intended to cap loans at $50,000 and withdraw only to basis. There were multiple illustrations offered in evidence: those reflecting loans capped at $50,000 and those showing continued borrowing; those showing partial withdrawals to basis, and those showing taxable withdrawals above basis; age-specific illustrations and composite illustrations; pre-purchase illustrations, post-purchase illustrations and annual reillustrations. The government argues that the illustrations which Dow more likely relied upon in making its decision to purchase the Great West plan showed maximum borrowing, and that post-purchase illustrations and reillustrations all show uncapped loans. It also observes that Dow called only former employees to testify to Dow's intentions as to how it would operate the plans, instead of turning to current executives and employees of the insurance brokers who ran the illustrations. Leaving funds in the plans also exposed the investment to financial uncertainty, and the government contends that the timing of positive cash outflow did not match Dow's avowed financial need to offset anticipated retiree medical expenses. Finally, the government points to the tax protests filed by Dow as a condition of seeking a compromise, which, the government argues, contain admissions that Dow intended to operate the policies on the basis of a maximum borrowing strategy.

The Court finds that the witnesses whom Dow called at trial—former employees, for the most part—were the ones who most likely knew Dow's intentions concerning the Great West plan at the outset. Witnesses Falla, White, Jenkins and Burdett from Dow, and Gary Lake, the consul-

tant, all testified that it was Dow's intention to cap loans at $50,000 and withdraw only to basis. In fact, no one testified that Dow ever expressed an intention to borrow against the policies over the $50,000 limit. The government suggests that the failure by Dow to call others compels the Court to draw an adverse inference on this point. These witnesses, that is, Dow's current tax, treasury and human resources personnel, and representatives from Clark/Bardes, were equally available to the government, and, thus, under the circumstances no adverse inference is either required or warranted. *See Kilburn v. United States*, 938 F.2d 666, 675 (6th Cir. 1991). Moreover, the Court accepts the testimony of the plaintiff's witnesses as accurate and truthful, and concludes that Dow intended to cap loans at $50,000 and inject cash into the Great West plan in the middle years. This conclusion is buttressed by contemporaneous documentation which includes the original 1987 RFP (J127), Lake's analysis of the proposals (J146), Lake's final recommendation to White, and White's recommendation to Dow's COLI task force (J172, 174). Moreover, this strategy is more consistent with Dow's stated purpose of embarking on this project at the outset: the capped loan strategy produces higher positive cash flow to fund retiree medical costs. Further, it yielded more favorable financial performance in years after year 18 of the plan.

In addition, capping loans and limiting withdrawals was consistent with Dow's overall tax-avoidance strategy. Interest on loans above $50,000 per policy was not deductible in any event; withdrawing cash from the policies above basis would have exposed Dow to a tax on earnings which could have been avoided when those proceeds were paid out as death benefits. Further, as Dr. Myers pointed out, this plan did not financially "compel" borrow-ing by creating a great disparity between borrowed and unborrowed funds, as existed in the other COLI cases.

### iii. Admissibility of Tax Protests

■ At trial, the defendant offered in evidence tax protests which Dow filed on three separate occasions prior to commencing the present action. Attached to the protests were illustrations which Dow used to demonstrate positive pre-tax cash flow as to its COLI plans, but the illustrations used did not show loans capped at $50,000. Dow timely objected to this evidence on the grounds that it was irrelevant and constituted evidence of settlement negotiations which is not admissible under Federal Rule of Evidence 408. The Court took evidence on a separate record from George Imwale, an IRS examiner, as to the purpose of protest procedure and conditionally received the evidence subject to resolution of the plaintiff's later-filed motion to strike the evidence.

Although Rule 408 does not bar evidence of tax protests as a matter of course, the Court finds that in the circumstances presented in this case, the evidence is barred by Rule 408, for reasons explained below. However, even if the evidence were received, the Court would ascribe very little weight to it, since it supports the claim that the COLI plans would generate substantial pre-tax economic benefit to Dow even if it pursued a maximum borrowing strategy, and the attachment of uncapped loan illustrations to the protests does not contradict the testimony of White, Falla, Burdett and Lake that Dow intended to operate the plans on a capped-loan basis at the outset. However, because there is very little decisional law on the issue, the Court will take a moment to deal with the question here.

The basis for the plaintiff's argument is that the filing of a protest is the first step

in a process which leads to settlement discussions designed to resolve tax disputes with the government. The government states, however, that protests are not filed with the Appeals Division but with the Examination Division; the process is not intended to be conciliatory, but rather adversarial.

At the conclusion of an audit by the IRS, the examiner prepares an examination report explaining the proposed adjustments. Treas. Reg. § 601.105(c)(2). In an "unagreed" (disputed) case, the IRS district director sends this report, known as the revenue agent's report ("RAR") to the taxpayer under cover of a "30–day letter." Treas. Reg. § 601.105(d)(1). The 30–day letter informs the taxpayer of its informal administrative appeal right, which is the right to an administrative appeal to the IRS's Appeals office, provided that a protest is filed. *Id.*; Treas. Reg. § 601.106(b). The regulations provide that, after review of any required written protest by the district director, the case and its administrative record are referred to the Appeals office. Treas. Reg. § 601.106(b). The instructions for preparation of a written protest are included in the 30–day letter. Treas. Reg. § 601.105(d)(2)(v).

Upon receipt of the 30–day letter, the taxpayer has three options. First, the taxpayer can seek administrative settlement negotiations with IRS's Appeals office by filing a protest within 30 days or such an extended time as the IRS may permit. Second, the taxpayer can do nothing, which will trigger a statutory notice of deficiency, otherwise known as a "90–day letter." I.R.C. § 6212(a). A 90–day letter is also issued if negotiations with the Appeals office prove unsuccessful. Third, the taxpayer can pay the proposed liability and then seek a refund by filing an administrative claim for a refund with the IRS. The

taxpayer may also follow this third course of action upon the failure of negotiations with the Appeals office or receipt of a 90–day letter. If an administrative claim for refund is denied or no action is taken on it for six months, then the taxpayer may litigate its right to the claimed refund by filing a complaint in federal district court or in the United States Court of Federal Claims. I.R.C. §§ 6532, 7422(a); 28 U.S.C. § 1346.

The mission of the IRS Appeals Division is "to resolve tax controversies, without litigation, on a basis which is fair and impartial to both the Government and the taxpayer and in a manner that will enhance voluntary compliance and public confidence in the integrity and efficiency of the Service." Internal Revenue Manual (IRM) § 8.1.3.2(2) (May 19, 1998). This "mission is accomplished through a program of considering protested cases, holding conferences, and negotiating settlements." *Id.* § 8.1.3.2(1).

Instructions directed to the taxpayer in the 30–day letter state that any protest should be filed with the District Director and not the Appeals Division. Imwalle, Tr. 4649–50. Once received by the District Director, the protest is forwarded to the Examination Division Case Manager who in turn is required to take a number of actions with respect to the protest under applicable IRM procedures. *Id.* at 4650–64. The protest serves an important function for the Examination Division, which examines it to determine whether the IRS erred or if additional investigation needs to be done. *Id.* at 4661–62.

Dow alleges, and the government does not deny, that large corporate taxpayers like itself protest 80 to 90 percent of the taxes recommended on audit, and that as of 1997, the Appeals Division had resolved approximately 85 percent of its large

cases. Dow M. to Strike Br. at 6 (citing GAO studies).

■ Federal Rule of Evidence 408 provides:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Rule 408 was intended to sweep broadly and "encompasses the whole of the settlement evidence." *Overseas Motors, Inc. v. Import Motors Ltd., Inc.*, 375 F.Supp. 499, 537 (E.D.Mich.1974), *aff'd*, 519 F.2d 119 (6th Cir.1975). The Rule's broad sweep was intended to abrogate the common-law requirement that protected statements always be posed hypothetically or specifically offered "without prejudice." *See* Advisory Notes to original Rule 408. When the applicability of Rule 408 is a close call, the court should lean toward exclusion. *Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1364 (10th Cir.1987).

■ However, "Rule 408 excludes only evidence of conduct and statements made solely as part of the settlement negotiations, and not statements and conduct made at ... meeting[s] which are unrelat-

ed to such compromise negotiations." *Trans Union Credit Info. Co. v. Assoc. Credit Servs.*, 805 F.2d 188, 192 (6th Cir. 1986). Thus, the Court must find that the party seeking exclusion subjectively intended the statements to be part of negotiations toward compromise. *See Blu-J, Inc. v. Kemper C.P.A. Group*, 916 F.2d 637, 641–42 (11th Cir.1990). Rule 408 also does not apply if the claim at issue is not in dispute. An actual lawsuit need not have been filed, but there must be "at least an apparent difference of view between the parties[ ] concerning the validity or amount of the claim." Weinstein's Federal Evidence § 408.06, at 408–23 (rev.1998).

■ Although it is tempting to define the existence of negotiations by an objective standard, courts generally agree that the proper inquiry is whether the person making the statement *believed* that the statement was related to negotiations. *See, e.g., Affiliated Mfrs., Inc. v. Aluminum Co. of Amer.*, 56 F.3d 521, 528–30 (3d Cir.1995) (affirming exclusion of both a letter between the parties and the defendant's internal memoranda regarding the possibility of settlement). *See also Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1106– 07 (5th Cir. Unit B 1981) (affirming exclusion of architectural report commissioned by the opposing party to ensure an informed settlement position). The belief, however, must be both honest and reasonable; where a statement is made to induce reliance or made in bad faith, the Rule will not prohibit its introduction in evidence. *Cf. Uforma/Shelby Bus. Forms, Inc. v. NLRB*, 111 F.3d 1284, 1293–94 (6th Cir. 1997) (holding that Rule 408 does not protect wrongs committed during the negotiations that are unrelated to the subject of the compromise).

The plain language of Rule 408 allows statements made in settlement negotia-

tions to be introduced for purposes other than proof of liability or amount of damages. *See* Fed.R.Evid. 408 ("This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."). Accordingly, the defendant argues here that statements otherwise protected under Rule 408 can be used for garden-variety impeachment, citing *Bankcard Am., Inc. v. Univ. Bancard Sys.*, 203 F.3d 477, 484 (7th Cir. 2000), *cert. denied*, 531 U.S. 877, 121 S.Ct. 186, 148 L.Ed.2d 128 (2000). However, that case does not support the broad proposition for which it is cited. *Bankcard* involved a RICO claim between two sales organizations. The court found that Rule 408 was not intended to permit a party to induce detrimental reliance on a promise made during negotiations and then assert confidentiality when the victimized party claimed estoppel. *Id.* at 484. *See also Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 293–94 (2d Cir.1999) (same). The application of an estoppel exception to Rule 408 is quite consistent with its goal of encouraging settlement, as it is difficult to understand how protecting fraud and deception will in any way advance parties' confidence in the settlement process. *Ibid.* There is little difference, however, between use of a statement made for settlement purposes to impeach the denial of liability, and offering it as an admission of liability. Asserting that a statement is offered as impeachment will not alone establish an exception to Rule 408. The appropriate approach has been established by the Second Circuit: the Court must weigh the competing policy rationales of encouraging settlement versus the formation of a complete record to determine whether the impeaching evidence falls within Rule 408's exception. *Starter*, 170

F.3d at 293; *see also* Weinstein's Federal Evidence § 408.08[1], at 408–30 (rev.2002).

In this case, this issue turns on the subjective intent of Dow when it filed its protests. Dow insists that it did so only to pursue the appeals process; the government counters that protests go to the Examination Division, not Appeals, and that Dow never intended the protests to be only for settlement purposes.

Dow relies on its assertions that (1) it filed the protest solely for settlement purposes; (2) a protest is not required to litigate a refund, and that there is no other reason to file a protest if not to pursue negotiation; (3) large corporations usually protest 80% or more of their audits, and approximately 85% of those cases are settled; and (4) the initial 30–day letter from the government for the 1989–91 audit cycle suggests that if Dow would like a conference with the Regional Office of Appeals, it should file a protest within 30 days.

The government responds that (1) Dow's belief, if true, is unreasonable, as it should know that protests are in fact filed with Examination, not Appeals; (2) Dow signed the statements in the protest under oath, suggesting that they were not subject to factual compromise; (3) Dow's protests never mentioned an intention to settle, even on the last protest filed three months before this case was initiated; (4) the Examination division had no power to settle Dow's case; (5) Rule 408 applies only to offers of compromise that function as an admission of weakness; (6) when Dow did want to protect documents from disclosure—such as when it negotiated with Appeals in August, 2000—it clearly indicated that the documents were "For Settlement Purposes Only."

The Court is persuaded that Dow reasonably believed that the only avenue to the Appeals Division, and thus an opportu-

nity to compromise and settlement the dispute, was by first filing a protest. Given the undisputed fact that the vast majority of disallowances on large taxpayer returns are protested, and the great majority of those protests settled, it is reasonable to conclude that Dow filed its protests believing that it was embarking on the settlement path, leading to the Appeals Division whose mission is "to resolve tax controversies, without litigation, on a basis which is fair and impartial to both the Government and the taxpayer and in a manner that will enhance voluntary compliance and public confidence in the integrity and efficiency of the Service." IRM § 8.1.3.2(2) (May 19, 1998). The statements, therefore, fall within the protection of Rule 408, and are not admissible to prove liability or damages.

### iv. Time Periods

It is undisputed that the capped loan illustrations, showing positive cash flow even without the income tax deductions, demonstrate negative pre-tax cash flow in the first eighteen years. The Court, however, does not confine its analysis of the transaction to isolated blocks of time, but rather evaluates the transaction as a whole. *CM Holdings*, 254 B.R. at 598 (citing *ACM Partnership*, 157 F.3d at 246). In *CM Holdings*, the court looked to the entire 81–year plan, observing that pre-tax cash flow did "not turn positive until the 53rd year of the plan." *Id.* at 629. In *Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978), the Supreme Court upheld a sale-and-lease-back transaction against a sham challenge after examining the transaction over its entire 25 years and beyond. Here, Dow did not necessarily expect an immediate return, but focused primarily on a source of funding to offset future retiree medical expenses. Positive pre-tax cash flows delayed for eighteen years is consis-

tent with this subjective business purpose, and does not render the transaction economically empty.

### v. Net Present Value

However, "[i]n transactions that are designed to yield deferred rather than immediate returns, present value adjustments are, as the courts have recognized, an appropriate means of assessing the transaction's actual and anticipated economic effects." *ACM Partnership*, 157 F.3d at 259. The process of adjusting for net present value (NPV) consists of discounting future earnings by a factor which is intended to reflect the time-value of money. Myers, Tr. at 3306–08; Plotkin, Tr. at 4024. The choice of an appropriate discount factor depends on the purpose of the inquiry. Here, the government points to the November 11, 1988 Great West illustration, as adjusted by Sayre, and demonstrates that plan produces a positive net present value cash flow absent tax deductions at discount factors below 4.69% and negative cash flow at discount factors above that rate. The government contends that the appropriate discount rate to apply was upwards of 9% as reflected by Moody's corporate average of investments, which also happened to be the rate used to determine the policy variable credited rate.

The Court is not persuaded that this analysis provides a reliable basis to determine the economic substance of an insurance plan. As explained by Dr. Myers and Dr. Plotkin, NPV analyses are useful in comparing investments and in evaluating a corporation's investment against its cost of capital. However, since the cash invested in an insurance policy builds up tax free (if it is paid out as a death benefit), Moody's corporate average does not furnish an equivalent basis for comparison. According to Dr. Myers, the tax-free inside build-up feature of life insurance justifies a low-

er discount factor. He calculated a NPV of $76 million at the inception of the Great West plan in May 1988. This demonstrates a substantial, non-tax benefit enjoyed by Dow.

### vi. Inside Build-up

In its alternative argument, the government adopts the approach it took in the previous COLI cases and attempts to isolate the potential economic benefits which come from cash value life insurance consisting of death benefit proceeds and return as inside build-up. As to the latter element, the government's argument hinges on the premise that Dow intended to operate the Great West plan·on a minimum payment strategy and thereby strip all excess cash from the policies. Had it done so, Dow likely would not have realized any substantial gain from the inside build-up. This infirmity existed in the previous COLI cases. *See, e.g., AEP*, 136 F.Supp.2d at 787–88 ("[T]he plan contemplated that literally every penny of inside buildup would be used to support policy loans."). This Court has already determined, however, that Dow did not intend to operate its policies in that fashion. Over the life of the plan, Dow stood to realize substantial economic gain from tax-free inside build-up returned in the form of death benefits.

### vii. Mortality Features

■■■■ The government's argument that Dow could not expect to profit from death benefit payments is based on the contention that the Great West plan was "mortality neutral," a term which the government has invented to mean that the cost of insurance paid will equal the death benefits awarded upon the deaths of all of the insured lives.[6] The government contends that "mortality neutrality" renders this aspect of a life insurance plan a sham. On its surface, the Court finds this argument somewhat curious and quite provocative, since it potentially could invalidate all forms of group life insurance. Virtually all insurance policies are designed prospectively so that the cost of insurance equates with the death benefit paid. In fact, the cost of insurance will generally be more than the death benefit because the insurance company needs to make a profit. That is the objective of actuarial calculations of mortality statistics in pricing. Consequently, all insurance policies are "designed" to be "mortality neutral," if not "mortality negative" (from the standpoint of the insured), on a prospective basis. What the insured purchases is protection against the risk of *premature* death. Therefore, the validity of life insurance, at least from a tax standpoint, is determined by whether there is genuine risk-shifting. *See Helvering v. LeGierse*, 312 U.S. 531, 539–542, 61 S.Ct. 646, 85 L.Ed. 996 (1941) (recognizing that "insurance involves risk-shifting and risk distributing"). The risk component of the COI is the cost of assuming the risk, at the beginning of the policy period, that the actual death rates of insureds in a certain block of business will vary from the expected death rates predicted by the actuary.

In the three prior cases, courts found that the COLI plans were flawed because of devices designed into the plans that eliminated the transfer of·risk. Those courts thus adopted the government's terminology and found that the plans were "mortality neutral" when, after the relevant period, usually a year, the cost of insurance (COI) and death benefits were "trued up" retrospectively. That is, when

---

6. The experts questioned on the subject agreed that "mortality neutrality" is not a term or concept recognized by actuarial science. Hickman, Tr. at 2934–35; Plotkin, Tr. at 4057; Bartlett, Tr. at 4784–85.

there is an agreement contained in the plan to make payments after the conclusion of a policy year so that the COI equals the amount paid out in death benefits, risk is eliminated and, as insurance, the COLI transaction is economically meaningless. *See Winn–Dixie*, 113 T.C. at 268–69; 285, 1999 WL 907566; *CM Holdings*, 254 · B.R. at 632–35; *AEP*, 136 F.Supp.2d at 777, 787–88.

As noted earlier, the Great West plan did not contain a 100% retrospective payment mechanism. In arguing otherwise, the government refers to the RFP in which Dow prescribed that its plan be fully experience-rated, Great West's conservative pricing, and the contractual right of Great West to increase the spread on the X–Rider to account for prior years' unfavorable mortality experience. There was also a dividend feature built into the policies that required Great West to "share" favorable mortality experience with the policyholders. The dividend payment was a form of retrospective adjustment, but it was not, nor could it have been, a 100% "true-up," since Dow's Great West policies were part of a pool which shared mortality experience. All of the other mechanisms constituted prospective adjustments, and, although they were designed to fine tune the risk allocation going forward, they did not eliminate past risk transfer as did the plans in *AEP* and *CM Holdings*.

It is not inconceivable that mortality pricing could, in some cases, be so conservative that practical risk transfer does not exist. In this case, however, Great West's mortality pricing was based on a standardized mortality table, and there is no evidence that its pricing was commercially unreasonable. The Great West insurance policies were not "mortality neutral" as that term is used in the prior COLI cases.

The plaintiff has demonstrated, by a preponderance of the evidence, that its COLI plan with Great West caused practical economic effects apart from the income tax deductions that were consistent with Dow's stated purpose for entering into the transaction. This plan was not an economic sham.

### b. MetLife COLI Plan

■ The government similarly contends that the MetLife plan is bereft of economic substance, based on prepurchase illustrations which show negative cash flow without the tax deductions for policy loan interest on both an absolute and net present value basis. The government also reasserts its contention that the MetLife COLI plan is "mortality neutral" so that Dow could not profit from the payment of death benefits, and that Dow intended to strip all excess cash from this plan as well.

### i. Illustrations

As with the Great West plan, there were prepurchase illustrations describing the MetLife COLI plan which showed positive pre-tax cash flow, although not in the first seventeen years of the policy when it is undisputed that the acquisition strategy called for maximum borrowing and partial withdrawals. As noted above, after Michigan law changed in the beginning of 1991 concerning an employer's insurable interest in lower level employees, Dow reactivated its COLI task force. Clark/Bardes furnished several proposals and sales illustrations throughout the spring of that year, although in June it became apparent that Dow would likely enter alternative minimum taxpayer (AMT) status. Dow's treasurer, Howard Burdett, testified, however, that the loss of tax deductions that would accompany AMT status, at least in the near term, was not enough "to offset the benefits that COLI would bring to Dow long term." Tr. at 1415. Dow was thus examining the prospect of generating cash through the COLI plan after the ac-

quisition phase of the policy and viewed the performance of the plan over its whole life.

Presentations were made to Dow by several insurance companies at an August 1991 meeting in Washington, D.C., and in September Clark/Bardes furnished illustrations of the MetLife plan showing both capped and uncapped loans, which has come to be known as "Scenario 1" and "Scenario 2." In early October 1991, Dow received additional illustrations showing positive cash flows. These were identified at trial as "Case 23" and "Case 24," the difference between the two being the uncapped (Case 24) and capped (Case 23) loan strategies that were illustrated. These were single-employee, age-specific illustrations and demonstrated positive cash flow absent the income tax deductions for policy loan interest over the life of the plan, as noted above. Case 23 called for a borrowed credited rate of 8.68% in the first eight years, increasing to 9.2% thereafter; the loan rate was 9.45%, which closely approximated Moody's Corporate Average. The unborrowed credited rate was 5.5% in the first seventeen years, increasing to 8.75% thereafter when, according to the illustration, partial withdrawals ceased and cash would have to be paid in to cover loan interest charges. The age-specific illustration shows cash flow net of tax deductions totaling $213,262 on a single life (age 40) over the 60–year life of the policy. The final census on the MetLife policy after the union employees were added was 17,061 individuals, which yields a positive pre-tax return in the whole plan of over $3.6 billion.

The government acknowledges these facts, but argues that Dow did not actually intend to operate the policy in this fashion, and further observes that the pre-tax cash flow is negative on a NPV basis at certain discount rates.

### ii. Loan Strategy

As noted above, the plaintiff's witnesses testified that borrowing strategy for the MetLife policy was the same as for the Great West policies: to cap loans at $50,000, and, given the Court's findings with respect to the Great West policies, the Court has little trouble concluding that Dow's initial plan was to operate the MetLife policy as the Case 23 illustration demonstrates. John Ryan from MetLife corroborated the intention to pursue this strategy, as described by Falla, White and Burdett of Dow. The higher unborrowed credited rate beginning in year eighteen, which was negotiated by Dow, is consistent with this operational strategy. The Memorandum of Understanding (MOU) limited Dow's right to withdraw cash in the later years, but this limitation would not necessarily discourage investment in the policies. Rather, it simply required a cash management plan looking forward four years. And the observations on the adverse tax consequences of borrowing above the $50,000 limit and withdrawing above basis made as to the Great West policies apply with equal force here.

### iii. Net Present Value

The government called Dr. James Hoag, an economist, to testify to his calculations of the NPV of the MetLife policy. He used an early composite illustration and applied Moody's Corporate Average as a discount factor, and concluded that the pre-tax NPV of the plan was negative. Hoag then analyzed Case 24 and concluded that the MetLife program would not generate a positive NPV at any discount rate. The plaintiff's experts, Dr. Myers and Dr. Plotkin, explained that this analysis failed to take into consideration the tax-free nature of the inside build-up in cash-value insurance policies, as noted above. Using Case 23, Myers estimated that the NPV of the "investment leg" of the MetLife plan

was approximately $370 million at inception, and the NPV of the "borrowing leg," which included the value of the tax deductions, was $15.1 million. Myers, Tr. at 3328–30, 3333–34. Myers did not use Moody's corporate average as a discount rate, because he concluded that it was not reasonable to compare this insurance plan to general corporate investments subject to income taxation. Moreover, even using the defendant's method of discounting, the MetLife policy, as illustrated by Case 23, yields a positive NPV absent policy loan income tax deductions at discount rates below 7%. Hoag, Tr. at 6391–92. Once again, this analysis demonstrates a substantial non-tax benefit to Dow over the life of the plan.

### iv. Inside Build-up

In the MetLife plan, Case 23 belies the government's contention that there was an intention to strip the policy of its cash value through continued borrowing and partial withdrawals above basis. In fact, Dow witnesses acknowledged that cash would have to be injected into the plan after the seventeenth year. The higher unborrowed credited rate provides a substantial return, especially considering that the inside build-up occurs tax free. When applying the two-part analysis from the other COLI cases which focus on the financial benefits of cash value life insurance, the Court concludes that there is no failure of proof that Dow would enjoy a financial advantage from the cash value accruing on the MetLife policy.

### v. Mortality Features

The method of calculating the COI in the MetLife policy is derived from the terms of the policy itself when read together with the MOU. The government argues that the policy was designed to be "mortality neutral, if not virtually mortality riskless," Def. Post-trial Br. at 22, because the plan was experience-rated, MetLife re-funded mortality dividends on an annual basis, and MetLife reserved the right to increase COI charges to recoup losses if claims for death benefits exceeded COI charges. As indicators of an economic sham, these arguments fall wide of the mark. None of these features by themselves or in combination constitute a 100% true-up mechanism, that is, a "full paid loss retro."

The MetLife policy was experience-rated *prospectively*, in the sense that the mortality statistics used to calculate the COI were derived from Dow's actual experience that Gary Lake complied. The dividend feature, common among group life insurance contracts according to the plaintiff's experts, *see, e.g.*, Plotkin, Tr. at 4038, 4047, was a benefit to Dow, but it did not transfer risk away from MetLife. MetLife's contractual right to adjust the COI going forward to recoup losses caused by benefit payments that exceeded COI was limited by the stop-loss provision. Once again, the witnesses generally agreed that stop-loss provisions are standard experience-rating mechanisms common in group life insurance administration. Yau, Tr. at 1987; Rogalski, Tr. at 2456; Plotkin, Tr. at 4050; Bartlett, Tr. at 4925.

The government contends that the Met-Life policy was conservatively priced. However, the parties' experts agreed that Charles Yau's decision to use Dow's actual mortality experience in setting the COI rates was reasonable and actuarially sound. *See* Rogalski, Tr. at 2454; Hickman, Tr. at 2961, 2968; DesRochers, Tr. at 3648–49; Bartlett, Tr. 4761; Sayre, Tr. at 6048. Yau developed a mortality schedule based on this data and converted it into the COI rates reflected in Attachment 2 of the MOU. Yau, Tr. at 2012–13. He did not add any additional margin. Nor was the price for the stop loss, 2.2%, an unreasonable charge that eliminated the transfer of

risk. Yau actually calculated the appropriate charge to be 2.71%, with .71% representing the cost of assuming the risk that annual deaths would exceed the 115% stop-loss limitation (calculated at a 10% probability), and 2% representing profit and return on capital. Through negotiations, the parties agreed on the 2.2% figure. After receiving a revised census with specific age cells approximately one month after the agreement was executed, Yau recalculated the risk exposure and discovered that there was actually an 18% probability that death benefits would exceed 115%, and therefore the stop-loss was underpriced. Further, this figure did not account for catastrophic loss, for which MetLife actually purchased reinsurance.

The defendant's expert, Dwight Bartlett, opined that the stop loss was actually greater than 115% and therefore the likelihood of Dow profiting from mortality, that is, receiving benefits in excess of COI, was extremely remote. Bartlett reached this conclusion, however, by adding the 2.2% retention charge to the stop-loss amount, thereby recalculating the stop-loss at 117.2%, which contradicted the express terms of the MOU, see J408, and effectively eliminated MetLife's profit because the 2.2% would not be available for its intended purpose. Bartlett also contended that Yau should have adjusted the COI charges to account for an improving mortality trend among the general population over time. However, Yau used Dow's actual mortality statistics; he characterized the data as the best mortality information he ever had in pricing a case. Yau, Tr. at 2365.

As noted earlier, the Court concludes that the mortality features of the MetLife plan constituted the actual transfer of risk, were reasonably priced, and did not contain a 100% retrospective adjustment mechanism that rendered the transaction a sham.

### c. Conclusion

The Court finds that Dow has established by a preponderance of the evidence that both its Great West and MetLife COLI plans were imbued with economic substance. The plans had substantial effects on the beneficial interest of the taxpayer apart from the income tax deductions. Although, from a subjective standpoint, tax deductions were discussed and considered by Dow's COLI task forces, focus on the tax deductions themselves did not predominate. In this respect, this case differs markedly from the prior COLI cases in which "the marketing information presented to [the other taxpayers'] executives showed that, absent tax deductions, the plan would lose money[, but they] agreed to the plan knowing the tax deductions were the only thing that made it worthwhile." *In re CM Holdings*, 301 F.3d at 103. Dow's COLI plans are not economic shams.

### 2. Shams in Fact

In deciding whether a transaction is a sham in fact, the Court examines the nature and form of the transaction to determine what actually occurred. In making this assessment, the Court "will ignore accounting tricks and other transactional artifices." *CM Holdings*, 254 B.R. at 600 (quoting *Peerless Indus., Inc. v. United States*, 1994 WL 13837 at *4 (E.D.Pa.), *aff'd*, 37 F.3d 1488 (3rd Cir. 1994)). The Court considers whether appropriate business formalities are employed, industry customs and practices are followed, and there is compliance with relevant commercial norms. Thus, paper transactions which solely attempt to create deductible losses or expenses are not recognized. *Woolford Realty v. Rose*, 286 U.S. 319, 330, 52 S.Ct. 568, 76 L.Ed. 1128

(1932) (stating that "[t]he mind rebels against the notion that Congress ... [was] willing to foster an opportunity for juggling so facile and so obvious"). But transactions involving two or more parties which are grounded in commercial custom and have present or future economic consequence to one or more parties will be recognized. *See CM Holdings*, 254 B.R. at 600 and cases cited therein.

### a. Policy Loans

In this case, the government revives the argument presented without success in the three previous COLI cases that the policy loans in both of Dow's plans are factual shams because they were "simultaneous netting transactions" which were "sourced" from the very premiums paid by the proceeds. The government characterizes the loans as "cashless" and "circular," existing only "on paper" for the purpose of generating the tax deductions that fueled COLI plans. The policy loans in this case took the form of the loans in the previous cases: in the first three years of each of the plans, Dow would receive a bill from the insurance company that netted the premium and interest charges against the proceeds of a loan that was made on the first day of the policy year, leaving a relatively small balance to pay in cash. The premium payment created value in the policy, which was used as security for repayment of the loan. In the MetLife plan, for example, the gross annual premium for the first year was $170,510,000, the policy loan that year was $158,756,000, leaving a cash payment from Dow to MetLife of $11,754,000, or approximately 0.68% of the gross annual premium. The government contends that as further evidence of the sham character of this transaction, the interest rate (indexed to Moody's Corporate Average) was excessive and set in a collusive manner, and the loans were "backdated."

These arguments have been rejected by courts previously, and the same result obtains here. Policy loans are not made from the cash contained in the insurance policy. Rather, "[i]t is the longstanding custom and practice in the insurance industry that policy loans are deemed as made from the general funds of the insurance company, with the policy value serving only as collateral." *AEP*, 136 F.Supp.2d at 780; *see also* Stip., ¶ 24; McGill, Tr. at 5093–94. Consequently, the fact that there is no value on the first day of the policy until the premium is paid does not affect the validity of the insurance company's act of advancing sums from its general funds to pay the premium, or in taking as collateral the policy value that results from the payment of that premium. The loan created actual indebtedness on the books of Dow (and a corresponding asset for the respective insurers), which was repaid from death benefit proceeds as the insureds died: the death benefit was reduced by the amount of the loan and unpaid interest. The use of a netting transaction in this instance did not make the loans a sham. The IRS itself regularly utilizes netting transactions when allowing taxpayers to apply refunds from prior years to the payment of current tax obligations as shown on tax returns. The use of the device with loans is no different, or any less valid. As the Third Circuit noted, "[a] circular netting transaction, where different loans and payments are deemed to occur simultaneously (and thereby offset each other), is not by definition a factual sham. As the District Court pointed out, the simultaneous netting of the payment and the loan with the policy value as collateral that occurred in years 1–3 is common in the industry, and is a transaction with economic substance." *In re CM Holdings*, 301 F.3d at 108.

The interest rate on policy loans in both plans was variable, indexed to Moody's Corporate Average (a composite average of the full range of investment grade debt instrument interest rates), and subject to a fixed spread between that rate and the credited rate on the cash value in the policies. In the prior COLI cases, the policyholders were given a choice of loan rates and universally chose the highest, which was referred to as "Moody's Baa Enhanced" rate, indexed to the lowest-rated corporate bonds, rated BAA. Although a higher interest rate would normally be adverse to the borrower's interest, it had no practical effect in those cases because of the fixed spread, and served as evidence of a collusive arrangement to drive up interest rates for the sole purpose of increasing the tax deductions for interest payments. In *CM Holdings,* the government's experts testified that indexing the loans to Moody's rating of the riskiest corporate grade debt instruments was not reasonable. Two of the government's experts in this case also testified in *CM Holdings;* when asked here what would have been an acceptable variable loan interest rate for COLI policies, "Bartlett and McGill testified an appropriate interest rate for Camelot's policy loans would be Moody's Corporate Average." *CM Holdings,* 254 B.R. at 605. Other government experts in this case testified that the appropriate rate would be the short-term bond index. Puglisi, Tr. at 5230–32, 5239–41; Hoag, Tr. at 6200–01

The Court finds that the policy loan rates were reasonable and commercially acceptable. Moody's Corporate Average is the rate referenced in the NAIC Model Policy Loan Interest Rate Bill, the relevant Michigan statute (Mich. Comp. Laws § 500.4023), the proposed Pryor/Kennelly legislation (H.R.4389, 101st Cong., 2d Sess. § 1(a) (1990); S. 2722, 101st Cong., 2d Sess. § 1(a) (1990)), and the Health Insur-

ance Portability and Accountability Act of 1996 (now codified at IRC § 264(e)). J1256; J1270; DesRochers, Tr. at 3596; Puglisi, Tr. at 5255–56, 5258, 5260. The variable loan interest rate under the Great West and MetLife policies did not exceed the maximum variable policy loan interest rate provided by the NAIC Model Policy Loan Interest Rate Bill or Michigan Compiled Laws § 500.4023. The MetLife policy allowed the policyholder on a policy anniversary date to elect for future policy years a fixed loan interest rate of 8% in lieu of the variable rate based on Moody's Corporate Average. The Great West policies provided for no such election. Stip., ¶ 121; J408, J409. Dow did not elect the fixed 8% interest rate under either MetLife policy at any time. The variable rate that it paid turned out to be above that rate in policy years one, two, and four, but below that rate in policy years three, five, six, and seven. Stip., at ¶ 123; Hoag, Tr. at. 6472. Moody's Corporate Average as a borrowing rate for policy loans is a traditional and regulatory favored variable interest rate. The reason for this is that this interest rate is similar to that which the insurance company might otherwise expect to garner from other investments, and therefore the use of this rate decreases the sensitivity of the insurance company's financial statements to policyholder borrowing. Plotkin, Tr. at 4085–86; DesRochers, Tr. at 3596–97, 3598; Bartlett, Tr. at 5022–23; Sayre, Tr. at 5824, 5926; Todd, Tr. at 607, 636–37; Laeyendecker, Tr. at 1154. A variable loan interest rate equal to Moody's Corporate Average is commonly used for policy loans in the life insurance industry. Plotkin, Tr. at 4085–86; Bartlett, Tr. at 5022–23; Puglisi, Tr. at 5290; Sayre, Tr. at 5905–06.

The plaintiff has established by a preponderance of the evidence that the policy loans were real transactions consistent

with commercial norms, and therefore were not factual shams.

### b. Partial Withdrawals

■ The government also contends that the partial withdrawals in years four through seven of the Great West policies and the MetLife policy, used to pay policy premiums, were shams in fact. It compares the partial withdrawals to the loading dividends that the district courts found to be factual shams in *CM Holdings* and *AEP* because of the circular and unconventional nature of the structure of those payments. The Third Circuit disagreed with the district court's holding in *CM Holdings* and concluded in *dicta* that "[t]he loading dividends of years 4–7 were [ ] simultaneous netting transactions that 'actually occurred,' and are therefore not factual shams." 301 F.3d at 108. Moreover, the courts in both *CM Holdings* and *AEP* found that the partial withdrawals in those cases were real. *CM Holdings,* 254 B.R. at 618–19; *AEP,* 136 F.Supp.2d at 785 ("The government initially claimed that these partial withdrawals were factual shams but did not include that claim in its post-trial brief. Be that as it may, the court concludes that these withdrawals were real.") This Court finds that the comparison of the partial withdrawals in this case with the loading dividends in the prior cases is inapt, but also finds an important and material difference in the features of the partial withdrawals of the Great West and MetLife policies which distinguishes them from their counterparts in the policies in *CM Holdings* and *AEP,* and compels the conclusion that they are factual shams.

A partial withdrawal is a means of accessing the cash value in a life insurance policy. The right to make a partial withdrawal, however, is entirely dependent on the terms of the insurance contract. In *CM Holdings,* the policy placed no limit on the amount of the policy value that could be taken; however, in years four through seven there was no net equity at the beginning of the policy year because all of the cash value was encumbered as security for loans. 254 B.R. at 618. This did not present an obstacle to the transaction because although the partial withdrawal lowered the policy value and the corresponding loan limit, the proceeds from the partial withdrawal were not used to pay premiums, but rather were applied to the loan balance by paying accrued interest. *Ibid.* It also reduced the death benefit. The source of the partial withdrawal was existing policy value, albeit encumbered value, which could be accessed according to the terms of the insurance contract.

In this case, on the last day of each of policy years four through seven, the cash value of Dow's Great West and MetLife policies was fully encumbered, yielding virtually zero net equity. Nevertheless, in the fourth through seventh years of the Great West plan and the fourth and fifth years of the MetLife plan, Dow made partial withdrawals that exceeded the premiums due in those years. DesRochers, Tr. at 3728–29; Ex. D777. The partial withdrawals were accomplished through a circular series of interdependent transactions in which (1) the gross premium was deemed paid; (2) the deemed payment of the premium created cash value; (3) Dow made a partial withdrawal of the cash value; and (4) the partial withdrawal was used to offset approximately 90% of the premium and accrued loan interest. DesRochers, Tr. at 3730–32; McGill, Tr. at 5154–55; Sayre, at Tr. 5613–16. The partial withdrawal transactions under the MetLife program were carried out through simultaneous netting transactions. DesRochers, Tr. at 3732. Great West and Dow introduced a one-day time lag into

the partial withdrawal transactions under the Great West plan, whereby transactions occurred on separate days but Dow did not lose any interest as a result of being out of funds overnight. Todd, Tr. at 848–49; Burdett, Tr. at 1622–25; McGill, Tr. at 5155–56; Ex. J448. Sending funds to Dow via wire transfer so that the funds were received on the same day Dow's previously-mailed check cleared neutralized the effect on Dow's bank account at the end of the day, justifying the characterization of the transaction as "simultaneous" for the purpose of this inquiry.

The problem with these transactions does not stem from the practice of netting the withdrawals against the premium obligation. Rather, the transaction was a sham because there was no value in the policy that could be withdrawn to pay the premium, according to the limitations in the respective insurance contracts. Unlike the policy loans, which were made from the insurance company's general funds, the source of the partial withdrawals must be the accessible cash value in the policies themselves. The Great West policies included a Partial Withdrawal Provision Amendment, which stated:

> By written request, the Owner may make partial withdrawals from the cash value of the Additional Paid–Up Life Insurance Benefit Rider, herein called the "Rider." *Partial withdrawals will be limited by the amount of any outstanding loans and loan interest due at the end of the Rider year.*

Ex. J1147, at CBTX 020204 (emphasis added). Similarly, the MetLife policy contains a partial withdrawal provision which limits the availability of funds in the policy:

> The Employer may request a partial Cash Withdrawal of at least *$10,000.* The available Cash Surrender Value will be determined as of the date Metropolitan receives the request.... The maxi-

mum amount available for a partial Cash Withdrawal is the smaller of the Cash Surrender Value less the future Monthly Deductions up to the next Policy Anniversary Date or the Cash Surrender Value minus *$1000.*

Ex. J593, at A014130–31. "Cash Surrender Value" is defined as "the Cash Value, *less any Loan and Loan Interest.* It is also the sum of the Account Values applicable to all insured Employees." *Id.* at A014122 (emphasis added). Thus, in both plans, the insurance contracts limited the funds available for partial withdrawal to *unencumbered* cash value.

Since the unencumbered cash value in the policies at the beginning of the fourth through seventh years was zero, there was nothing available to withdraw or to offset against the premium obligation. There was no basis upon which the premiums for that year could be "deemed" paid, except for the 10% that did not look to the partial withdrawal as the source of payment. The "payment" of 90% of the premium was not real, since it essentially came from nothing. That portion of the transaction in each plan, therefore, was a sham in fact.

### c. Backdating

▓ Because the insurance policies under both of the plans were delivered and the final censuses determined after the agreed effective dates of the respective policies, the government contends that calculating interest on the first-year policy loans from the effective dates of the policies, rather than the final issue dates, constituted backdating the loans. The government argues that the interest paid (and deducted) for that interim period constituted phantom interest, since there was no debt obligation that required an interest payment. As noted earlier, the government made a similar argument in *AEP*, where the company entered into a prepayment agreement with the insurer that pro-

vided for temporary coverage from the application date to the date the policy was issued. However, there was an explicit provision in the prepayment agreement freeing AEP of the obligation to pay loan interest, and the insurer from crediting interest to policy values, until the policies were actually issued. *See AEP*, 136 F.Supp.2d at 781. When the policies were issued, they were backdated to the application date, as were the loans. The court found, however, that the insurer had not advanced any funds during the interim period, nor was there any insurance policy in existence that could have served as loan collateral. *Ibid.* Finally, the policies were transferred to a grantor trust which did not even exist during the interim period, but thereby became liable for an interest obligation that preceded its existence. *Id.* at 782. The court found the loans and interest obligation during the interim period to be factual shams. *Ibid.*

Dow argues that the circumstances in this case differ from those in *AEP* because of the express agreement between Dow and the two respective insurers to begin coverage under the policies as of the application dates, despite the need to refine the employee census and engage in other underwriting tasks thereafter. Since coverage began on the application date, so did the obligation to pay a premium, which all along was intended to be financed in the first year by a maximum policy loan; consequently, the argument goes, there is no phantom interest since there was a real debt obligation during the period between the application date and the date of final issue.

Michigan law does not prohibit an insurer from agreeing to make life insurance coverage effective at any time, as long as the period does not precede the *application date* by six months. *See* Mich. Comp. Laws § 500.4046 ("No policy of life insurance other than industrial life insurance shall be issued or delivered in this state if it contain[s] ... [a] provision by which the policy shall purport to be issued or to take effect as of a date more than 6 months before the application therefor was made, if thereby the premium on such policy or contract is reduced below the premium which would be payable thereon as determined by the nearest birthday of the insured at the time when such application was made."). The Court of Appeals for the Sixth Circuit, applying Michigan law, has held that an agreement between an insurer and insured which provides that life insurance coverage is effective on the application date is one that the courts must honor, and it fixes the obligation as to when premiums are due. *New York Life Ins. Co. v. McConchie*, 264 F.2d 17, 19–20 (6th Cir.1959) (reversing lower court's reformation of policy to reflect as effective date the delivery date of the policy). "The parties had the right, even in the absence of a provision in the application, to agree on the effective date of the policy." *Id.* at 19. The plaintiff's witnesses testified in this case without substantial contradiction that it is customary in the life insurance industry to make a policy effective on the application date if the policy is ultimately issued, and to charge a premium from the effective date. Lake, (1/16 a.m.) Tr. at 546–47; Todd, Tr. at 740–42; Ryan, Tr. at 1915; Dykhouse, Tr. at 2766–67.

In this case, after Dow had chosen Great West as the insurer for its 1988 COLI plan, it sent Great West a census tape with pertinent information on 4,359 eligible insureds. Ex. J215; Todd, Tr. at 726–27. This occurred on April 20, 1988. In May, Dow and Great West entered into an agreement, entitled "Application for Insurance," which provided Dow, under certain conditions, temporary insurance covering approximately 4,000 employees while indi-

vidual policies for these employees were processed. However, the agreement provided that once processed, the policies would be effective from the "Common Due Date." Ex. J231 ("It is understood by the parties that each qualified employee will make an individual application for a life insurance policy ('Policy') for which Dow ... will be the beneficiary and have all rights of ownership.... All Policies will be issued with the same policy date, which will be the Common Due Date...."). The Application defined the Common Due Date as "the date this application is signed by both parties." Dow executed the Application on May 9, 1988, Great West executed it on May 10, 1988, and the policies defined the Common Due Date was May 9, 1988. J231.

The application required the payment of an "Advance Premium" in the amount of $2 million, which was "5% of the estimated annual premium" under the individual Great West policies. The application stated that "[u]pon issuance of a Policy as of the Common Due Date, the premiums under this application should be considered premiums under such Policy." Great West and Dow had agreed that the first premiums under the individual policies would be credited to cash value and earn inside build-up from the effective date of the policies. The first premiums under the Great West policies in fact were credited to cash value and earned inside build-up from the Common Due Date. J239; Todd, Tr. at 888–90. Great West and Dow also agreed by the date of the application that the first premiums under the individual policies would be financed by policy loans to the maximum extent permitted by the policies as of the Common Due Date. Falla, Tr. (1/8 p.m.) at 32–33; White, Tr. (1/10 p.m.) at 22–23.

The policies were actually issued on June 20, 1988. Todd, Tr. at 738–40; J259.

Dow paid the initial premiums due on May 9, 1988 using a combination of cash ($2 million) and a maximum loan. Todd, Tr. at 895–96; Ex. J312. On June 20, 1988 Great West delivered specimen policies to Dow. By October 12, Great West began to reconcile the consents it had received with the 4,393 policies' delivered to Dow in June. In November 1988, Great West discovered a clerical error made in connection with the specimen policies delivered to Dow in June 1988. As a result, Great West had to reprint the specimen policies to reflect the correct guarantee issue extras. Ex. J295; Todd, Tr. at 740–42.

For the MetLife plan, Dow applied for group life coverage on October 31, 1991. MetLife and Dow agreed by then that the first premium under the MetLife program would be credited to cash value and earn inside build-up from that date. The first premiums under the MetLife policies in fact were credited to cash value and earned inside build-up from October 30, 1991. Ex. J643; Ex. J683. MetLife and Dow also agreed that any group policy issued to Dow would cover up to approximately 18,000 employees, that the first-year premium would be financed with maximum policy borrowing, that the variable policy loan interest rate would be set in reference to Moody's Corporate Average, and that the coverage and loan would be effective from that date if a policy was ultimately issued. By October 30, 1991, the essential terms of the loan already had been specified. MetLife agreed to estimate the premium due and loan available by using Dow's initial census of the entire population eligible for insurance in October 1991. Exs. J555, J559, J565, J577; Ryan, Tr. at 1692–94, 1750; Burdett, Tr. at 1460; Lake, (1/16 a.m.) Tr. at 547, 505–06, 515. It appears that the second policy issued for union employees was issued separately solely as an administrative convenience because the total number of insureds came

within the original 18,000 contemplated by Dow and MetLife.

Because the administrative processing of the consents was not complete by October 30, 1991, Dow and MetLife determined that Dow should pay an estimated premium based on the number of estimated insureds and then would receive a premium adjustment for any employees who did not consent. J560; Ryan, Tr. at 1915, 1941. In a Memorandum of Record dated October 14, 1991, John Ryan of MetLife wrote that Dow decided 18,000 employees would be covered under a group plan with an effective date of October 31, 1991, even though the policy would be issued in December 1991. J564; Ryan, Tr. at 1689–90, 1698–99, 1826. When the final loan amounts were calculated, the initial premium payment dated October 30, 1991 was more than the amount necessary to cover the unfinanced premium. Burdett, Tr. at 1463; Ex. J637; Ex. J643.

The Court is satisfied that the plaintiff has established by a preponderance of the evidence that bilateral obligations were created between Dow and its respective insurers as of the application dates for both programs. Insurance was issued, premiums were paid by real loans, policy value was created, and inside build-up was credited against the cash value created by the premium payment. The loans taken to finance the premium payments from the application dates were thus real debt obligations on which interest was due and paid. The loans as they were outstanding between the application and issue dates in both programs were not factual shams.

### B. IRC Section 264 (4-of-7 Safe Harbor)

As noted earlier, in 1964 Congress limited the deductibility of interest on loans used to finance the purchase of life insurance. The controlling statute is 26 U.S.C. § 264, which states in part:

(a) No deduction shall be allowed for—

. . . .

(3) Except as provided in subsection (c), any amount paid or accrued on indebtedness incurred or continued to purchase or carry a life insurance . . . contract (other than a single premium contract or a contract treated as a single premium contract) pursuant to a plan of purchase which contemplates the systematic direct or indirect borrowing of part or all of the increases in the cash value of such contract (either from the insurer or otherwise).

. . . .

(c) Exceptions.—Subsection (a)(3) shall not apply to any amount paid or accrued by a person during a taxable year on indebtedness incurred or continued as part of a plan referred to in subsection (a)(3)—

(1) if no part of 4 of the annual premiums due during the 7–year period (beginning with the date the first premium on the contract to which such plan relates was paid) is paid under such plan by means of indebtedness. . . . For purposes of applying paragraph (1), if there is a substantial increase in the premiums on a contract, a new 7–year period described in such paragraph with respect to such contract shall commence on the date the first such increased premium is paid.

26 U.S.C. § 264 (1991).[7]

The plaintiff insists that the financing designs for the purchase of both its COLI plans complied with all the requirements

---

7. The 1998 amendments to this statute moved subsection (c) to subsection (d). *See* Pub.L. 105–206, § 6010(*o*)(1) (1998).

set forth in the exception to the general rule prohibiting deductions for interest on policy loans. In arguing against this contention, the government mounts an attack on several fronts. First, the government observes that for Section 264 to apply at all, the contract must be a "life insurance contract" as defined by the IRC. Under the IRC, "the term 'life insurance contract' means any contract which is a life insurance contract under the applicable [state] law," and which meets certain financial criteria. IRC § 7702(a). The government asserts that the Great West policies were not "life insurance contract[s]" under Michigan law [8] for two reasons: first, the Great West plan actually amounted to a group insurance contract issued at a time when Michigan law did not allow corporations to be the beneficiaries of employee group COLI plans; and second, at the time the Great West policies were issued, Dow did not have an insurable interest in the lives of all the employees as required by Michigan law. The government next argues that neither the Great West nor the MetLife plans satisfied the "4–of–7" rule because the partial withdrawals used to pay the premiums in years four through seven were shams, thereby violating the requirement implicit in Section 264(c) that the premiums in the first seven years be of equal amounts.

### 1. Whether the Policies Are "Insurance" Under State Law

#### a. Group v. Individual Policies

"Group insurance" is authorized by Section 4404 of the Michigan Insurance Code, which states:

> Group life insurance may be issued covering not less than 10 employees with or without medical examination, written under a policy issued to the employer or to the trustees of a fund established by the employer, the premium on which is to be paid by the employer, the employees, or by the employer and the employees jointly, and insuring only all of his or her employees, or all of any class or classes of employees determined by conditions pertaining to the employment, for amounts of insurance based upon some plan that will preclude individual selection, for the benefit of persons other than the employer. However, if the premium is to be paid by the employer and employee jointly and the benefits of the policy are offered to all eligible employees, not less than 75% of the employees may be so insured. This section

---

8. In its post-trial brief, the United States asserts for the first time that several of the employees covered under the Great West policies resided in Texas and Louisiana, and therefore the issue must be examined under the law of those states as well. The plaintiff objects to this argument as untimely. This issue was raised by the defendant as an affirmative defense to support a setoff if the Court were to order a refund. However, the amended answer phrases this affirmative defense in terms only of Michigan law. The Joint Final Pretrial Order similarly defines the issue in terms of Michigan law only. It is elementary that affirmative defenses that are not asserted timely are waived. *Scott v. Collins*, 286 F.3d 923, 927–28 (6th Cir.2002). In addition, the Joint Final Pretrial Order outlines the issues to be tried; issues not described therein and not otherwise litigated are not properly before the court. *Life Care Ctrs. of Amer., Inc. v. Charles Town Assoc. Ltd. P'ship*, 79 F.3d 496, 507–08 (6th Cir.1996). It appears that the parties did not engage in any discovery on this issue, except as it arises under Michigan law. Certainly, no proofs were offered at trial on the application of Louisiana's and Texas' group insurance and insurable interest requirements. The Court finds, therefore, that the issue was not raised in a timely fashion by the defendant, and therefore was waived, except as the question arises under Michigan law.

does not require an employee to purchase group life insurance.

Mich. Com. Laws § 500.4404. Although not a definitional section, the statute sets forth many of the attributes required of group insurance. The Great West policies in this case were issued on individual, not group, forms, and were approved as such by the state insurance bureau. Nonetheless, the government contends that this Court should recharacterize the policies as group insurance because they possess many of the traits commonly seen in group contracts, such as the absence of medical underwriting and individual selection, coverage of all employees in a "class," issuance of a single policy, socialization of insurance costs, an experience rating.

This argument is flawed because the policies issued by Great West did not possess all the features required of group insurance under Michigan law, and those attributes common to group policies could have been characteristics of individual policies as well. For instance, there was individual risk selection in the Great West plan since about a quarter of the employees covered underwent a medical review, adjustments in the benefit amount were made for age, and approximately thirty employees with a history of high-volume medical claims were excluded from coverage. Todd, Tr. at 727–31; Exs. J210, J255, J274, J251. Under the Great West program, there was no master policy or certificates issued to employees, although there was a specimen policy. The defendant points to the fact that individual policies were never delivered to the insured employees, but the employees were not the owners of the policies; Dow was. Great West viewed the plan as consisting of 4,051 individual policies and administered them as such, and the Michigan Insurance Bureau has never challenged that characterization. Dykhouse, Tr. at 2749. Finally, only management personnel who had at-

tained a certain level of responsibility within the company were eligible for coverage. Thus "all of [Dow's] employees" were not included in the plan as required by Mich. Com. Laws § 500.4404. Since the employees occupied positions in various locations having to do with different job responsibilities, they did not constitute a class within Dow's workforce "determined by conditions pertaining to the employment."

The Court does not find a proper basis to recharacterize the policies Dow purchased from Great West as group insurance. The Michigan statutory prohibition against an employer being an owner and a beneficiary of an employee group policy, which was in effect in 1988 when the Great West plan was purchased, does not affect the status of the policies as "life insurance" under state law.

### b. Insurable Interest

The question of insurable interest usually arises in disputes between the insurer and policyholder over the validity of an obligation to pay an insurance benefit. See Hicks' Estate v. Cary, 332 Mich. 606, 52 N.W.2d 351 (1952) (insurable interest rule may not be interposed by the deceased's widow to invalidate the right of a corporation to the proceeds of a life insurance policy owned by the corporation which formerly employed the deceased). The Court has not found a case which supports the general proposition advanced by the government here, which is whether a stranger to an insurance transaction can assail its validity under governing state law by claiming that the policyholder had no insurable interest in the insured life or property. However, the Michigan Supreme Court has held that a life insurance policy naming as a beneficiary one who has no insurable interest in the life of the insured was a wagering contract, contrary

to public policy and void. *See Mutual Benefit Ass'n v. Hoyt,* 46 Mich. 473, 9 N.W. 497 (1881). It appears, therefore, that the presence of an insurable interest is a necessary component of a life insurance contract valid under state law and, therefore, IRC § 7702(a) as well.

In 1990, Michigan enacted legislation establishing an employer's insurable interest in the lives of its management and non-management employees. *See* Mich. Comp. Laws § 500.2210 (1990). Before then, the public policy in this area was developed through judicial decisions. The plaintiff offered testimony from a former Michigan insurance commissioner as to his opinion of the public policy underlying the insurable interest rule. The Court does not find the testimony helpful, inasmuch as the question is principally a legal issue. *See Woods v. Lecureux,* 110 F.3d 1215, 1220 (6th Cir.1997) (holding that expert testimony on ultimate issue of law is not helpful to the fact finder and inadmissible under the rules of evidence) (citing *Berry v. City of Detroit,* 25 F.3d 1342, 1353–54 (6th Cir. 1994)). The government argues that in the business context, Michigan's insurable interest rules limit employers to insuring the lives of only their "key persons." The government points to an opinion dated November 23, 1987 from a Michigan Insurance Bureau employee that a "key man" is one upon whose continued life "the success of the business is dependent." J138. This opinion is no more helpful than the plaintiff's expert testimony, and its impact on the development of Michigan's common law in the area is nil.

Michigan case law does not equate the insurable interest of a business in its employees with the concept of "key man" status. In fact, the term is not used in any of the major Michigan cases discussing insurable interests in one's employees or fellow businesspersons, and appears only in a few cases which discuss ancillary issues that just happen to have arisen in the context of a so-called key-man insurance policy. *See, e.g., G.P. Enters., Inc. v. Jackson Nat. Life. Ins. Co.,* 202 Mich.App. 557, 509 N.W.2d 780 (1993) (informing agent orally of change in health when delivering policy did not comply with terms of application for key-man insurance); *All Amer. Life & Cas. Co. v. Oceanic Trade Alliance Council Int'l, Inc.,* 756 F.2d 474 (6th Cir.1985) (affirming verdict entered against insurer who refused to tender proceeds to key-man life insurance policy, alleging that insured was murdered by fellow stockholders and employees); *Johnson v. Primerica Life Ins. Co.,* 34 F.Supp.2d 562 (W.D.Mich.1998) (finding that insurer improperly permitted corporate officers lacking actual authority under Michigan law to alter the beneficiary on a key-man life insurance policy taken out by the company); *Secor v. Pioneer Foundry Co.,* 20 Mich.App. 30, 173 N.W.2d 780 (1969) (recognizing that one who possesses an insurable interest in a contract at the time of purchase can still collect on that contract after that insurable interest has terminated by separation from employment— "key man" contract was at issue).

 Rather, an "insurable interest" "is broadly defined as being present when the person has an interest in property, as to the existence of which the person will gain benefits, or as to the destruction of which the person will suffer loss." *Universal Underwriters Group v. Allstate Ins. Co.,* 246 Mich.App. 713, 726, 635 N.W.2d 52, 59 (2001) (citing *Crossman v. Amer. Ins. Co.,* 198 Mich. 304, 309, 164 N.W. 428 (1917)). Michigan has and continues to recognize the general principle that one obviously has an insurable interest in one's own health and well-being. *Id.* at 727, 635 N.W.2d at 59–60 (holding that buyer has insurable interest in vehicle entitling her

to personal injury protection benefits even if she was not its owner at the time of the accident); Dykhouse, Tr. at 2705. The common law on the existence *vel non* of an insurable interest in the health and well-being of *others,* however, has grown from the public policy prohibiting wagering on the lives of strangers, which dates back to English laws passed centuries ago. *See Crossman,* 198 Mich. at 308, 164 N.W. at 429 ("Policies of insurance founded upon mere hope and expectation and without some interest in the property, or the life insured, are objectionable as a species of gambling, and so have been called wagering policies. All species of gambling policies were expressly prohibited in England by St. 19 Geo. II, c. 37, and have been treated as illegal in this country upon the principles of that statute, without acknowledging it as authority.") The question since then is how far one can come to that line without passing over it. Two Supreme Court cases from the late nineteenth century have substantially influenced the law of several states in this area, including Michigan. In *Warnock v. Davis,* 104 U.S. 775, 26 L.Ed. 924 (1881), the executor of the deceased's estate sued members of a trust association who had taken out a policy of life insurance on the deceased and secured a waiver from the deceased for its proceeds. The Court recognized that the policy could validly have been assigned to the trust association as security for a debt, but found that it could not validly be assigned to the association for any other purpose because the association lacked an insurable interest in the deceased's life. *Id.* at 778–79, 26 L.Ed. 924. The Court recognized that pecuniary loss was one measure of an insurable interest, but emphasized that it was not the only factor to be considered:

It is not easy to define with precision what will in all cases constitute an insurable interest, so as to take the contract out of the class of wager policies. *It may be stated generally, however, to be such an interest,* arising from the relations of the party obtaining the insurance, either as creditor of or surety for the assured, or from the ties of blood or marriage to him, *as will justify a reasonable expectation of advantage or benefit from the continuance of his life.* It is not necessary that the expectation of advantage or benefit should be always capable of pecuniary estimation; for a parent has an insurable interest in the life of his child, and a child in the life of his parent, a husband in the life of his wife, and a wife in the life of her husband. The natural affection in cases of this kind is considered as more powerful—as operating more efficaciously—to protect the life of the insured than any other consideration. *But in all cases there must be a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit or advantage from the continuance of the life of the assured.* Otherwise the contract is a mere wager, by which the party taking the policy is directly interested in the early death of the assured. Such policies have a tendency to create a desire for the event. They are, therefore, independently of any statute on the subject, condemned, as being against public policy.

*Id.* at 779, 26 L.Ed. 924 (emphasis added).

Shortly after *Warnock,* the Court heard the case of *Connecticut Mutual Life Insurance Co. v. Luchs,* 108 U.S. 498, 2 S.Ct. 949, 27 L.Ed. 800 (1883). In that case, Luchs sued the defendant insurance company for the death benefit from a policy of life insurance he has purchased on the life of his partner, Dillenberg. The partnership they had formed required the contribution of both services and capital.

Because Dillenberg had failed to timely contribute his portion of the capital required, an insurance agent suggested a life insurance policy to cover the outstanding balance, which was subsequently procured. The insurance company claimed that Luchs lacked an insurable interest in the life of Dillenberg, but the Court rejected this argument, as "Dillenberg was his partner and had not paid his promised proportion of the capital of the concern." *Id.* at 505, 2 S.Ct. 949. Furthermore, the Court suggested that aside from the debt, Luchs had a pecuniary interest in the mere continuance of the partnership, which he expected to result in financial rewards. *Id.* at 506, 2 S.Ct. 949. Accordingly, the interest was valid, and the Court affirmed a lower-court ruling awarding the proceeds to the plaintiff.

Both Supreme Court cases were subsequently cited by the Michigan court in *Sun Life Assurance Co. of Canada v. Allen*, 270 Mich. 272, 259 N.W. 281 (1935). In that case, partners in the Hand Baking Company took out life insurance policies on each others' lives. After realizing that members of the partnership were dying off, the insurance company denied a claim upon a Mr. Cap, and sued in equity for rescission of the insurance contract. The Court found that Cap was never a true partner in the Hand Baking Company, but essentially an employee awarded a partnership only for the purpose of collecting life insurance. Consequently, its members had no insurable interest in his life. "The mere existence of a legal partnership does not establish an insurable interest," and it was "impossible to hold that the partnership could have suffered so substantial a loss upon the death of Cap as to prefer his continued services to the insurance money." *Id.* at 278, 279, 259 N.W. 281. Citing both of the aforementioned Supreme Court cases, the Michigan Court concluded that the required pecuniary interest in

Cap was lacking, and that the policy was void.

Taken by itself, *Sun Life* might suggest that Michigan courts would look only to the pecuniary effect of an insured's loss to determine an insurable interest. The United States Court of Appeals for the Sixth Circuit, however, did not read that case as limiting the definition set forth in *Warnock* and *Luchs* when it decided *Indemnity Ins. Co. of North America v. Dow*, 174 F.2d 168 (6th Cir.1949). In that case, the plaintiff Dow sought the proceeds of a life insurance policy he had taken out on Marsha Kruger, an airplane pilot with whom he had begun a joint venture to offer charter flights. Dow invested the money, and hired Kruger was to handle the operations. The insurance company denied payment, arguing that Dow lacked any insurable interest in his employee. Applying Michigan law, the Sixth Circuit rejected this argument. The Court noted that the *Sun Life* court had cited *Warnock* and *Luchs* with approval, and concluded that because the Michigan court did not explicitly reject the more generous definitions cited in those cases, Dow had a proper insurable interest:

> It was not necessary to prove that the death of the insured resulted in a substantial loss to the beneficiary in this case, that he would suffer therefrom 'a substantial pecuniary loss,' or that his insurable interest is established only when he shows pecuniary loss in fact, as contended here by appellant. It is sufficient that the beneficiary has a reasonable expectation of some benefit or advantage from the continuance of the life of the assured.

*Id.* at 170 (referencing *Warnock*, 104 U.S. at 779, 26 L.Ed. 924).

No Michigan case has constricted this definition, and, in fact, the Michigan

Court of Appeals has somewhat relaxed the standard when, in *Secor*, it held that a business could recover on a policy of life insurance on a former employee's life even after its insurable interest had disappeared. 20 Mich.App. at 35–37, 173 N.W.2d at 783–84. This Court concludes that the correct test for determining whether an employer has an insurable interest in its employees' lives is whether it "has a reasonable expectation of some benefit or advantage from the continuance of the life of the" employee. *Dow*, 174 F.2d at 170. The Court believes this test would be applied by the Michigan Supreme Court in determining the question under state law. *See Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 517 (6th Cir.2001) (holding that while the district court should consult "all available data" in predicting a likely holding of a state's highest court, decisions from that state's intermediate appellate courts must be followed unless the Court is convinced the state supreme court would rule differently).

■ In this case, Dow proved at trial that it actually reduced the number of proposed insureds in the Great West plan from approximately 20,000 employees because of concerns over the insurable interest rule. White, Tr.(1/10 p.m.) at 19, 46. The 4,051 that were insured in the 1988 program were all management personnel earning over $50,000 annually. Under its Hay Point system, Dow had determined that those employees who had merited 238 points were present and future leaders, became eligible for certain executive level benefits (such as stock options), and held positions of responsibility in various locations throughout the company. Moreover, all of the employees consented to coverage, which further vindicates the public policy designed to prevent wagering contracts on which the insurable interest rule is grounded. Dow has established by a pre-

ponderance of the evidence that it had a reasonable expectation of some benefit or advantage from the continued employment, and more importantly, the continued vitality, of those employees. The Court therefore rejects the government's contention that Dow did not have an insurable interest in these employees, and that the Great West contracts did not qualify as "life insurance" under state law for the purpose of IRC § 7702(a).

### 2. Payment of Premiums

■ The core requirement of the 4–of–7 Rule contained in IRC § 264(c)(1) is that policy loans cannot be used to finance premium payments for more than three of the first seven years of a policy. There is no express language in the statute that requires premiums in years four and later to be at least as much as the premiums in the earlier years. The government contends, however, that there is a requirement "implicit" in this section that the amount of the premiums in the first seven years be the same. Dow disagrees. This is a pivotal issue, since the Court has found that the partial withdrawals were factual shams, and that for tax purposes the only legitimate payment of the premiums in years four through seven consisted of the cash portion, which was about 10% of the nominal premium total. If Section 264(c)(1) includes a level premium requirement, neither of Dow's COLI plans complied with it.

The district court in *AEP* held that Section 264(c)(1) contained a level premium requirement, but only after the policyholder conceded the issue. *See AEP*, 136 F.Supp.2d at 783. The court in *CM Holdings* likewise reached this same conclusion, although the policyholder in that case did not contest it either. *CM Holdings*, 254 B.R. at 645–46. The court reasoned that although Congress failed to anticipate the circumstance of an insured financing large

premiums in the first three years and paying much smaller premiums in cash in the next four years, it specifically prohibited the opposite financing structure, and therefore must have intended to require level premiums in all seven years. *Ibid.* The court also cited Treasury Regulation 1.264–4(c)(1)(ii), which states that "if the stated annual premiums due on a contract vary in amount, borrowing in connection with any premium, the amount of which exceeds the amount of any other premium, on such contract may be considered borrowing to pay premiums for more than one year," 26 C.F.R. 1.264–4(c)(1)(ii), to support its conclusion. *CM Holdings,* 254 B.R. at 646.

I must respectfully disagree with these decisions, because I believe they contravene fundamental rules of statutory construction. There is little doubt that Congress did not anticipate a policy acquisition scheme in which premiums are frontloaded, as the court in *CM Holdings* observed. But the existence of a tax loophole left by Congress is not itself a justification for a judicial plug crafted from "implicit requirements." *See Cen–Tex, Inc.,* 377 F.2d at 690–92.

▉▉▉▉ To the contrary, I believe that the plain language of Section 264(c) counsels against reading a level premium requirement into it, when it already explicitly covers single premiums and increasing premiums, but omits any reference to *decreasing* premiums. When construing statutes, the court's "task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." *Negonsott v. Samuels,* 507 U.S. 99, 104, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993). Above all other principles, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there."

*Conn. Nat. Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). The language of Section 264 is plain and unambiguous. Section 264 generally prohibits the deduction of any interest paid on indebtedness incurred to carry life insurance, "[e]xcept as provided in subsection (c)." 26 U.S.C. § 264(a)(3) (1991). Subsection (c) contains four exceptions to the rule expressed in subsection (a)(3), only one of which applies to this case, subsection (c)(1). That section provides a safe harbor for such interest paid provided that "no part of 4 of the annual premiums due during the 7–year period ... is paid under such plan by means of indebtedness." 26 U.S.C. § 264(c)(1) (1991). At the end of subsection (c), this safe harbor is qualified by the proviso that any "substantial *increase* in the premiums on a contract" will trigger the beginning of a new seven-year period. 26 U.S.C. § 264(c) (1991) (emphasis added). In other words, taxpayers may not backload premiums. There is no equivalent provision forbidding the frontloading of premiums with decreasing amounts over the seven year period. Thus, the plain language of the statute does not prohibit such frontloading.

▉▉▉▉ This interpretation is also counseled by the statutory rule of construction that "the expression of one thing is to the exclusion of the other." *Nat'l Truck Equip. Ass'n. v. Nat'l Highway Traffic Safety Admin.,* 972 F.2d 669, 674 (6th Cir.1992). "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *TRW Inc. v. Andrews,* 534 U.S. 19, 28, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). For that reason, "[w]hen Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference ... is that Congress

considered the issue of exceptions and, in the end, limited the statute to the ones set forth." *United States v. Johnson,* 529 U.S. 53, 58, 120 S.Ct. 1114, 146 L.Ed.2d 39 (2000). *See generally Textron, Inc. v. Comm'r,* 117 T.C. 67, 75–76, 2001 WL 946539 (2001) (applying this rule to find that by incorporating constructive ownership in one subsection of a statute, but not another, Congress obviously intended the concept of "ownership" to be distinct in each section).

▮ No rule is absolute, however, and this maxim against implied exclusions can and must yield when "other circumstances evidencing congressional intent [ ] overcome[s] the[ ] force" of the canons of statutory construction. *Chickasaw Nation v. United States,* 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001) (noting that "specific canons" of statutory interpretation "are often countered by some maxim pointing in a different direction"). *See also United States v. Vonn,* 535 U.S. 55, 122 S.Ct. 1043, 1049–50, 152 L.Ed.2d 90 (2002). Furthermore, despite language in more recent cases to the contrary,[9] the Supreme Court has recognized that in very unique circumstances, particularly compelling legislative history can overcome the plain language of a statute. *See Harrison v. Northern Trust Co.,* 317 U.S. 476, 63 S.Ct. 361, 87 L.Ed. 407 (1943). In *Harrison,* the Court granted certiorari to a lower court decision awarding the plaintiffs substantial sums of money free of the estate tax. The court of appeals had affirmed a verdict for the plaintiffs, finding that Congress's use of the phrase "payable out of" was governed by a previous Supreme Court decision that preceded the statute in question. Finding, however,

that "words are inexact tools at best," the Court explained that "there is wisely no rule of law forbidding resort to explanatory legislative history no matter how clear the words may appear on superficial examination." *Id.* at 479, 63 S.Ct. 361 (citations omitted). Upon examining the legislative history, the Court found in the applicable House Report clear evidence that the statute was actually intended to *overrule* the case on which the lower court had relied. Finding this history to be "conclusive in favor of the Government's contention," the Supreme Court reversed the judgment of the lower court and remanded for further proceedings. *Id.* at 480, 63 S.Ct. 361.

There is no evidence here, however, much less evidence as compelling as that in *Harrison,* indicating that Congress intended to impose a level premium requirement on taxpayers seeking to use the four-of-seven safe harbor provision of Section 264(c)(1). The *CM Holdings* Court referenced a report indicating that Congress sought "to prevent avoidance of this provision by taking out a contract with very low premiums for the first 4 years, with the premiums being substantially greater thereafter." S.Rep. No. 830 (1964), *reprinted in* 1964 U.S.C.C.A.N. at 1751–52. *See CM Holdings,* 254 B.R. at 645. However, this passage does not suggest an intent to include a level premium requirement, nor does it furnish justification to judicially amend the statute.

▮ The Supreme Court has emphasized that judges must "ordinarily resist reading words or elements into a statute that do not appear on its face." *Bates v. United States,* 522 U.S. 23, 29, 118 S.Ct.

---

9. *See Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) ("When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete."); *see also Rat-*

zlaf v. United States, 510 U.S. 135, 147–48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (holding that the Court would "not resort to legislative history to cloud a statutory text that is clear").

285, 139 L.Ed.2d 215 (1997). "Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States,* 480 U.S. 522, 526, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (rejecting lower court finding that passage of mandatory reincarceration law for probation violators must have removed federal judges' authority to suspend those sentences). "Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement," *Badaracco v. Commissioner,* 464 U.S. 386, 398, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984), nor can they "draw on some unexpressed spirit outside the bounds of the normal meaning of words." *Addison v. Holly Hill Fruit Prods.,* 322 U.S. 607, 617, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944). *See also id.* ("Legislation introducing a new system is at best empirical, and not infrequently administration reveals gaps or inadequacies of one sort or another that may call for amendatory legislation. But it is no warrant for extending a statute that experience may disclose that it should have been made more comprehensive. The natural meaning of words cannot be displaced by reference to difficulties in administration.")

The authors of the 1964 tax bill could easily have contemplated that taxpayers would take advantage of the safe harbor through both rising *and* declining premium schedules. To assume otherwise gives too little credit to the congressional wit. *See Addison,* 322 U.S. at 618, 64 S.Ct. 1215 ("The idea which is now sought to be read into the grant by Congress to the Administrator to define 'the area of production' beyond the plain geographic implications of that phrase is not so complicated nor is English speech so poor that words were not easily available to express the idea or at least to suggest it."). Nor does the Treasure Regulation cited by the *CM Holdings* court (Treas.Reg.1.264–4(c)(1)(ii) imply a level premium requirement.) Rather, the passage *recognizes* that premiums need not be level—something that is only possible if subsection (c) does not prohibit declining premiums—and provides an independent check to ensure that debt borrowing for one year will not mask the figures in other years, which is a potential infirmity not raised by the government in this case. Even if the *CM Holdings* court is correct, and this treasury regulation somehow was intended to expand the statutory text in subsection (c), the regulation would be contrary to the plain language and intent of the statute. Unambiguous statutes leave the agency with no interpretive role to play. *See Barnhart,* 534 U.S. at 462, 122 S.Ct. 941 (declining to give effect to agency interpretation of statute whose text was unambiguous both in its plain language and through the statutory maxim of implied exclusion).

Neither the plain text nor principles of statutory interpretation support the proposition that 26 U.S.C. § 264(c)(1) contains an "implicit" level premium requirement. The legislative history cited by the *CM Holdings* court suggests no smoking gun like that in *Harrington,* where the committee report indicated a particular intent to overturn the case on which the lower courts has relied. I do not find patently "absurd" Congress's decision to permit declining premiums but bar those that substantially increase. Finally, to the extent that there is any "implicit" intent in the legislative history of this statute to bar declining premium plans, no court has the authority to rewrite a statute simply because, in that court's opinion, it could have been better written. Legislators speak through their statutes, not their committee

reports. *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 337, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994).

Thus, although the premiums Dow actually paid in years four through seven in each of the plans were substantially less than those paid by means of policy loans in the first three years, those declining premiums do not disqualify the plan from the safe harbor of 26 U.S.C. § 264(c).

### III. Conclusion

The Court finds that Dow has established by a preponderance of the evidence that both its Great West and MetLife COLI plans were imbued with economic substance. They had substantial effects on the beneficial interest of the taxpayer apart from the income tax deductions. The plaintiff has established by a preponderance of the evidence that the policy loans were real transactions consistent with commercial norms, and therefore were not factual shams. Nor was any phantom interest paid on any portion of the policy loans in the first year of either plan. However, since the unencumbered cash value in the policies at the beginning of the fourth through seventh years was zero, and there was nothing available to withdraw or to offset against the premium obligation, the partial withdrawals were not real and constituted shams in fact.

There is no basis for requiring the recharacterization of the Great West policies as group insurance. Furthermore, Dow had an insurable interest under Michigan law in the lives of all of the employees covered under that plan. The Great West plan satisfied the definition of "insurance" under state law for the purpose of IRC § 7702(a).

Finally, because IRC § 264(c) does not contain a level premium requirement, both of Dow's COLI plans complied with the statutory requirements despite the fact that the premium payments in years four through seven by means of partial withdrawals were deemed factual shams.

The Internal Revenue Service improperly disallowed Dow's deductions for interest and expenses claimed on Dow's 1989, 1990 and 1991 tax returns in connection with its corporate owned life insurance plans purchased from Great West and MetLife.

Accordingly, it is **ORDERED** that the plaintiffs' Motion to Strike Appeals Protests From Record at Trial [dkt # 61] is **GRANTED.**

It is further **ORDERED** that judgment will enter in favor of the plaintiffs in the amount of $22,209,570, plus interest.

### *JUDGMENT*

This matter came on for trial before the Court sitting without a jury. The Court has this day filed an opinion containing its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52, concluding that the plaintiff has sustained its burden of proof and is entitled to a judgment against the defendant.

Accordingly, it is **ORDERED AND ADJUDGED** that the plaintiff shall recover from the defendant the sum of $22,209,570, plus interest allowed by law, and costs of the action, to be taxed.